

Slip Copy    Page 1

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

(Cite as: Slip Copy)

**H**
Chan v. Sung Yue Tung Corp.
S.D.N.Y.,2007.

United States District Court,S.D. New York.
Heng CHAN, Shing Tao Au, Yan Bin Cao, Ai Yin Chen,
Wan Zhen Jiang, Fong Li, Jian Yun Lin, Wei Chao Tan,
Feng Qin Zeng Tang, Sum Kay Wong and Yong Cai
Zhang, Plaintiffs,
v.
SUNG YUE TUNG CORP. d/b/a 88 Palace, Kung Tak
Yeung, Gui Yang, Gong Gui Guan, Cheuk Hong Lau, and
Yeung Chao Lo, Defendants.
No. 03 Civ. 6048(GEL).

Feb. 1, 2007.

Mark S. Cheffo, Rachel B. Passaretti, and Mara Cusker
Gonzalez, New York, New York, and Raymond Brescia,
Urban Justice Center, New York, New York, for
plaintiffs.
Daniel Hochheiser and Michael Sande, Hochheiser &
Hochheiser LLP, New York, New York, for defendants.

OPINION AND ORDER
LYNCH, J.
*1 Plaintiffs, a group of eleven waiters, busboys, and
captains who worked at the a the 88 Palace Restaurant in
New York City's Chinatown, brought this case alleging
violations of federal and state labor laws by the restaurant
and its managers and owners. The parties tried the case
before the Court from November 27 to December 6, 2006.
This opinion sets forth the Court's findings of fact and
conclusions of law pursuant to Federal Rule of Civil
Procedure 52(a).

FINDINGS OF FACT

I. *The Parties*

A. Plaintiffs

1. Plaintiffs Heng Chan, Shing Tao Au, Yan Bin Cao, Ai
Yin Chen, Wan Zhen Jiang, Fong Li, Jian Yun Lin, Wei
Chao Tan, Feng Qin Zheng Tang, Sum Kay Wong, and
Yong Cai Zhang are eleven Chinese immigrants who are
current or former waiters, waitresses, buspersons, and
captains at a Chinese restaurant known as 88 Palace

Restaurant, located at 88 East Broadway, New York, New
York 10002 (the " restaurant" ). The restaurant is located
in a mall in Chinatown.

2. Plaintiffs bring this action against defendants Sun Yue
Tung Corp. d/b/a 88 Palace Restaurant, Gui Yang, Kung
Tak Yeung, Gong Gui Guan, Cheuk Hong Lau, and
Yeung Chao Lo with respect to acts or omissions
occurring after August 8, 2002. [FN1]

> FN1. Defendants Triple 8 Palace, Inc., Kwok
> Ming Chan, and Grace Chan were dismissed
> from the case by stipulation on November 28,
> 2006. Defendant Hang Li was also dismissed by
> stipulation on December 14, 2006.

3. Prior to August 8, 2002, the restaurant was known as
Triple 8 Palace. On August 8, 2002, the restaurant was
sold to defendant Sun Yue Tung Corp., a New York
corporation formed by some of the defendants. After the
sale, Sun Yue Tung Corp. opened for business as 88
Palace Restaurant.

4. At all relevant times, the restaurant has been a business
or enterprise engaged in interstate commerce with annual
gross sales over $500,000. The restaurant annually
purchases and receives goods valued in excess of $5,000
at its New York facility from points outside of New York.

5. Plaintiff Heng Chan was employed as a waiter by 88
Palace from on or about August 14, 2002 until December
31, 2002.

6. Plaintiff Shing Tao Au has been employed as a waiter
by 88 Palace from on or about August 14, 2002 through
the present.

7. Plaintiff Yan Bin Cao has been employed by 88 Palace
as a captain from on or about August 14, 2002 through the
present.

8. Plaintiff Ai Yin Chen was employed by 88 Palace as a
busboy from on or about August 14, 2002 through April
18, 2004.

9. Plaintiff Wan Zhen Jiang was employed by 88 Palace
as a busgirl from on or about August 14, 2002 through on
or about June 21, 2004, and again from on or about
December 18, 2004 through the present.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 2
Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507
(Cite as: Slip Copy)

10. Plaintiff Fong Li was employed by 88 Palace as a waiter from on or about August 14, 2002 through on or about May 28, 2004.

11. Plaintiff Jian Yun Lin has been employed by 88 Palace as a waiter from on or about August 14, 2002 through the present.

12. Plaintiff Wei Chao Tan has been employed by 88 Palace as a captain from on or about August 14, 2002 through the present.

13. Plaintiff Feng Qin Zheng Tang was employed by 88 Palace as a captain from on or about August 14, 2002 through February 23, 2006.

*2 14. Plaintiff Sum Kay Wong has been employed by 88 Palace as a captain from on or about August 14, 2002 through the present.

15. Plaintiff Yong Cai Zheng was employed by 88 Palace as a busboy from on or about August 14, 2002 until September 14, 2003.

B. Defendants and Managers of the Restaurant

16. Defendant Kung Tak Yeung assembled a group of investors to purchase Triple 8 Palace in August 2002. The investors included Yeung, Gui Yang, Yeung Chao Lo, and Gong Gui Guan. (P.Ex. 13.) The investors purchased the restaurant for $1.3 million, with each investor contributing a percentage of the purchase price that was commensurate with his ownership interest.

17. At all relevant times, Gui Yang has been 88 Palace's president and largest shareholder, with approximately five and one half shares. (P.Ex. 13 at 88-003696.) At all relevant times, Gui Yang has also been the head manager of the restaurant. His responsibilities have included hiring and firing employees, supervising operations in the dining room and kitchen, buying supplies, managing the payroll, and signing checks.

18. At all relevant times, Kung Tak Yeung has owned three and one-half shares of 88 Palace and been an officer of 88 Palace. At all relevant times, he has also been a manager at 88 Palace and has been in charge of public relations and employee relations at the restaurant. Kung Tak Yeung signs employee paychecks and other checks on behalf of 88 Palace, and can hire and fire employees.

19. At all relevant times, Yeung Chao Lo has owned three shares of 88 Palace and been an officer and manager of 88

Palace who has assisted Gui Yang in running the restaurant. Yeung Chao Lo signs checks on behalf of 88 Palace, and can hire and fire employees.

20. Cheuk Hong Lau served as the general manager at 88 Palace from the time it opened in August 2002 until October 2003. He had the authority to hire and fire employees, set schedules and tip shares, and generally assign work and supervise employees.

21. Gong Gui Guan owned three shares of 88 Palace from August 2002 until late 2004 or early 2005. (See Tr. 316.[FN2]) He also worked at the restaurant, where he raised and cared for live shrimp and prepared cooked shrimp. The evidence did not establish that Gong Gui Guan exercised managerial power. He wore the same uniform as a waiter, and as plaintiff Sum Kay Wong acknowledged, Gong Gui Guan did the same work with shrimp that plaintiff Yong Cai Zhang, a busboy, did with snails and clams. (Tr. 96.) Yong Cai Zhang, when asked how his job differed from Gong Gui Guan's, was unable to identify any specific differences. (Tr. 400.)

> FN2. Because of the order in which transcripts were ordered in this case, the page numbers in the transcript run consecutively throughout the trial, except for the transcript of the last day, December 6, which begins again at page 1. Accordingly, citations to the transcript will refer to the page number without indicating the date, except for the last day's transcript, which will be cited as " 12/6/06 Tr."

22. Gong Gui Guan may have had certain unique job responsibilities and a measure of discretion. It appears, for example, that Gong Gui Guan on some occasions was the person who physically took some of the money from the tip collection box to bring to the part-time workers to whom it was paid. (Tr. 162.) Also, various plaintiffs testified that he had more flexibility regarding the area where he worked and the ability to leave the restaurant to " run out to buy things" (Tr. 66), and plaintiff Sum Kay Wong testified that as the distributor of shrimp, " if [Gong Gui Guan was] in favor of certain customers, he would make a bigger scoop on that plate." (Tr. 65.)

*3 23. Plaintiffs claimed that Gong Gui Guan had the power to hire and fire employees; but there was little evidence of this. Plaintiff Wan Zhen Jiang claimed that Gong Gui Guan hired and supervised her (P.Ex. 19 ¶ 13), but when asked at trial to provide specific illustrations of what he did that constituted supervising her, she was able to provide no relevant examples. (Tr. 412.) In her

Slip Copy                                                                                                    Page 3

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507
**(Cite as: Slip Copy)**

deposition, Wan Zhen Jiang stated that Gong Gui Guan had asked her whether she had a valid employment authorization card (Wan Zhen Jiang Dep. 33-34), but even if true, this appears to have been a ministerial rather than a managerial function.

24. Although Gong Gui Guan may have had special responsibilities and a favored position among the employees, this does not amount to a supervisory role. It is not clear why Gong Gui Guan, if indeed he was a manager, would give himself a .8 tip share, the share received by waiters, rather than a 1.06 tip share, the share received by captains. Moreover, Gong Gui Guan participated in a meeting of waiters and captains to discuss possible actions against the restaurant to remedy perceived labor rights violations (Tr. 88, 294), which strongly suggests that he was not regarded as their employer. In light of all the evidence, the Court concludes that Gong Gui Guan was not a manager or supervisor.

25. The corporation indicated in filings with the New York State Department of State that Dai Hai Nan, a non-party who is presently general manager of the restaurant, owned one-half of one share in the restaurant. (P.Ex. 13 at 88-3706.) The evidence indicated, however, that although Dai Hai Nan originally wished to become an investor, he quickly discovered that he could not afford to do so, and the check he had written to the corporation was voided and returned to him uncashed. (P.Ex. 33 at 4.) The Court credits Dai Hai Nan's testimony that he was never an owner of the restaurant and that he did not have management responsibilities. Unlike many other witnesses, Dai Hai Nan's demeanor on the witness stand was never defensive, and there is no apparent reason why the other defendants would deny Dai Hai Nan's ownership interest while freely admitting Gong Gui Guan's.

26. Moreover, there was little evidence of Dai Hai Nan's involvement in management activities prior to his promotion to general manager in late 2004. As with Gong Gui Guan, the plaintiffs alleged that Dai Hai Nan had the power to hire and fire employees, but direct testimony concerning his activities pertained more to his role in processing hiring-related paperwork than to his role in decisions about who would work at the restaurant. Dai Hai Nan stopped participating in the tip pool when he was promoted to general manager. (Tr. 689.) Accordingly, the Court finds that Dai Hai Nan was not a manager or owner of the restaurant at any time during which he participated in the tip pool.

II. *Wage and Hour Practices at 88 Palace*

27. At all relevant times, plaintiffs have received income in two ways: through weekly paychecks, and through cash distributions of tips at the end of each night. While wages are calculated on an hourly basis, tips are not.

*4 28. At all relevant times, the restaurant has taken a tip credit to satisfy federal and state minimum wage requirements for waiters, busboys and captains when those employees worked banquet shifts. In other words, the restaurant pays its employees wages that are below minimum requirements and claims that it is entitled to do so because the employees receive tips. Employees are paid the same hourly or weekly wage, based on the maximum available tip credit, whether they work banquet or non-banquet shifts.

29. Waiters and busboys at 88 Palace, including plaintiffs, received wages of no more than $3.30 per hour from 2002 to 2004, no more than $3.85 per hour during 2005, and no more than $4.35 per hour during 2006.

30. Captains received no more than $3.70 per hour from 2002 to 2004, no more than $4.25 per hour in 2005, and no more than $4.75 per hour in 2006.

31. During the same time period, non-tipped employees at 88 Palace, such as dishwashers, were paid the federal minimum wage of $5.15 per hour.

32. Waiters, busboys and captains at 88 Palace not infrequently work a span of hours that exceeds 10 hours in a single day (including breaks). For example, on many days, waiters and captains start work at approximately 11:00 a.m. and finish work at approximately 11:00 or 11:30 p.m., with a half hour off for lunch and an employer-mandated two-hour afternoon break. 88 Palace has never compensated these employees for an additional hour of work on the days that their spread of hours has exceeded 10 hours.

33. At all relevant times, the total compensation received by all plaintiffs exceeded the amount they would have received if paid a flat hourly wage equal to the legally-required New York State minimum wage, including all overtime requirements.

III. *Tip-Sharing and Banquets at 88 Palace*

A. The Tip Pool

34. The restaurant has, at all times, operated a tip-pooling system through which tips left by customers are combined

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 4

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

(Cite as: Slip Copy)

and then redistributed among the waiters, busboys, captains, and the restaurant, according to a tip pool share formula determined by management. The management has also used money from the tip pool to pay a portion of the approximately $9.00 hourly rate paid to part-time employees. Employees who participate in the tip pool are assigned a number between 0 and 2 that determines their share of the tip pool; the higher the number, the greater the share.

35. The various plaintiffs received tip pool shares ranging from .055 to 1.06.

36. Defendant Gong Gui Guan has at all relevant times received a .8 share in the tip pool. Dai Hai Nan shared in the tip pool at 88 Palace from the time the restaurant opened in August 2002 until late 2004, when he became general manager.

   B. Banquets and the 15 Percent Additional Payment

37. Along with meals served to individual tables, the restaurant offers patrons the opportunity to pre-reserve large parties or banquets. These banquets are reserved and paid for by a host, rather than by the individual diners who attend the banquets.

*5 38. Aside from the cost of the food served at the banquet, banquet hosts pay an additional amount of 15 percent. This 15 percent payment is distributed on the following basis: first, a deduction is made to pay half the wages of the part-time workers who worked at the banquet. 25 percent of the remaining amount is kept by the restaurant, while 75 percent is added to the tip pool (which also contains the tips from non-banquet customers). Thus, at the end of each day, the tip pool includes (1) the amounts left as tips by non-banquet customers on their tables or in credit card payments, and (2) 75 percent of the additional amount paid by banquet customers, not including the portion of that additional amount used to pay part-time workers.

   C. The Additional Payment Functionally Replaces Tips

39. Unlike non-banquet customers, who leave money on the table or with their credit card charge as a tip for their servers, banquet customers at 88 Palace almost never leave any additional tip for those who have served them, other than the 15 percent additional payment discussed above. In other words, customers who would ordinarily leave tips for servers do not do so when they pay the 15 percent additional charge at issue.

40. Banquet hosts rarely decline to pay the 15 percent payment. Although certain plaintiffs did remember isolated instances on which hosts paid significantly less than 15 percent (Tr. 199, 219), they acknowledged that this had happened " maybe once or twice" in the entire period the restaurant was opened. (Tr. 57-59 (Wong Direct).) It is also rare for banquet hosts to include in their payment an additional amount beyond the 15 percent payment.

   D. The 15 Percent Payment Is Described To And
   Understood By Customers As Tips

41. The additional 15 percent payment is referred to by defendants and their employees by the Mandarin and Cantonese words used to refer to tips. (See, e.g., 12/6/06 Tr. 43.)

42. From the time that 88 Palace opened in August 2002 until January 2005, the banquet menus distributed to customers included Chinese characters meaning " 15% tips," indicating that an amount equivalent to 15% of the cost of the banquet would be added to each bill. (P. Exs.3, 4.) In January 2005, some time after the commencement of this litigation, the management changed the character in the menus to one that can be read as " service charge" or " tips." However, the 15 percent payment is collected and distributed in the same manner as before.

43. The defendants and other managers at 88 Palace have never informed banquet customers, on the banquet menu, banquet bill, or otherwise, that of the 15 percent additional tips or surcharge, only 75 percent would be provided to the waiters, busboys, and captains, and 25 percent would be retained by the restaurant.[FN3]

> FN3. During the course of the trial, it was suggested that the restaurant's menus may have been modified at some point to contain a notice regarding the restaurant's practice of retaining a portion of the 15% additional fee. In light of the fact that the first mention of modifications to the menu was during the trial, that no modified menus were provided to plaintiffs in the course of discovery or at any point prior to trial, and that counsel were unable to reach a stipulation as to when, if ever, such modified menus came into use, the Court ruled that evidence of such menus could not be offered at trial. (Tr. 568-78.)

44. Instead, the defendants and other managers have advised customers that the 15 percent added to the bill

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507
**(Cite as: Slip Copy)**

was for tips for the banquet servers. Numerous witnesses testified with varying degrees of specificity to having overheard managers so advising banquet hosts and customers. For example, Fen Qin Zeng Tang remembered specific occasions on which she personally translated such comments made by Cantonese-speaking managers to Fuzhou-speaking customers. (P.Ex. 8 ¶ 11 (Tang Aff.).)

**\*6 45.** The defendants' claim that customers were advised of the restaurant's practice of retaining a portion of the 15% payment was not persuasive; indeed, some of the restaurant's managers, testifying for the defense, carefully avoided making this claim. For example, Cheuk Hong Lau testified that he had not discussed the subject with customers (12/6/06 Tr. 17), and Hang Li, the supervisor generally responsible for working with banquet hosts to plan their events, testified that it was not his practice to inform customers that the restaurant would retain a portion of the 15% payment. (*Id* . at 23, 32.) In fact, Hang Li testified that he had never advised customers that the restaurant would retain a portion of the additional payment. (12/6/06 Tr. 37.)

46. Defendant's witness Dai Hai Nan, general manager of the restaurant, testified that he had said to banquet hosts that the 15 percent amount added to the banquet bill was a tip to be paid to the servers. (Tr. 690.) The Court credits Dai Hai Nan's testimony. As noted above, his responses in general were not defensive or evasive; in fact, when counsel informed the Court that direct examination was complete, he protested, " But I have lots of stories to tell." (*Id.*) Moreover, Dai Hai Nan had no incentive to fabricate an answer that would disadvantage his employer. His testimony therefore supports the Court's conclusion that employees and customers of the restaurant generally understood the 15% additional payment to have been tips.

47. According to Wendy Soo Hoo, the restaurant's bookkeeper, the 15% additional payment was not separately billed to the customer. Instead, she calculated the total banquet receipts after the banquets, subtracted 25% from the 15% additional payment, and then distributed the rest to the servers. (Wendy Soo Hoo Dep. 29, 31-32.) The bill presented to banquet hosts did not separately identify the 15 percent charge. (Tr. 56 (Wong Direct).) The receipt given to the host at banquets makes no mention of the 15% payment. (Wendy Soo Hoo Dep. 35.)

48. Gui Yang claimed that the restaurant routinely provided a bill of some kind to banquet hosts after their meal on which food charges and the 15% additional payment were separately tabulated. (Tr. 602-604, 637.) If

true, this might to some extent support defendants' claim that the 15% charge was a mandatory additional fee, distinguishable from the tips that are traditionally left by customers in addition to the amounts billed to them by a restaurant. Gui Yang's testimony on this question was not credible, however, because the bills Gui Yang described were not produced in discovery or at trial. Gui Yang's testimony that the bills were not retained because they were not needed is inconsistent with the restaurant's general practices, as evidenced by the fact that the restaurant retained and produced at trial copies of almost every conceivable document exchanged in the course of transactions between customers and servers at the restaurant, including menus containing dim sum orders (Tr. 602) and cash register print-outs totaling the payments received from each banquet. (P.Ex. 32.) The restaurant even saved meal bills for lunches,[FN4] which makes it difficult to imagine why bills for banquets-which served a similar function, but involved much larger sums of money-would not have been retained.

> FN4. These documents were not given exhibit numbers, but were admitted into evidence in large boxes that once contained Heineken beer.

**\*7 49.** Moreover, it appeared from the sample banquet receipt introduced by plaintiffs that the bookkeeper had for that particular receipt calculated the amount of the 15% additional fee by adding the total amounts received from two banquets. (P.Ex. 32.) If there had been bills to the customers showing the 15% payment, as Gui Yang testified, it would have been logical and easier for the bookkeeper simply to copy the 15% figures from those bills, not to make a calculation herself based on the total of the two unenhanced bills. Thus, the Court concludes that no separate bill showing the 15% payment existed.

E. How the Additional Payment Is Treated for Accounting and Tax Purposes

50. The restaurant's payroll register has classified the money collected at banquets and distributed to employees as " tips." (*See* 2002-2004 Payroll Records.) Similarly, internal financial records from the restaurant labeled the money collected at banquets and distributed by 88 Palace as " tips." (P.Ex. 23, at MIU 88 Palace 00358.) Louis Miu, the restaurant's accountant and designated corporate witness, repeatedly and unambiguously characterized the waiters' share of the 15% payment as tips, describing it as " not a wage.... That [payment] becomes gratuity going to the employees" (Tr. 496), and stating that " of the 15 percent service charge that [the restaurant] received, 75 percent was paid over to the employees as tips." (*Id.* at

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

(Cite as: Slip Copy)

514.) When the restaurant computed overtime payments due to the servers, the servers' percentage of the 15% fee was not included. (Tr. 509.)

51. Defendant Gui Yang stated that internal documents used the terms " tips" and " service charge" interchangeably, " due only to confusion on my part, or on the part of other persons, regarding the distinction" between the two, and that " [i]n [his] mind, the word ' tips' serves as a kind of shorthand for ' service charge." ' (Gui Yang Aff. ¶ 7.) This highlights the fact that there was no meaningful distinction between tips and the money defendants argue is a service charge; the restaurant managers did not see a meaningful distinction between " tips" and the money collected at banquets.

52. Once the 75 percent of the additional banquet payment was added to the tip pool, it was distributed in exactly the same manner as tips. It was not distributed on a per hour basis, as wages were. Nor was the employees' share of the 15 percent payment treated as wages for the purposes of overtime calculation.

53. The defendants have never included the amount of the banquet payments that they distribute to the waiters, busboys and captains through the restaurant's tip pool on the employees' W-2 forms as wages, nor deducted federal, state, city, FICA, or disability taxes from that amount. By contrast, at all relevant times, the defendants have deducted federal, state, city, FICA and disability taxes from the waiters', busboys', and captains' hourly wage payments.

54. Louis Miu testified that in tax filings prepared by the restaurant, the money from banquets that was distributed to the waiters, busboys and captains was included in the same category as tips left on the table, rather than in the category for wages. (Tr. 471-73, discussing P.Ex. 22 at 88-000034 (Feng Qin Zheng Tang W-2 form).) Plaintiffs have been required to declare and pay taxes on the amount they receive from the 15 percent banquet payment in the same manner they do with other tips they receive from the tip pool. (Id.)

*8 55. The defendants have never included the amount of the banquet payments that they distribute to the waiters, busboys and captains in their records of the restaurant's gross receipts. The defendants have never deposited that amount into a bank account controlled by the restaurant nor paid any sales tax on that amount. Indeed, software customized by Louis Miu classifies the money collected at banquets and distributed by the restaurant to employees as " 75% Tips Paid Out," and shows that those payments

were not included in 88 Palace's total sales. (P.Ex. 23.)

56. The defendants have not reported the additional amount provided by banquet customers as gross sales in documents filed with the city, state, and federal governments. The additional amount left by banquet customers at 88 Palace during the 2002 tax period totaled approximately $417,000. If the additional amount left by each banquet customer was usually 15% of the banquet bill, 88 Palace's gross receipts for banquets alone during the 2002 tax period should have been approximately $2.780 million. The defendants reported only $1.547 million in gross receipts on 88 Palace's 2002 corporate tax return. Therefore, the defendants failed to report at least $1 million in gross receipts in 2002. The defendants' receipts were similarly underreported for 2003.

57. However, relatively little weight will be given to the underreporting as a factor in assessing how 88 Palace treated the banquet charges, because the underreporting of gross receipts for tax purposes was in general so extensive and pervasive that the failure to report this particular charge cannot clearly be attributed to any specific choice by 88 Palace as to how particular items should be characterized.

IV. *Notice and Posting of Minimum Wage and Tip Credit Laws at 88 Palace*

58. Plaintiffs claimed that the restaurant did not post a sign informing employees of federal minimum wage laws or tip credit laws until January 2004, and that no sign informing employees of New York minimum wage or tip credit laws was posted until January 2006. There was testimony from some of the defendants that signs had been posted prior to those dates (Gui Yang Dep. 107), and although it is difficult to see why new signs would be posted if old signs were already in place, the evidence did not support a clear finding as to the periods of time in which signs were posted.

59. Regardless of when the signs were posted, however, it is clear that they were in English, not Chinese, a language which is not understood well by any of the plaintiffs. Moreover, the managers at the restaurant appear to have made no effort to explain or otherwise inform employees of the federal or state minimum wage or tip credit laws. Thus, the Court finds that the employees of the restaurant were not given effective notice of these laws.

V. *Uniforms*

60. The defendants have required waiters and busboys to

Slip Copy                                                                                    Page 7

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507
(Cite as: Slip Copy)

wear a uniform consisting of a green jacket or vest, white shirt, tie, black pants, and black shoes, and captains to wear a uniform consisting of a black suit, white shirt, tie, and black shoes.

*9 61. With the exception of the waiters' and busboys' jackets and vests, the defendants have not provided employees with any of the items of their uniforms, nor reimbursed them for the cost of their uniforms.

62. From the opening of the restaurant until March 2004, the defendants did not pay or reimburse employees for the laundering of their uniforms. Although the restaurant began to provide laundry service for waiters' and busboys' jackets and vests and captains' suits in March 2004, plaintiffs continue to clean or pay for the cleaning of all of the other items of their uniforms.

63. Defendants contend that a washing machine was available at the restaurant for the use of the plaintiffs, free of charge. Various plaintiffs testified that they had been unable to use the machine for their laundry. (See, e.g., Tr. 73 (Sum Kay Wong Direct).) Even if the machine was in theory available, the defendants offered no evidence that any of the plaintiffs ever used this machine, or were told of its existence.

### VI. Recordkeeping at 88 Palace

64. The defendants and employees of 88 Palace were not instructed to preserve documents that were or could be potentially relevant to this litigation.

65. As Magistrate Judge Francis set out in detail in his opinion and order on plaintiffs' motion for sanctions based on spoliation, Heng Chan v. Triple 8 Palace, Inc., No. 03 Civ. 6048, 2005 WL 1925579 (S.D.N.Y. Aug. 11, 2005) (" Heng Chan II" ), the defendants engaged in systematic destruction of several categories of relevant business records, including banquet and tip records, during the pendency of this litigation. Defendants have not appealed that decision.

66. In particular, the defendants discarded banquet receipts dating from the opening of the restaurant in August 2002 through the end of 2003. The receipts showed, for each banquet: the size of the banquet, the income from the banquet, written terms and representations to customers, and the tip percentage collected.

67. The defendants maintained a " money received book" in which gross lunch (or dim sum) sales were recorded

each day. At the end of each month, Gui Yang or Yeung Chao Lo ripped out of the money received book the pages for that month and discarded those pages.

68. The defendants also destroyed daily records, known as " tip distribution sheets," which showed: (1) how much each tipped employee received in tips, including amounts paid from the additional amount left by banquet customers; (2) the amount retained by 88 Palace from the additional amount left by banquet customers; (3) the names of the employees who worked the banquets; and (4) the number of banquets. As defendants admitted, and Magistrate Judge Francis found, the defendants regularly discarded or otherwise failed to retain these tip distribution sheets during the pendency of this litigation.

69. Although the evidence supports plaintiffs' position even without an adverse inference, the defendants' destruction of documents warrants, as a matter of logic as well as of a sanction for spoliation of evidence, an inference that the missing documents would support plaintiffs' position.

### VII. Credibility Determinations

*10 70. Numerous plaintiffs who testified were impeached in a variety of ways. Several acknowledged having violated tax or immigration laws, or were shown to have done so. The Court gives such information little weight; while such conduct is improper, in the context of this case the Court does not find it to be indicative of general dishonesty. More significantly, certain witnesses were shown to have testified inconsistently in matters of detail during depositions, and one or two witnesses appeared defensive or inappropriately combative on cross examination. In general, the Court attributes these weaknesses to language difficulties or unfamiliarity with court procedures on the part of witnesses of foreign birth, and of limited education and experience, testifying against their employers or former employers. For the most part, without endorsing every detail of every witness's testimony, the Court finds the plaintiffs' testimony credible, and impressive in its cumulative effect.[FN5]

> FN5. Defendants attempted to suggest that it is not credible that certain plaintiffs would be permitted to overhear or translate comments to banquet customers inconsistent with defendants' positions in this lawsuit after the lawsuit was filed. This argument fails to take account of the practical necessities of running a restaurant, which presumably take precedence over litigation-related strategy. For example, if a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 8

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

**(Cite as: Slip Copy)**

banquet host during a conversation translated by one of the plaintiffs asked a manager what became of the fifteen percent additional payment, it would be extremely awkward-and would look highly suspicious-to ask the plaintiff to find a substitute translator.

71. Credibility determination in this case was particularly difficult. Nearly all of the witnesses testified in one or another of three Chinese languages: Mandarin, Cantonese, and Fuzhou. Thus, the factfinder lacked direct access to the sort of linguistic cues or nuances of expression that can provide evidence of honesty or evasion. Many of the witnesses on both sides resorted to claims of misunderstanding, mistranslation of prior, apparently inconsistent deposition testimony, or their own failure to understand a question. Moreover, many witnesses' answers were non-responsive or defensive. On a cold reading of the transcript, the dialogue often suggests defensive evasiveness, but the degree to which the testimony should be attributed to translation problems, cultural differences, lack of familiarity with court procedures, or poor preparation of difficult witnesses by counsel is difficult to determine.

72. Finally, because the witnesses are immigrants living within a relatively insular community, often lacking English skills after many years in the country, it is hard to be confident that testimony professing ignorance of basic legal or business matters that might appear incredible to one steeped in the culture is in fact untrue. The Court's overall impression in the end was that many witnesses in the case shared a constitutional aversion to sharing information about themselves, even where it was apparently in their interest to do so.

73. Despite the general difficulty of making credibility determinations, there were certain witnesses whose credibility could be fairly assessed with confidence. In particular, defendant Gui Yang's answers in general were so evasive, and his demeanor so suggestive of untruthfulness-frequently giving the impression that he was embarrassed by his own claims-that there was no possibility of cultural misunderstanding. In addition, the substance of Gui Yang's testimony was in places patently implausible, such as the assertion discussed in paragraphs 48 and 49 above that the restaurant retained almost every conceivable document pertaining to meals served, but inexplicably disposed of banquet bills that itemized the 15% banquet payments.

*11 74. On occasion, Gui Yang's reluctance to be forthright was to some extent understandable, as for example when he sat in awkward silence when asked about his involvement in a general practice of tax evasion. In at least one instance, however, he was caught in an outright and material misstatement of fact. One of the exhibits received in evidence was a document prepared at the restaurant listing the total amount of the 15% additional payments received at banquets during 2002, 2003 and 2004. (P.Ex. 12.) Each of the three pages of this document bore the heading "Tips," which at some point had been crossed out and the phrase "Service Charge" written in its place. When this exhibit was offered, defense counsel explained that he had made the alterations himself on the original document in the course of trial preparation, mistakenly thinking he was taking notes on a copy rather than the original.[FN6] (Tr. 306-09.) Gui Yang, however, claimed that he himself had instructed the restaurant's bookkeeper to make the alterations, and that he had handed the document to defense counsel with those changes made. (Tr. 588-90.)

> FN6. It should be emphasized that defense counsel did nothing untoward in altering the document; it appears that counsel was merely taking notes for purposes of trial preparation, and no suggestion was made otherwise at the trial.

75. If true, Gui Yang's claim that he had been responsible for the alteration in the document would have been significant evidence that some meaningful distinction between the two concepts had been made at the restaurant. Thus, his false testimony was directly relevant to a central issue in the case: whether the defendants themselves considered the 15% payment to be tips or a service charge. Beyond this particular untruth, Gui Yang's demeanor and general reticence made him a particularly incredible witness. Because he was a key witness for the defendants, holding more shares and having more managerial responsibility than any other owner, his lack of credibility weighed heavily in the Court's consideration of factual questions as to which credibility was relevant.

*VIII. The Investigation By The Department of Labor*

76. It should be noted that the defendants at various points during the trial relied upon a document pertaining to an investigation of the restaurant by the United States Department of Labor. (Tr. 494-95 (Louis Miu Direct), 536-37 (Louis Miu Cross).) The document is a "Summary of Unpaid Wages" and cover letter dated June 8, 2004, which reflects the Department's findings that the restaurant had violated federal labor law by failing to pay overtime to certain employees. (D.Ex. J.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 9

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507
(Cite as: Slip Copy)

74. The document does not, as the defendants appeared to believe, vindicate the restaurant of any other labor violations; in addressing the overtime issue, it does not discuss any other possible violations or indicate that investigations on any other subject were conducted. While it may be inferred that the investigation touched on other matters and that the investigator did not find violations, this is of little significance, because nothing in the report suggests that the investigator had access to all the evidence introduced at trial. Accordingly, the document's lack of reference to other matters is no reason to disregard the evidence that emerged at trial, which was in most respects unambiguous.

CONCLUSIONS OF LAW

I. *The Defendants, With the Exception of Gong Gui Guan, Are Employers Subject to the Requirements of the Fair Labor Standards Act and New York Labor Law*

*12 1. The defendants, with the exception of Gong Gui Guan, are subject to the requirements of the Fair Labor Standards Act (" FLSA" ) and New York labor law because they were or are plaintiffs' " employers" at the restaurant, a business enterprise engaged in commerce with annual gross sales of over $500,000. *See* 29 U.S.C. § 206(a); *see also id.* §§ 203(r)(1) & (s)(1).

2. The FLSA defines " employer" broadly as " any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Supreme Court has emphasized the " expansiveness" of this definition. *Falk v. Brennan,* 414 U .S. 190, 195 (1973); *see Herman v. RSR Sec. Sves. Ltd.,* 172 F .3d 132, 139 (2d Cir.1999). New York labor law also defines the term broadly. *See* N.Y. Lab. Law §§ 2(6), 651(6); 190(3).

3. When determining whether a given person is an " employer" for purposes of FLSA, " the overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the ' economic reality' presented by the facts of each case." *Herman,* 172 F.3d at 139, quoting *Goldberg v. Whitaker House Coop.,* 366 U.S. 28, 33 (1961). Under the " economic reality" test, courts consider factors including " whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter v. Dutchess Cnty. Coll .,* 735 F.2d 8, 12 (2d Cir.1984) (internal citations and quotations omitted). No one factor is

dispositive. *Herman,* 172 F.3d at 139. " Instead, the ' economic reality' test encompasses the totality of circumstances, no one of which is exclusive." *Id.* Employer status " does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees. Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA." *Id.*

4. " New York law adopts a similarly broad definition of " employer" in the context of its minimum wage and overtime laws." *Moon v. Kwon,* 248 F.Supp.2d 201, 236 (S.D.N.Y.2002).

5. Defendants Gui Yang and Yeung Chao Lo are employers of plaintiffs. They have been owners, officers, and/or managers of the restaurant at all times relevant to this action, and have had the power to hire and fire plaintiffs, control the conditions of their employment, and determine the rate and methods of their payment. " The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation." *Donovan v. Agnew,* 712 F.2d 1509, 1511 (1st Cir.1983). The evidence at trial showed, and defendants did not introduce evidence contesting, that Gui Yang and Yeung Chao Lo were shareholders and boardmembers of 88 Palace and who exercised control over the operations of the restaurant and its employees. Therefore, Gui Yang and Yeung Chao Lo, as well as the corporation itself, are employers of the plaintiffs.

*13 6. Defendant Kung Tak Yeung is also an employer of plaintiffs. Kung Tak Yeung asserted that he did not " manage the restaurant" and that he did not " set salaries, hire or fire workers, set schedules, take reservations, distribute tips, or participate in other management activities." (Kung Tak Yeung Aff., D. Ex. G ¶ 8.) However, he acknowledged that he was a member of the board, that he was in charge of public relations for the restaurant, a responsibility that involved outreach in Chinatown to generate business for the restaurant. (*Id.*) Kung Tak Yeung also acknowledged involvement in the affairs of the restaurant, including " receive[ing] and review[ing] written complaints from customers and workers" (*id.*), signing tax returns on behalf of the corporation (Tr. 431), and maintaining an office at the restaurant. (Tr. 425.) Moreover, defendant Yeung Chao Lo testified that Kung Tak Yeung had interviewed him for the job of general manager, after which he was immediately hired. (12/6/06 Tr. 9.) Considering the totality of the circumstances, this evidence is sufficient to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

**(Cite as: Slip Copy)**

establish that Kung Tak Yeung, like the other two board members, exercised operational control over the restaurant.

7. Defendant Cheuk Hong Lau, a manager at 88 Palace, was also an employer of plaintiffs for the period between August 2002 and October 2003 when he worked for the restaurant. The evidence established, and defendants did not contest, that Cheuk Hong Lau had the authority to hire and fire captains, waiters and busboys (Cheuk Hong Lau Aff., D. Ex. M ¶ 2, Tr. 627), and that he handled shift assignments. (12/6/06 Tr. 5.)

8. Defendant Gong Gui Guan, however, is not an employer of plaintiffs, because the evidence did not establish that he had operational control. Gong Gui Guan was a minority shareholder in the restaurant from from August 2002 until late 2004 or early 2005, but the totality of the circumstances suggest that his investment did not carry with it managerial responsibility. His primary responsibility at the restaurant involves working at a cart where he tends and prepares shrimp. Various plaintiffs testified that Gong Gui Guan had the power to hire and fire employees, but the Court found Gong Gui Guan's denials of the power to hire and fire employees persuasive. Few concrete examples of Gong Gui Guan's exercise of managerial power were given. Although the plaintiffs suggested that Gong Gui Guan was responsible for taking money from the tip box to pay the part-timers, there was no testimony establishing that this was because he was in any way responsible for allocating the part-timers' pay, as opposed to merely handing out payments in the way a low-level human resources employee might.

9. On the other hand, there was strong evidence suggesting that Gong Gui Guan was not a manager in any meaningful sense. Another employee, Yong Cai Zhang, works at a station similar to Gong Gui Guan's (Yong Cai Zhang's station prepares snails and clams, rather than shrimp), and Yong Cai Zhang is a plaintiff and undisputedly an employee. Gong Gui Guan received only a .8 tip share, lower than the captains; it would be odd for an employee who outranked a captain to be assigned a lower tip share than a captain received. The evidence also suggested that Gong Gui Guan had accompanied several of the plaintiffs to a meeting to consider action against their employers, which strongly suggests that they did not regard him as their employer.

*14 10. The plaintiffs seemed to base their claim that Gong Gui Guan was an employer primarily on their understanding that Gong Gui Guan was able to move freely around the restaurant, whereas other employees

were assigned to particular areas. This may be evidence of favored status, but is not evidence of managerial responsibility. Although the Court believes that Gong Gui Guan likely knew more about the affairs of the corporation than he conceded in his testimony, he appears to have been a silent investor with no real managerial responsibility. Accordingly, the Court finds that Gong Gui Guan was not an employer of the plaintiffs.

11. Because the Court finds that Gong Gui Guan was not a manager of 88 Palace, he is not an employer of the plaintiffs under the standards discussed below. In the interests of convenience, these conclusions of law will at times refer to the " defendants" collectively, but in each such instance it should be understood that Gong Gui Guan is not referenced thereby.

## II. *The 15% Additional Payments Collected From Banquet Customers Are Tips*

12. A " tip" for purposes of the FLSA is " a sum presented by a customer as a gift or gratuity in recognition of some service performed for him." 29 C.F.R. § 531.52. By contrast, a " service charge" is a mandatory charge imposed by an employer on a customer that is the property of the employer, not the employees, and becomes part of the employer's gross receipts. 29 C.F.R. § 531.55. Although the messy realities of the restaurant's operation do not fit neatly into the simple binary conceptual structure of the regulations, the overwhelming weight of the evidence establishes that, at all relevant times, the additional amount paid by banquet customers was a tip.

13. The evidence indicates that, at all relevant times, the 15 percent additional payment referenced on the restaurant's menus and added to banquet invoices has been presented to and understood by banquet customers as an amount that would substitute for the customary gratuity left by customers for the employees servicing the banquets. Fifteen percent is the standard and customary tip amount throughout the United States, and banquet customers, unlike non-banquet customers at the restaurant, did not leave any additional money on the tables for banquet servers. Although customers left more or less than the 15% payment only on rare occasions, they understood the payment to be a tip for the employees.

14. The Mandarin and Cantonese words used by restaurant managers in describing the charge to customers (and to each other) are best translated as " tips." There is no evidence that customers were advised that any portion of the 15 percent additional payment would be retained by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 11

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

(Cite as: Slip Copy)

the restaurant. The evidence established that customers had not been told that a portion of the 15 percent payment would be retained by the restaurant; nor did the menus disclose this fact. In fact, the bills given to the customer did not separately itemize the 15% payment.

**\*15** 15. Dai Hai Nan, a manager at the restaurant and a non-party to this litigation, testified that he had told customers that the 15% payment would be provided to the employees as tips. This testimony, elicited by defense counsel, was eminently credible; Dai Han Nan had nothing to gain by alienating his employers and fellow managers by giving this testimony. Another manager, Hang Li, who was at the time a defendant in the case, testified that he had never told customers that a portion of the additional payment was retained by the restaurant.

16. The defendants' wage and accounting practices treated the portion of the banquet monies they paid to plaintiffs and other employees in the same way they treated tips from non-banquet customers. The evidence establishes that defendants always combined the portion of banquet monies that they provided to plaintiffs with any non-banquet tips collected that day and distributed the pooled amount pursuant to the tip share formula. Defendants deducted federal, state, local, FICA and disability taxes from the plaintiffs' wages. They did not, however, deduct these taxes from tips distributed to plaintiffs, nor from the amount paid to plaintiffs from the banquet monies.

17. Defendants required plaintiffs to declare and pay taxes on the amount they received from banquets in the same manner as with all other tips they received from the tip pool. Although management required the employees to sign documents falsely understating the amounts of tip income received, the amounts nevertheless necessarily included a portion of the tips received from banquets. Defendants did not include the portion of the banquet monies they provided to plaintiffs and other employees in the restaurant's gross receipts or pay sales tax on that amount.

18. If the additional amount added to the banquet bill and paid by customers was a service charge, the full amount should have been included in the defendants' gross receipts, and any portion paid to plaintiffs should have been paid as wages and reported as such on plaintiffs' W-2 forms. See *Reich v. Priba Corp.,* 890 F.Supp. 586, 595 (N.D.Tex.1995) (" The fact that all of the table dance fees are not reported as gross receipts is fatal to Cabaret Royale's claim that the tips are more properly classified as wages." ). Similarly, if the banquet monies had been paid to plaintiffs as wages, defendants would have deducted

FICA and taxes from that amount, as they have always done with the base wages they pay plaintiffs by check. Although the defendants may have violated federal and state tax laws in multiple ways, their failure to pay taxes on the banquet monies they distributed to plaintiffs and other employees does not appear to have been solely a function of their generalized failure to comply with their tax reporting obligations. Rather, the testimony of the restaurant's accountant, Louis Miu, and the defendants themselves indicates that they consciously and intentionally treated the banquet monies they paid to plaintiffs as tips.

**\*16** 19. Common sense suggests, moreover, that customers would assume that the 15 percent amount referenced on the banquet bill was a tip. The Chinese term used for most of the relevant period was a standard term for " tip." The amount was the regular and customary restaurant tip amount. Any restaurant customer would expect to provide a tip to the servers, absent such a charge, and would naturally assume that the charge on the menu was a substitute for a direct payment of tips by the customer to the wait staff. It is entirely credible, as testified to by certain plaintiffs, that some customers would seek to verify with management their understanding that the 15 percent charge added to their bill would in fact be distributed to the waiters, to " take care" of the customer's customary tip obligations. Some customers would inquire into the distribution of the payment because it is generally considered rude to leave less than a 15 percent gratuity unless there is some specific reason to do so; customers would therefore want to make sure that the waiters were being duly tipped. Other customers would simply want to know where their money was going.

20. It would be quite surprising if management disclosed to customers who inquired about the 15 percent charge that only 75 percent of the amount was being provided to the waiters, and it would be astonishing if any customer who was so advised would not question the rationale of a charge that was only partially conveyed to the staff. The managers would have known that customers who discovered 88 Palace's actual practice would likely feel that both they and the servers were being cheated, because the servers received less than the customary tip amount, and because the customer was paying money to the restaurant for services whose nature was hardly apparent. Management would therefore have been reluctant to disclose the real arrangement. Moreover, a customer who discovered that servers were receiving less than 15 percent tips during banquets would feel obligated to make sure that servers received a customary tip. There was,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 12

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

(Cite as: Slip Copy)

however, no evidence that any customer ever attempted to leave extra money to compensate for the portion of the payment that was retained by management.

21. The testimony of plaintiff Jian Yun Lin that customers would sometimes remark to the waiters that they would be leaving the tip as part of the bill (P.Ex. 11 ¶ 12), and that numerous plaintiffs that they heard managers reassuring the customers that the 15 percent charge was for the waiters, entirely accords with common experience. Given the likely negative consequences of disclosing that the restaurant took a percentage of the 15 percent charge, it is difficult to see how managers could avoid denying this fact to customers, even in the presence of plaintiffs during the pendency of the litigation.

22. In sum, the 15 percent additional payment was referred to, understood to be, treated as, and never in practice distinguished from, tips. The Court therefore finds that the 15% payments were tips, not a service charge.

### III. *Defendants Violated Federal Minimum Wage and Tip Credit Laws*

**\*17** 23. Federal and state laws require employers to pay employees a legally-prescribed minimum hourly wage. Federal law sets the minimum at $5.15, while New York law sets a minimum of $6.75. *See* 29 U.S.C. § 206(a)(1); N.Y. Labor Law § 652(1). Provided certain conditions are satisfied, however, an employer may " pay tipped employees an hourly rate less than the federal minimum wage, by allowing them to credit a portion of the actual amount of tips received by the employee against the required hourly minimum wage." *Chung v. New Silver Palace Rest., Inc.*, 246 F.Supp.2d 220, 228 (S.D.N.Y.2002) (*"New Silver Palace I"*).

24. Under federal law, an employer is eligible for this " tip credit" if (1) the employer has informed the tipped employee of statutory requirements related to the tip credit; and (2) " all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips." 29 U.S.C. § 203(m); *see New Silver Palace I*, 246 F.Supp.2d at 228. These requirements should be " strictly construed, and must be satisfied even if the employee received tips at least equivalent to the minimum wage." *Id.* at 229. Thus, an employer may not take a tip credit unless it complies strictly with both statutory requirements.

25. Though New York state requirements are not structured identically, state law similarly allows employers to take a tip credit, *see* N.Y. Labor Law § 652(4); N.Y. Comp.Codes R. & Regs. tit. 12, § 137-1.4, but prohibits them from retaining for themselves any portion of employees' tips, regardless of whether the employer takes a tip credit. *See* New York Labor Law § 196-d. New York law does not preclude employers from retaining part of a service fee added to the customer's bill, as long as the fee is a fixed charge and not a tip. *Id.; see Weinberg v. D-M Rest. Corp.*, 53 N.Y.2d 499, 506-07 (1981).

26. In short, if the banquet service fees were " tips," federal law prohibited defendants from retaining any portion of them if defendants also relied on the " tip credit" to satisfy the minimum wage. 29 U.S.C. § 203(m). Under state law, defendants were barred from collecting a portion of plaintiffs' tips or " gratuities" no matter how the minimum wage requirement was satisfied. N.Y. Labor Law § 196-d.

27. At all relevant times, plaintiffs, as well as all captains, waiters and busboys at the restaurant, have been " tipped employee[s]" within the meaning of the law because they have been " engaged in an occupation in which [they] customarily and regularly receive[ ] more than $30 a month in tips." 29 U.S.C. § 203(t).

28. The defendants failed to comply with the requirement under 29 U.S.C. § 203(m) that all tips be provided to employees with positions that " customarily and regularly" receive tips. At all relevant times, the defendants have retained for the restaurant itself a significant portion of the tip pool, in the form of 25 percent of all banquet tips. " Congress, in crafting the tip credit provision ... of the FLSA did not create a middle ground allowing an employer both to take the tip credit and share employees' tips." *New Silver Palace I*, 246 F.Supp.2d at 230.

**\*18** 29. The defendants also violated the strict requirements of the laws concerning tip credits by taking part of the tip pool to help pay part-time workers. These workers were not paid in tips, but with an hourly wage.[FN7]

> FN7. Plaintiffs' proposed damages calculation does not include any proposed recovery for tips misappropriated to pay part-time workers. Because plaintiffs have not indicated what recovery they believe is appropriate for this category of misappropriate tips, if any, no damages in this regard will be awarded. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 13

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

**(Cite as: Slip Copy)**

documents evidencing the misappropriation of plaintiffs' tips to pay part-timers are in Chinese, so the Court would be unable to calculate these damages without further submissions from the parties even if it was appropriate to do so on its own initiative.

30. Plaintiffs argue that the defendants mandated a tip pooling system which allocated shares to certain individuals who acted as managers, including part-owners Gong Gui Guan and Dai Hai Nan, and that, because these individuals acted as supervisors rather than servers, they do not qualify as employees who " customarily and regularly receive[ ] tips." *See id.* at 229 (holding that forced sharing of tips with management was an illegal practice). This contention is rejected.

31. While the evidence reflects that Gong Gui Guan and Dai Hai Nan may have had some supervisory responsibilities, and exercised somewhat greater autonomy than captains or waiters, and that Gong Gui Guan had a modest financial interest in the restaurant, defendants amply demonstrated that Gong Gui Guan generally acted in effect as a server, with particular responsibility for preparing and serving shrimp dishes in many respects parallel to the duties of plaintiff Yong Cai Zhang, who served clams and snails. Gong Gui Guan wore a waiter's uniform and worked at a food table. Dai Hai Nan became general manager of the restaurant in early 2005, and ceased participating in the tip pool at that time. Before that time, although he purchased supplies (and exercised some personal authority), he also was described by several plaintiffs as acting as a captain. Thus, at the time these individuals received tips, they also acted as ordinary serving personnel, of the sort who customarily and regularly receive tips.

32. Unlike the situation in *New Silver Palace I,* any receipt of tips by Gong Gui Guan and Dai Hai Nan did not constitute part of part of a general practice of forced tip sharing with management, *see* 246 F.Supp.2d at 230-31, even if those individuals had a management or ownership role. Numerous managers worked in and around the restaurant, but only these two, who regularly worked in a service capacity, participated in the tip pool, and Dai Hai Nan stopped doing so when he stopped performing in that capacity. Other than the confiscation of the 25 percent share of the banquet tips and the distribution of some tips as wage payments to part-time workers, there was no generalized practice of management participation in the tip pool.[FN8]

FN8. Plaintiffs appeared sincerely to resent

Gong Gui Guan and Dai Hai Nan's participation in the pool, which may be evidence in itself that these experienced waiters did not regard them as persons who customarily receive tips. However, this resentment appeared to have colored some of their testimony and led them to minimize the extent to which these individuals acted as ordinary waiters or captains.

33. The defendants were also ineligible for the federal tip credit because they failed to provide plaintiffs with proper notice of minimum wage laws. Employers bear the burden of showing that they have satisfied this requirement by, for example, providing employees with a copy of § 203(m) and informing them that their tips will be used as a credit against the minimum wage as permitted by law. " If the employer cannot show that it has informed employees that tips are being credited against their wages, then no tip credit can be taken and the employer is liable for the full minimum-wage." *Reich v. Chez Robert, Inc.,* 28 F.3d 401, 403 (3d Cir.1994).

*19 34. It appears that the restaurant did not post any notice for a significant period of time after it opened. The notice it did post is insufficient under the statute both because it is in English, a language that few of the plaintiffs can read, and because it is posted in a relatively inconspicuous area. Moreover, numerous plaintiffs testified credibly that they had never been told anything about the minimum wage laws or the tip credit. Thus, the defendants did not comply with their duty to make sure that plaintiffs had notice of minimum wage and tip credit laws.

35. In light of the foregoing, plaintiffs are entitled to recover the difference between the full minimum wage and the reduced hourly wage they were paid because of the tip credit allowance that the defendants took. *See New Silver Palace I,* 246 F.Supp.2d at 231. Plaintiffs are also entitled to recover the amount of tips that the defendants illegally retained.

36. The Court is aware of a certain apparent irony in this regard. It is undisputed that plaintiffs in fact were paid total compensation in excess of the minimum wage. While their pay may be modest, they are not exploited in the sense of receiving less than the minimal subsistence pay required by law. It may seem peculiar, then, to hold that such employees are entitled to additional compensation calculated with reference to a minimum pay scale that their total actual income exceeded. Tipping, however, is a somewhat anomalous method of compensation that is strictly regulated by the FLSA. In

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

**(Cite as: Slip Copy)**

form and to some degree in substance, tips are gifts from customers to wait staff, not compensation paid by the employer. The FLSA permits such gifts to be deemed compensation satisfying a portion of the required minimum to be paid by the employer, but only if certain very specific requirements are met. Employers who wish to qualify for this credit must comply strictly with these requirements. If they fail to do so, they must pay the full minimum hourly wage, not the reduced amount permitted when the tip credit is available.

*IV. Defendants Violated New York Minimum Wage Laws and Supporting Regulations*

37. New York law, like federal law, requires employers to pay employees a certain minimum wage. *See* N.Y. Lab. Law § 652(1). The New York minimum wage for the relevant time period was $5.15 until January 1, 2005; $6.00 on and after January 1, 2005; and $6.75 on and after January 1, 2006. *Id.* Like the FLSA, New York law allows an employer who meets certain requirements to pay tipped employees an hourly rate less than the minimum wage by treating a portion of the employees' tips as a credit, or allowance, against the employer's minimum wage obligations. *Id.* § 652(4). Where an employer takes a tip credit, the New York minimum wage for the relevant time period was: $3.30 prior to January 1, 2005; $3.85 on or after January 1, 2005, and $4.35 on or after January 1, 2006. *Id.*

A. Defendants Violated New York's Tip Appropriation Law

*20 38. Regardless of how an employer meets its minimum wage obligations, New York law prohibits " any employer or his agent or an officer or agent of any corporation, or any other person" from " demand[ing] or accept[ing], directly or indirectly, any part of the gratuities, received by an employee, or retain[ing] any part of a gratuity or of any charge purported to be a gratuity for an employee." N.Y. Lab. Law § 196(d). The statute provides an exception for " sharing of tips by a waiter with a busboy or similar employee." *Id.* The term " similar employee" refers to employees similar to waiters, including hosts or greeters. *New Silver Palace I,* 246 F.Supp.2d at 229.

39. New York labor law also requires employers to post, in a conspicuous manner in the workplace, section 196-d and " any regulations promulgated pursuant thereto relating to illegal deductions from wages and tips by employers." N.Y. Lab. Law § 198-d. This requirement applies to all restaurant employers, regardless of whether

the employer takes a tip credit. State law also requires restaurants to post summaries of state minimum wage orders in conspicuous locations in the workplace. N.Y. Lab. Law § 661.

40. The defendants violated New York Labor Law § 196(d) by permitting persons other than captains, waiters, busboys, and similar employees to share in the tip pool. At all relevant times, the defendants have retained 25 percent of the banquet tips collected at 88 Palace for the restaurant itself. This practice is prohibited by § 196(d).

41. The defendants' violation of New York law is even clearer than their violation of federal law. The New York statute prohibits the employer from " retain[ing] any part of a gratuity *or of any charge purported to be a gratuity* for an employee." N.Y. Labor Law § 196-d (emphasis added). Whatever non-frivolous argument can be made about what the banquet charge " really" was, or about how it was treated by the defendants, or about how it is properly characterized under federal regulations, there is no doubt that the fee was " purported" to be a tip or gratuity for the servers, and would be so understood by a customer. The characterization of the charge on the menu and the representations to the customers, while significant factors in the analysis under federal law, are absolutely dispositive under the New York standard.

42. New York law is also more favorable to plaintiffs with respect to the sharing of tips by Gong Gui Guan and Dai Hai Nan. New York law does not look to whether an employee is of the type that customarily receives tips- arguably a broad and flexible standard that focuses on the serving duties of the employee. Rather, it expressly forbids sharing of tips with anyone who can be characterized as an " employer." § 196-d.

43. For the reasons discussed above, Gong Gui Guan cannot be considered an " employer" within even a broad reading of the law. *See Ayres v. 127 Rest. Corp.,* 12 F.Supp.2d 305, 308 (S.D.N .Y.1998) (holding that under New York law, although a general manager could not share in the tip pool, there was " a triable issue of fact as to whether [an individual] was an ' employer or agent' ... or whether he was merely a senior floor captain with more limited supervisory responsibilities during this period" and that only in the former case would the individual's participation in the tip pool be unlawful). Similarly, as discussed above, Dai Hai Nan stopped sharing in the tip pool when he began acting as general manager of the restaurant.

*21 44. Although § 196-d " clearly prohibits part-owner

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 15
Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507
(Cite as: Slip Copy)

employees who wield ... broad managerial authority" from retaining tips, *New Silver Palace I*, 246 F.Supp.2d at 230, the plaintiffs did not demonstrate that either Dai Hai Nan or Gong Gui Guan wielded broad managerial authority during the time they participated in the tip pool. For the time Dai Hai Nan shared in the tip pool, he was not a " general manager" but a " senior floor captain with more limited supervisory responsibilities." *Ayres*, 12 F.Supp.2d at 308. He wore a captain's uniform, and although he at one point attempted to buy a share of the restaurant, the evidence indicated that Dai Hai Nan received only the tip share to which another employee doing the same job would have been entitled. Thus, Dai Hai Nan is not an employer for purposes of New York law. Similarly, although Gong Gui Guan for some period of time owned shares in the restaurant, he was a passive investor who did not exercise broad management authority, or indeed any authority.

45. In addition, the defendants have failed to comply with New York Labor Law § 198-d's notice requirement. Although the restaurant apparently posted a sign about New York labor law in or around January 2006, nearly three and a half years after it opened, that sign is posted in English only, and defendants made no other efforts to give notice to the plaintiffs of the relevant New York labor law.

46. Accordingly, plaintiffs are entitled to recover the amount of tips that the defendants illegally retained.

### B. Defendants Violated New York's Spread of Hours Regulation

47. Under New York Law, employers must pay " one hour's pay at the basic minimum hourly wage rate before allowances, in addition to the minimum wages otherwise required" for " each day in which the spread of hours exceeds 10." N.Y. Comp.Codes R. & Regs. tit. 12, § 137-1.7. The " spread of hours" measures the interval between the beginning and end of an employee's workday" and " includes working time plus time off for meals plus intervals off duty." *Id.* § 137-3.11. Another provision clarifies this requirement: " An employee shall receive one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage required in this Part for any day in which: (a) the spread of hours exceeds 10 hours; or (b) there is a split shift; or (c) both situations occur." *Id.* § 142-2.4

48. This Court's earlier opinion denying summary judgment in this case explained that " [t]he plain text of § 142.4 ensures an additional wage only ' in addition to the

*minimum* wage' required under New York law (emphasis added)." *Chan v. Triple 8 Palace, Inc.*, No. 03 Civ. 6048, 2006 WL 851749 (" *Heng Chan I*" ), at *21 (S.D.N.Y. Mar. 30, 2006). The Court therefore interpreted the spread-of-hours provision not to affect " workers whose total weekly compensation is already sufficiently above the minimum rate." *Id.* In other words, " If the total compensation is equal to or greater than the minimum wages due, including compensation for an additional hour for each day in which the spread of hours exceeds ten," the spread-of-hours provision does not entitle the employee to any further payments. *Id.*

*22 49. In this case, however, the plaintiffs' total weekly compensation did not exceed the minimum wages due, because the money paid from the banquet fee, which made up the difference between plaintiffs' wages and the minimum wage, was tips, not wages. Because the banquet fee was tips, not wages, defendants did not qualify for the tip credit, and the " total weekly compensation" received by plaintiffs did not comply with New York's minimum wage law. Thus, as defendants acknowledged during the trial, if the banquet fee is legally considered a tip, " the dominos fall for [plaintiffs]." (12/6/06 Tr. 64 (Mr. Hochheiser.)) The plaintiffs are entitled to recover an additional hour's pay at minimum wage for days when plaintiffs worked a spread of hours exceeding ten hours.

### C. Defendants Violated New York's Uniform Expenses Regulation

50. New York law provides that in the restaurant industry, " [n]o allowance for the supply, maintenance, or laundering of required uniforms shall be permitted as part of the minimum wage." N.Y. Comp.Codes R. & Regs. tit. 12, § 137-1.8. " Where the employer fails to launder or maintain required uniforms for any employee, he shall pay such employee in addition to the minimum wage ... (a) $6.40 per week on and after March 31, 2000, if the employee works more than 30 hours weekly...." *Id.* The provision only applies " if the employees' expenditures for [uniform-maintenance] purposes would reduce their wages to below minimum wage." *Ayres*, 12 F.Supp.2d at 310. Thus, if the wages paid to plaintiffs were less than the minimum wage-as they effectively were, because defendants were ineligible for the tip credit-defendants must reimburse them for all uniform-related expenses.

51. A " required uniform" is any " clothing worn by an employee, at the request of an employer, while performing job-related duties" unless it is " clothing that may be worn as part of an employee's ordinary wardrobe." N.Y. Comp.Codes R. & Regs. tit. 12, § 137-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                     Page 16
Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507
(Cite as: Slip Copy)

3.13 The uniforms that plaintiffs and other employees wear at 88 Palace, consisting of either suits or jackets, and pants, shirts, and ties of specific colors, constitute " required" uniforms.

52. Plaintiffs purchased, and were not reimbursed for the price of, all of the items in their uniforms other than the waiters' and busboys' jackets, which were provided to plaintiffs by the restaurant upon payment of a deposit. In addition, plaintiffs have paid for the laundering of most, if not all, of the items in their uniforms.

53. Because, at all relevant times, plaintiffs were paid wages of no more than the New York minimum wage with a tip credit, their uniform expenses necessarily decreased their wages below minimum wage.

54. Accordingly, plaintiffs are entitled to recover from defendants (1) the cost of those uniform items for which they paid; (2) the full statutory weekly uniform maintenance allowance for all weeks that the defendants did not offer any laundry service; and (3) a reasonable percentage of the statutory weekly uniform maintenance allowance for weeks on which the restaurant provided laundry service for only the jacket or suit portion of plaintiffs' uniforms.

V. *Defendants Violated Federal and New York Overtime Laws*

*23 55. Both the FLSA and New York labor regulations require employers to pay employees an overtime rate of at least one and one-half times their regular rate for hours worked in excess of 40 hours per week. *See* 29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.107; N.Y. Comp.Codes R. & Regs. tit. 12, § 137-1.3. All sources of remuneration, except as specifically exempted, must be counted towards an employee's " regular rate." 29 C.F.R. § 778.108. Where an individuals is " unlawfully paid less than the minimum wage, the overtime calculation must be based on the minimum wage to which he was entitled." *Cao v. Chandara Corp.,* No. 00 Civ. 8057, 2001 WL 34366628, at *6 (S.D.N.Y. July 25, 2001).

56. A weekly salary does not include the overtime premium for workers who regularly work more than 40 hours a week unless there is evidence that the parties understood and intended such an arrangement. In other words, " [t]here is a rebuttable presumption that a weekly salary covers 40 hours; the employer can rebut the presumption by showing an employer-employee agreement that the salary cover a different number of hours." *Giles v. City of New York,* 41 F.Supp.2d 308, 317

(S.D.N.Y.1999).

57. As established above, defendants have paid plaintiffs an overtime rate based on a " regular rate" of the minimum wage calculated with the maximum tip credit. Because defendants were not eligible to take a tip credit under the FLSA, plaintiffs' " regular rate" for purposes of overtime should have been the full minimum wage. Accordingly, plaintiffs are entitled to recover, for all hours over 40 hours a week that they worked at 88 Palace, the difference between (1) the reduced hourly overtime rate they were paid because of the tip credit allowance claimed by defendants and (2) the federally prescribed overtime rate of one and one-half times the full statutory minimum wage.

VI. Damages

A. Statute of Limitations

58. The defendants are liable for all damages accruing under the FLSA and New York law from the time 88 Place opened in August 2002 through the present. *See* 29 U.S.C. § 255(a) (two-year statute of limitations, running from the date the cause of action accrued; three-year statute of limitations where violation is " willful" ); N .Y. Lab. Law § 198(3) (six-year statute of limitations); *id.* § 663(3). This action was initiated on August 11, 2003, well before the shortest relevant statute of limitations expired.

B. Plaintiffs' Entitlement to Compensatory Damages

59. Plaintiffs' evidence of compensatory damages is presumptively correct. Under federal and state law, employers are responsible for keeping detailed records of wages, hours, tips, and other employment information. *See* 29 U.S.C. § 211(c) (requiring employers to keep personnel records); N.Y. Lab. Law § 195(4) (same); *id.* § 661 (same). These requirements are not mere technicalities, but substantive obligations that are ' fundamental underpinnings' of FLSA and critical to ensuring the statute's effectiveness, for an employer's ' [f]ailure to keep accurate records can obscure a multitude of minimum wage and overtime violations." ' *Moon v. Kwon,* 248 F.Supp.2d 201, 218 (S.D.N.Y.2002), quoting *Wirtz v. Miss. Publishers Corp.,* 364 F.2d 603, 607 (5th Cir.1966).

*24 60. Specifically, employers must maintain and preserve, for each tipped employee, records of, inter alia, (1) the total daily and weekly hours worked; (2) the regular hourly rates of pay for each week in which overtime compensation is due; (3) the total daily and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 17

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

(Cite as: Slip Copy)

weekly earnings; (4) the total wages paid; (5) the total weekly premium pay for overtime hours; (6) the weekly or monthly amounts of tips received by employees; (7) the amount by which the wages of each tipped employee have been deemed increased by tips; and (8) the hours worked and total payment for both tipped and non-tipped work. *See* 29 C.F.R. §§ 516.2, 516.5, 516.28. New York law imposes similar obligations on restaurant employers. *See* N.Y. Comp.Codes R. & Regs. tit. 12, § 137-2.1; *id.* § 137-2.2.

61. The Supreme Court has held that when a defendant fails to comply with these recordkeeping requirements, a plaintiff employee may carry his burden " if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Moon,* 248 F.Supp.2d at 219, quoting *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946). " [I]t is possible for plaintiff to meet this burden by relying on his recollection alone." *Doo Nam Yang v. ACBL Corp.,* 427 F.Supp.2d 327, 335 (S.D.N.Y.2005). New York law similarly provides that where an employer fails " to keep adequate records, ... the employer in violation shall bear the burden of proving that the complaining employee was paid wages, benefits and wage supplements." N.Y. Lab. Law § 196-a.

62. Here, the record establishes that the defendants disregarded multiple obligations under federal and state recordkeeping laws. Defendants have not maintained and preserved several categories of records that they were required to preserve under the statutes, particularly those concerning the critical issues of tips owed and paid to plaintiffs. As Magistrate Judge Francis found in his opinion and order on plaintiffs' motion for sanctions based on spoliation, the defendants were grossly negligent in destroying relevant evidence, including banquet receipts, the money-received book, and tip distribution sheets, during the pendency of this litigation. *Heng Chan II,* 2005 WL 1925579, at *8. Defendants did not appeal that ruling or seek reconsideration. The plaintiffs are therefore entitled to an adverse inference that the evidence destroyed would have been favorable to plaintiffs. *See id.* (noting that there is " ample extrinsic evidence" that the missing evidence would have been favorable to plaintiffs). In addition, it is undisputed that the records of tip income signed by employees were deliberately falsified, and that employees were required to sign false verifications in order to receive their paychecks.

63. Thus, plaintiffs' evidence of their hours worked and

wages and tips earned is entitled to a reasonable inference of correctness which the defendants bear the burden of negating, pursuant to the burden-shifting framework adopted by the Supreme Court in *Mt. Clemens Pottery. See Reich v. Southern New England Telecommc'ns Corp.,* 121 F.3d 58, 66-67 (2d Cir.1997). Because New York law imposes an even higher recordkeeping burden on employers, a " finding of FLSA liability ... necessarily implies a finding of liability under New York law." *Doo Nam Yang,* 427 F.Supp.2d at 337. Therefore, in the absence of rebuttal by defendants, plaintiffs' recollection and documentation of hours worked and compensation owed is presumed to be correct. *Liu v. Jen Chu Fashion Corp.,* No. 00 Civ. 4221, 2004 WL 33412, at *3 (S.D.N.Y. Jan. 7, 2004).

*25 64. Each plaintiff is entitled to compensatory damages totaling:
(a) the difference between the reduced hourly wage he or she was paid because of the tip credit allowance the defendants took and the statutorily-prescribed minimum wage, including at the applicable New York minimum wage for all hours after January 1, 2005, when New York's rate was increased above the federal minimum wage, *see* 29 U.S.C. § 218(a) (requiring employers to comply with the higher state minimum wage);
(b) his or her share of the amount of tips that the defendants illegally retained for themselves;
(c) an extra hour of pay at the applicable New York minimum wage for each day on which he or she worked a spread of more than 10 hours;
(d) the cost of those uniform items for which he or she paid, the full statutory weekly uniform maintenance allowance for all weeks that the defendants did not offer any laundry service, and a reasonable percentage of the statutory weekly uniform maintenance allowance for weeks on which the restaurant provided laundry service for only the jacket or suit portion of plaintiffs' uniforms; and
(e) the difference between the reduced hourly overtime rate they were paid because of the tip credit allowance that the defendants claimed and the federally prescribed overtime rate of one and one-half times the full statutory minimum wage, including at the applicable New York minimum wage for all hours after January 1, 2005.

C. Compensatory Damages Calculation

65. Plaintiffs have submitted detailed damages calculations for each plaintiff on each issue in this litigation. Defendants submit an alternative calculation only on the question of damages for illegally retained tips.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 18

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

(Cite as: Slip Copy)

In light of the presumption in favor of plaintiffs' damages calculation discussed above, the defendants' failure to offer any evidence that plaintiffs' calculations are inaccurate, and the Court's independent review of the record and plaintiffs' calculation, the plaintiffs' calculations will be adopted as to each category of damages. Defendants' arguments as to how damages for illegally retained tips should be calculated will be discussed below.

### 1. *Tip Credit Damages*

| | Regular Hours | Overtime Hours | Total |
|---|---|---|---|
| Yan Bin Cao | $10,814.03 | $38.43 | $10,852.46 |
| Sum Kay Wong | $11,420.45 | $53.65 | $11,474.10 |
| Jian Yun Lin | $13,167.56 | $66.60 | $13,234.16 |
| Wei Chao Tan | $10,696.46 | $36.53 | $10,732.99 |
| Shing Tao Au | $14,388.95 | $70.30 | $14,459.25 |
| Wan Zhen Jiang | $12,344.03 | $57.35 | $12,401.38 |
| Feng Qin Zheng Teng | $7,512.26 | $49.30 | $7,561.56 |
| Fong Li | $5,884.85 | $68.45 | $5,953.30 |
| Ai Yin Chen | $5,643.43 | $74.93 | $5,718.36 |
| Yong Cai Zhang | $3,638.95 | $34.23 | $3,673.18 |
| Heng Chan | $1,340.33 | $45.33 | $1,385.66 |

*26 67. The total compensatory damages for the tip credit unlawfully taken by defendants is $97,446.40.

### 2. *Damages for Illegally Retained Tips From Banquet Fees*

68. The issue of damages for illegally retained tips from the banquet fees is the only issue on which the parties have submitted differing calculations. Although the difference between the parties' calculation methods is not very large, amounting to a dispute of about 10 or 15 percent, it is significant.

69. Both parties' methods account for the fact that some plaintiffs worked only some of the relevant months. Of

66. The Court finds that the plaintiffs are entitled to the following compensatory damages for the tip credit unlawfully taken by defendants. As discussed above, these figures represent the difference between the reduced hourly wage each defendant was paid because of the tip credit allowance taken by defendants and the statutorily-prescribed minimum wage, for both regular and overtime hours.

the months worked by all plaintiffs, however, records for some months are missing. Therefore, it is necessary to make an educated guess as to the tips retained during the missing months. The parties rely on different sets of records: the defendants rely primarily on individual tip distribution sheets for each plaintiff (D.Exs.Q1-Q11), while the plaintiffs rely on these documents but also on records of the entire tip income received by the restaurant (P.Ex. 12).

70. Aside from using different sources, the parties use different methods of calculation. Defendants' method works as follows. First, defendants calculate for each plaintiff the total tips withheld by the restaurant for all recorded months,[FN9] then divide by the number of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 19

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

(Cite as: Slip Copy)

recorded months. This gives the average withheld tips over the course of the plaintiff's employment. Second, defendants multiply this average withheld tips by the number of months the plaintiff worked.[FN10] This method thus uses the average of the recorded months to project the amounts received during the unrecorded months.

> FN9. To get this number, defendants add together the banquet tips received by each plaintiff for all recorded months. The restaurant withheld 25% of the tips, so the defendants then divide the total tips received by 75%, or. 75. In other words, they solve the equation. $.75x = (total\ tips\ received)$. This gives the total tips taken in by the restaurant for all recorded months. Finally, the defendants subtract from the total tips *taken in by the restaurant* the total tips *received by the plaintiff*. This gives the total tips *withheld* for all recorded months.

> FN10. This method in effect credits the plaintiff for the average monthly withheld tips for each month-even those months for which an actual number is available. But because the average is the sum of all known months divided by the number of known months, the sum of the averaged number is the same as the sum of the actual numbers. This method therefore involves no inaccuracies for the known months.

71. Plaintiffs' method is different. Plaintiffs first calculate the total amount of banquet tips withheld by the restaurant, relying on defendants' records where available and prior years' records where the relevant year's records are not available.[FN11] Plaintiffs then calculate each plaintiff's share in the total tips withheld. To determine each plaintiff's share, they divide the plaintiff's tip-share number (e.g., 1.06) by the average total number of tip-shares-i.e., the average total number of servers. They estimate the average total number of tip-shares at 20. In other words, to determine each server's share, the plaintiffs estimate that about 20 servers were sharing in the tips on any given night, and then calculate how much money each plaintiff would have received, based on the plaintiff's tip share and the total tips withheld.

> FN11. For the period from August 2002 through September 2004, this number is available because it is recorded in defendants' internal records (P.Ex. 12). For the period October 2004 through November 2006, plaintiffs rely on defendants' records where they are available and

prior years' amounts where they are not available.

72. The Court finds that plaintiffs' calculation method is more reliable, because more of the numbers it relies on are real, rather than estimated. Defendants' method rests on their estimate that during the unrecorded months, plaintiffs made roughly the same tips as in the recorded months. Defendants' records, however, show that the total tips received varied dramatically from month to month, ranging for example from $20,691 in April 2003 to $52,475 the very next month. 27 out of 52 of the relevant months-roughly half-are missing from defendants' records of individual tips received. Thus, defendants' use of an average for the missing months rests on a great deal of guesswork.

*27 73. Plaintiffs, on the other hand, rely on monthly totals of received tips (P.Ex. 12), for which there are records of the first 26 of the relevant months. For the remaining months, plaintiffs rely on individual plaintiffs' tip distribution charts (D.Ex. Q1-Q11), which exist for 16 of the remaining months. Plaintiffs therefore rely on significantly more actual records than defendants.

74. It is true that plaintiffs' method, like defendants', rests on an estimate: that on an average night, there were 20 shares participating in the tip pool. As plaintiffs acknowledge, " an exact calculation of total shares is simply not possible" (P. Damages Submission at 10 n. 5), because total shares vary daily, from approximately 8.57 to 22.77 total shares. Plaintiffs' estimate of 20 is close to the highest number of shares recorded. (*Cf.* Tr. 21 (Wong Direct) (noting that there are currently 22 or 23 employees eligible for the tip pool).) The higher the number of shares, the less money each plaintiff will receive, just as when more slices are cut from a pie, each slice must be smaller. Plaintiffs' calculation, therefore, is cautious and errs on the side of being generous to defendants. As noted before, it also relies on more actual numbers. It should also be noted that although the defendants adopt a different calculation method, they make no challenge to the accuracy of the numbers on which plaintiffs rely.

75. Accordingly, the Court finds that plaintiffs' method of calculating tips withheld by the restaurant is more reliable than that of defendants. The following damages for unlawfully retained tips will therefore be awarded to each plaintiff:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                            Page 20

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507
(Cite as: Slip Copy)

| | |
|---|---|
| Yan Bin Cao | $33,928.75 |
| Sum Kay Wong | $33,928.75 |
| Jian Yun Lin | $28,807.43 |
| Wei Chao Tan | $33,928.75 |
| Shing Tao Au | $25,606.60 |
| Wan Zhen Jiang | $17,604.54 |
| Feng Qin Zheng Teng | $28,220.22 |
| Fong Li | $12,464.78 |
| Ai Yin Chen | $7,833.15 |
| Yong Cai Zhang | $4,580.02 |
| Heng Chan | $2,536.24 |

76. The total compensatory damages for the tips unlawfully retained by defendants is $229,439.23.

### 3. *Spread of Hours Damages*

| | |
|---|---|
| Yan Bin Cao | $3,674.85 |
| Sum Kay Wong | $3,674.85 |
| Jian Yun Lin | $3,674.85 |
| Wei Chao Tan | $3,674.85 |
| Shing Tao Au | $3,674.85 |
| Wan Zhen Jiang | $3,304.05 |
| Feng Qin Zheng Teng | $2,824.35 |
| Fong Li | $1,359.60 |
| Ai Yin Chen | $1,282.35 |
| Yong Cai | $803.40 |

77. The Court finds that plaintiffs are entitled to the following damages, representing an extra hour of pay at the applicable New York minimum wage for each day on which he or she worked a spread of more than 10 hours:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

(Cite as: Slip Copy)

Zhang

Heng Chan    $278.10

78. The total compensatory damages for spread-of-hours violations is $28,226.10.

### 4. *Uniform Maintenance Damages*

| | |
|---|---|
| Yan Bin Cao | $1,004.45 |
| Sum Kay Wong | $1,004.45 |
| Jian Yun Lin | $1,004.45 |
| Wei Chao Tan | $1,004.45 |
| Shing Tao Au | $1,004.45 |
| Wan Zhen Jiang | $924.45 |
| Feng Qin Zheng Teng | $828.05 |
| Fong Li | $524.80 |
| Ai Yin Chen | $508.80 |
| Yong Cai Zhang | $332.80 |
| Heng Chan | $115.20 |

*28 80. The total compensatory damages for uniform and laundry expenses are $8,256.35.

### 5. *Total Compensatory Damages*

| | |
|---|---|
| Yan Bin Cao | $49,460.51 |
| Sum Kay Wong | $50,082.15 |
| Jian Yun Lin | $46,720.89 |
| Wei Chao Tan | $49,341.04 |
| Shing Tao Au | $44,745.15 |
| Wan Zhen Jiang | $34,234.42 |

79. The Court finds that the plaintiffs are entitled to the following damages for uniform and laundry expenses:

81. The total compensatory damages awarded to each plaintiff are as follows:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 22

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

**(Cite as: Slip Copy)**

| Feng Qin Zheng Teng | $39,434.18 |
| Fong Li | $20,302.48 |
| Ai Yin Chen | $15,342.66 |
| Yong Cai Zhang | $9,389.40 |
| Heng Chan | $4,315.20 |

82. The total compensatory damages for all plaintiffs is $363,368 .08.

D. Plaintiffs' Entitlement to Liquidated Damages

83. The defendants are liable for liquidated damages under both the FLSA and New York law. An employer who violates the minimum wage or overtime provisions of the FLSA " shall be liable to the employee or employees who are affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, ... and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).[FN12]

> FN12. " As used in the FLSA ' liquidated damages' is something of a misnomer. It is not a sum certain, determined in advance as a means of liquidating damages that may be incurred in the future. It is an award of special or exemplary damages added to the normal damages." *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1063 n. 3 (2d Cir.1988).

84. An employer may avoid liquidated damages only if it meets the " ' difficult' burden of establishing, by ' plain and substantial' evidence, its subjective good faith and objective reasonableness." *Moon,* 248 F.Supp.2d at 234. " Double damages are the norm, single damages the exception." *Southern New England Telecommc'ns.,* 121 F.3d at 71. Courts have discretion to deny an award of liquidated damages where the employer shows that, despite the unlawful acts, the employer acted in subjective " good faith" and had objectively " reasonable grounds" for believing that the acts or omissions giving rise to the failure did not violate the FLSA. 29 U.S.C. § 260. " ' Good faith' in this context requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them ." *Southern New England Telecomms.,* 121 F.3d at 71.

85. Defendants have not established that they acted in good faith in claiming a tip credit to meet their federal minimum wage obligations at the same time that they retained a significant portion of the employees' tips. Defendants have pointed to no " active steps" taken by any of them to determine whether they were entitled to retain a portion of the tips. *Southern New England Telecomms.,* 121 F.3d at 71. They have shown neither a subjective belief in the lawfulness of their wage practices nor that these practices were objectively reasonable.

86. Similarly, under New York labor law, an employee may be awarded liquidated damages amounting to 25% of the total wages owed by the employer " upon a finding that the employer's failure to pay the wage required ... was willful." N.Y. Lab. Law. § 198(1-a); *id.* § 663(1) (same). An employer acts " willfully" if it " knowingly, deliberately, or voluntarily disregards its obligation to pay wages." *Ayres,* 12 F.Supp.2d at 309, quoting *P & L Group, Inc. v. Garfinkel,* 541 N.Y.S.2d 535, 537 (2d Dep't 1989). The plaintiff need not prove that the defendants acted maliciously or in bad faith. *Id.*

*29 87. For the same reasons as those discussed above, the defendants' violations of New York's minimum wage, tip allocation, spread of hours, and uniform laws were knowing and willful. In fact, the evidence supports a view that the defendants, who routinely referred to the banquet fees as tips both with customers and among themselves, and treated those fees as tips for internal accounting purposes, subjectively and reasonably believed themselves to be taking a percentage of plaintiffs' tips.

88. Accordingly, the defendants are liable for the full amount of liquidated damages under federal and New York law. Each plaintiff is thus entitled to recover liquidated damages under the FLSA equivalent to 100 percent of:
(a) the difference between the reduced hourly wage he or she was paid because of the tip credit allowance the defendants took and the statutorily-prescribed minimum wage, at the federally prescribed overtime rate of one and a half times the full statutory minimum wage (where

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 23

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

**(Cite as: Slip Copy)**

relevant); and
(b) his or her share of the amount of tips that the defendants illegally retained for themselves.

In addition, each plaintiff is entitled to recover liquidated damages under New York law equivalent to 25 percent of:(c) an extra hour of pay at the applicable New York minimum wage for each day on which he or she worked a spread of more than 10 hours;
(d) the cost of those uniform items for which he or she paid, the full statutory weekly uniform maintenance allowance for all weeks that the defendants did not offer any laundry service, and a reasonable percentage of the statutory weekly uniform maintenance allowance for weeks on which the restaurant provided laundry service for only the jacket or suit portion of plaintiffs' uniforms.

### E. Liquidated Damages Calculation

89. The plaintiffs are entitled to the following liquidated damages:

|  | FLSA | NY | Total |
|---|---|---|---|
| Yan Bin Cao | $44,781.21 | $1,169.83 | $45,951.04 |
| Sum Kay Wong | $45,402.85 | $1,169.83 | $46,572.68 |
| Jian Yun Lin | $42,041.59 | $1,169.83 | $43,211.42 |
| Wei Chao Tan | $44,661.74 | $1,169.83 | $45,831.57 |
| Shing Tao Au | $40,065.85 | $1,169.83 | $41,235.68 |
| Wan Zhen Jiang | $30,005.92 | $1,057.13 | $31,063.05 |
| Feng Qin Zheng Teng | $35,781.78 | $913.10 | $36,694.88 |
| Fong Li | $18,418.08 | $471.10 | $18,889.18 |
| Ai Yin Chen | $13,551.51 | $447.79 | $13,999.30 |
| Yong Cai Zhang | $8,253.20 | $284.05 | $8,537.25 |
| Heng Chan | $3,921.90 | $98.33 | $4,020.23 |

90. The total liquidated damages awarded under the FLSA are $326,885.63. The total liquidated damages awarded under New York law are $9,120.61. The total liquidated damages for all plaintiffs are $336,006.24

### F. Total Damages Awarded

91. The total damages awarded to each plaintiff are as follows:

| Yan Bin Cao | $95,411.55 |
|---|---|
| Sum Kay Wong | $96,654.83 |
| Jian Yun Lin | $89,932.31 |
| Wei Chao | $95,172.61 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 24

Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

(Cite as: Slip Copy)

| | |
|---|---|
| Tan | |
| Shing Tao Au | $85,980.83 |
| Wan Zhen Jiang | $65,297.47 |
| Feng Qin Zheng Teng | $76,129.06 |
| Fong Li | $39,191.66 |
| Ai Yin Chen | $29,341.96 |
| Yong Cai Zhang | $17,926.65 |
| Heng Chan | $8,335.43 |

*30 92. The total damages awarded for all plaintiffs are $699,374.32.

### VII. *Joint and Several Liability*

93. The defendants, with the exception of Gong Gui Guan, who is not liable for the reasons discussed above, are jointly and severally liable for the judgment. Each defendant (again, excluding Gong Gui Guan) acted as plaintiffs' joint employer and is responsible both individually and jointly for defendants' federal and state law violations. *See* 29 C.F.R. § 791.2; *Doo Nam Yang,* 427 F.Supp.2d at 342-43.

### CONCLUSION

Accordingly, for the foregoing reasons, the Court concludes that plaintiffs have proven, by a preponderance of the evidence, that the defendants other than Gong Gui Guan violated FLSA and the New York Labor Law in the various ways discussed above. For these violations, the Court awards plaintiffs damages totaling $699,374.32, as calculated and set forth above, for which the defendants other than Gong Gui Guan are jointly and severally liable. Judgment will be entered in favor of defendant Gong Gui Guan.

Plaintiffs shall submit an application for the amount of their fees and costs, a request for prejudgment interest, and an appropriate form of a judgment no later than February 16, 2007. The defendants shall submit any opposition to this submission no later than March 2, 2007.

SO ORDERED.

S.D.N.Y.,2007.
Chan v. Sung Yue Tung Corp.
Slip Copy, 2007 WL 313483 (S.D.N.Y.), 154 Lab.Cas. P 35,256, 12 Wage & Hour Cas.2d (BNA) 507

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                           Page 1

Not Reported in F.Supp., 1993 WL 276058 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.)

---

**H**
Krueger v. New York Telephone Co.
S.D.N.Y.,1993.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Evelyn KRUEGER, Francis J. Lupardo, Carlyle D.
Forde, Walter Grabowski, Nicholas T. Bruck, and
Albert J. Dwyer on behalf of themselves and all
others similarly situated, Plaintiffs,
v.
NEW YORK TELEPHONE COMPANY and Nynex
Corporation, Defendants.
Bernice CARROLL, Betsy J. Bell and William F.
Perkins, individually and on behalf of all other
persons similarly situated, Plaintiffs,
v.
NEW YORK TELEPHONE COMPANY, a
Company of the Nynex Corporation, Defendant.
Nos. 93 CIV. 0178 (LMM), 93 CIV. 0179 (LMM).

July 21, 1993.

*MEMORANDUM AND ORDER*
McKENNA, District Judge.
*1 Now before the Court are the similar motions of
plaintiffs in these related actions for an order
pursuant to 29 U.S.C. § 216(b) (1988) directing
defendants to furnish the named plaintiffs and their
counsel with the names and last known residence
addresses of all potential class members, authorizing
notice to such individuals and proscribing the notice's
form.FN1

The actions, filed almost simultaneously, both
involve claims arising under the Age Discrimination
in Employment Act, as amended, 29 U.S.C. § 621-
634 (1988) (" the ADEA" ) and the New York
Human Rights Law, Executive Law § 290 et. seq.
(McKinney's 1993) (" the HRL" ). In addition, the
*Krueger* action includes a claim to remedy
defendants' alleged interference with the attainment
of plaintiffs' rights to pension benefits pursuant to the
Employee Retirement Income Security Act of 1974
(" ERISA" ), as amended, 29 U.S.C. § 1001 et seq.FN2
Plaintiffs claim that defendant New York Telephone
Company (" NYT" ) unlawfully discharged or
otherwise discriminated against them and others
similarly situated in the implementation of the
NYNEX Force Management Plan (" FMP" ).

1.

Notification to others similarly situated who have not
yet joined either action is, in this Court's view, an
appropriate course of action to take at this juncture in
the litigation. *See Hoffmann-La Roche, Inc. v.
Sperling,* 493 U.S. 165, 170 (1989). The ADEA
incorporates the enforcement provisions from the
Fair Labor Standards Act; specifically, Section
216(b) provides as follows:
An action to recover the liability prescribed ... may
be maintained against any employer (including a
public agency) in any Federal or State Court of
competent jurisdiction by any one or more employees
for and in behalf of himself or themselves and other
employees similarly situated. No employee shall be a
party plaintiff to any such action unless he gives his
consent in writing to become such a party and such
consent is filed in the court in which such action is
brought.

29 U.S.C. § 216(b).

The Supreme Court's decision in *Hoffmann* clearly
authorizes and, in fact, advocates that the district
court exercise its discretion early in the litigation to
permit discovery of the names and addresses of
discharged employees to ensure that such potential
plaintiffs are promptly and accurately notified. The
Supreme Court noted the underlying interests in the
trial court's discretionary involvement in facilitating
notice to potential plaintiffs:
A collective action allows age discrimination
plaintiffs the advantage of lower individual costs to
vindicate rights by the pooling of resources. The
judicial system benefits by efficient resolution in one
proceeding of common issues of law and fact arising
from the same alleged discriminatory activity.

*Hoffmann,* 493 U.S. at 170.

Defendants argument that Justice Kennedy's
concurrence in *Hazen Paper Co. v. Biggins,* 113 S.Ct.
1701, 1710 (1993) (Kennedy, J., concurring), " casts
significant doubt on whether a plaintiff may proceed,
as plaintiffs attempt to do here, under a disparate
impact theory of liability in an action under the
ADEA," (Defs.' Mem. in Opp., at 3), is premature

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1993 WL 276058 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.)

Page 2

both as to this action and in general, given that the Supreme Court in *Hazen* specifically declined to decide whether a disparate impact theory of liability is available under the ADEA, *id.* at 1706, and that the Second Circuit Court of Appeals has clearly ruled that disparate impact doctrine is applicable to ADEA cases in this circuit. *Maresco v. Evans Chemetics, 964 F.2d 106, 115 (2d Cir.1992); Lowe v. Commack Union Free School Dist., 886 F.2d 1364, 1369 (2d Cir.1989), cert. denied, 494 U.S. 1026 (1990).*

**\*2** Plaintiffs' allegations of disparate impact are sufficient at this stage and do not undermine plaintiffs' argument that it is appropriate to notify those " similarly situated." Plaintiffs have identified two ranking criteria that could support a disparate impact analysis under the ADEA which were employed in all of the banding entities into which plaintiffs and those similarly situated were divided. Moreover, alleged statements from certain NYT employees may also support plaintiffs' claims. Defendants' FMP, however diffuse its implementation, appears nevertheless to have been a single plan contemplating reduction of defendants' staff within a tightly proscribed period, i.e., December 1992.

Defendants contest plaintiffs' motion by seeking to contest the merits of plaintiffs' claims more vigorously than is necessary at this stage. Specifically, defendants seek to cast doubt on whether a definable group of " similarly situated" plaintiffs can exist here. It is beyond contention that a definable group of " similarly situated" former and present employees does exist; the Court need not evaluate the merits of plaintiffs' claims in order to determine whether a " similarly situated" group exists. Plaintiffs need only set forth " substantial allegations that the putative class members were together victims of a single decision, policy or plan infected by discrimination." *Sperling v. Hoffmann-La Roche, Inc., 118 F.R.D. 392, 407 (D.N.J.1988).* In this Court's view, the " similarly situated" burden has been met here; even if plaintiffs' claims turn out to be meritless or, in fact, all the plaintiffs turn out *not* to be similarly situated, notification at this stage, rather than after further discovery, may enable more efficient resolution of the underlying issues in this case. At the very least, plaintiffs' detailed allegations and supporting affidavits " successfully engage [defendants'] affidavits to the contrary" for purposes of the present motion. *Id.* at 406. Further, as the court said in *Frank v. Capital Cities Communications, Inc.,*

*88 F.R.D. 674 (S.D.N.Y.1981):*
[T]he experiences of other employees may well be probative of the existence *vel non* of a discriminatory policy, thereby affecting the merits of the plaintiffs' own claims; and the notice machinery contemplated by the ADEA, by reaching out to potential plaintiffs, may further the statute's remedial purpose.

*Id.* at 676.

The Court thus decides that defendants must provide plaintiffs with the names and last-known residences of those putative plaintiffs who have not yet joined either the *Carroll* or the *Krueger* actions.[FN3] During oral argument, all parties were in apparent agreement that approximately eighty individuals had not yet opted in to either action, but might be eligible to do so.[FN4] These approximately eighty individuals and any others falling within the group of persons similarly situated will be notified under the guidelines set out by the Court below.

2.

**\*3** In accordance with *Hoffmann,* the Court turns now to the form and content of the notice it has ordered which is to be approved by the Court prior to mailing in order that present and after-the-fact disputes between counsel as to form and manner of consent may be eliminated. *Hoffmann, 493 U.S. at 170.* One notice is to be mailed to possible plaintiffs describing both actions. The notice shall include the following information: (1) a brief identification of each action (including class definitions arrived at as set forth in footnote 4, *supra* ); (2) any fees or advances a plaintiff would be obligated to pay at any stage of the litigation; (3) that the *Carroll* action is limited to plaintiffs living in the New York City metropolitan area; (4) the number of individuals who have submitted signed consent forms in each action as of the date of the mailing; (5) that both actions include claims under the HRL; (6) that only the *Krueger* action includes an ERISA claim; (7) that the Court has expressed no opinion as to the merits of the ADEA, HRL or ERISA claims; (8) that the individual is free to join either action (subject to the geographic limitations of *Carroll* ), no action, or to pursue an individual claim should he or she wish to do so; and (9) that if the individual signs the consent form for either action that he or she will be bound by the result.

For the foregoing reasons, the *Krueger* plaintiffs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1993 WL 276058 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.)

Page 3

motion is granted and the *Carroll* plaintiffs motion is granted in part and denied in part. Defendants are ordered to release the names and addresses described above within 15 days of the Court's approval of a class definition (*see*, footnote 4, *supra* ). Defendants' counsel will draft a notice of the form and content described above (including an opt in form). Defendants' counsel will submit the proposed notice to plaintiffs' counsel within 15 days of the Court's approval of a class definition; plaintiffs' counsel will submit the proposed notice with their respective comments to the Court within 7 days of receipt of the proposed notice drafted by defendants. The Court will then determine and approve the final form and content of the notice.

SO ORDERED.

FN1. The motions filed in the two actions are substantially similar except that in *Carroll* plaintiffs also request class certification pursuant to Fed.R.Civ.P. 23 and joint notice with *Krueger* to all parties who have previously opted in to either case (as distinct from notice only to those " similarly situated" who have not opted in to either action). The *Carroll* plaintiffs have since declined to press that part of their motion relating to class certification. Insofar as the motion in *Carroll* relating to form of notice differs from that in *Krueger,* the Court's disposition of the common aspects of the motions will, in effect, determine all issues raised as part of both motions.

FN2. Fed.R.Civ.P. 23, which generally governs class actions in federal court, is not applicable to plaintiffs' ADEA claims. As discussed *infra*, ADEA actions require parties to opt in whereas a pendent state law claim, such as the HRL claim, must be certified under Rule 23 which requires that a class member is a party unless he or she affirmatively " opts out" of the suit. At some future date, the Court may be called upon to decide whether to certify classes for the HRL and/or the ERISA claims pursuant to Fed.R.Civ.P. 23. Plaintiffs apparently concede that if an HRL class is certified, it should be limited to those employees who join the ADEA collective action. (Pls.' Mem. in Support *(Krueger),* at 2 n. 2.) *See Robinson v. Sizes Unlimited, Inc.,* 685

F.Supp. 442, 445-46 (D.N.J.1988) (determining that appropriate course of action where pendent jurisdiction over state law claims is asserted in ADEA collective action is to limit the class certified for the state law claim to ADEA class members who could then choose to opt out of the state law based class action). The Court need not decide at this point whether it will also limit the ERISA class action to those individuals who opted into the ADEA action; clearly, the issues of pendent jurisdiction relevant to the HRL claims are not present in relation to the ERISA action.

FN3. The Court stresses that no notice is to be sent to those parties who have already signed consents to be included in either action.

FN4. Accordingly, the Court assumes that the parties can agree as to an appropriate procedure for defendants to release to plaintiffs the names and last known residences of those individuals aged 40 or over, employed as managers or in a managerial capacity, who were involuntarily terminated, discharged, demoted, reduced in pay, forced to retire, furloughed or laid off from employment by NYT as part of the FMP in December 1992.

Since counsel for plaintiffs in both *Krueger* and *Carroll* apparently agreed at oral argument that (geographical limitations and allegations relating to ERISA apart) their class definitions are coterminous in substance, such counsel are to confer within 10 days of the date of this Order and attempt to agree to a precise class definition. That failing, such counsel will, within 15 days of the date of this Order, submit their competing definitions and supporting justifications to the Court. Any definition must be approved by the Court, even if arrived at by agreement between plaintiffs' respective counsel.

S.D.N.Y.,1993.

Krueger v. New York Telephone Co.

Not Reported in F.Supp., 1993 WL 276058 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1993 WL 276058 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- F.Supp.2d ----                                         Page 1

--- F.Supp.2d ----, 2007 WL 1288582 (S.D.N.Y.)

(Cite as: --- F.Supp.2d ----)

Lynch v. United Services Auto. Ass'n
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
William LYNCH, on behalf of himself and others
similarly situated, Plaintiff,
v.
UNITED SERVICES AUTOMOBILE
ASSOCIATION, Defendant.
No. 07-CV-562 (CM).

April 26, 2007.

DECISION AND ORDER DENYING
DEFENDANT'S MOTION TO DISMISS THE
COMPLAINT OR, ALTERNATIVELY, FOR
SANCTIONS PURSUANT TO 28 U.S.C. § 1927,
AND GRANTING PLAINTIFF'S MOTION FOR
CONDITIONAL CLASS CERTIFICATION AND
COURT-AUTHORIZED NOTICE

MCMAHON, J.

*1 Plaintiff William Lynch brings this lawsuit on
behalf of himself and other similarly situated
employees of defendant United Services Automobile
Association (" USAA" ), for USAA's alleged
violations of the Fair Labor Standards Act (" FLSA"
). 29 U.S.C. § 201 et seq. Lynch alleges that USAA
failed to pay plaintiff and other special investigators
for overtime hours worked in excess of forty hours
per week at a rate of one and one half times their
regular rate of pay, in violation of 29 U.S.C. §
207(a)(1).

USAA moves to dismiss the complaint on the basis
that Lynch is judicially and equitably estopped from
bringing such a claim. USAA argues that Lynch
sought to opt into an identical class action filed in
August 2006 in the Middle District of Florida (which
was subsequently dismissed in December 2006), and
that Lynch argued in that litigation that the Florida
court was the proper venue to determine whether to
conditionally certify the class of USAA special
investigators. Because Lynch now avers that this
court is the proper forum to decide whether to certify
the identical class, USAA argues that he should be
estopped and the case dismissed. Alternatively,
USAA argues for sanctions against Lynch's attorneys
because their " blatant forum-shopping" means
USAA will have to duplicate its efforts in defending
the Florida litigation here.

Plaintiff Lynch concurrently moves for conditional
class certification, court-authorized notice pursuant to
section 216(b) of the FLSA, and an order directing
USAA to produce a list of its special investigators.
Lynch argues that the allegations in his complaint,
the deposition testimony of four opt-in plaintiffs and
USAA's 30(b)(6) representative, and three opt-in
plaintiff declarations sufficiently demonstrate that a
class of " similarly situated" employees exists, and
that no further discovery is necessary at this
procedural stage.

For the reasons stated below, defendant's motion to
dismiss the complaint or, alternatively, for sanctions
under 28 U.S.C. § 1927, is denied. Plaintiff's motion
for conditional class certification, court-authorized
notice, and an order directing USAA to produce a list
of special investigators, is granted.

I. Background

A. The Parties

Defendant USAA is a financial services company
headquartered in San Antonio, Texas, that provides
insurance products and services, including property
and casualty insurance, to military personnel and
their family members. USAA operates a unit within
its Property & Casualty company called the Special
Investigators Unit (" SIU" ). (Declaration of
Rachhana T. Srey in Supp. of Pl.'s Opp. to Def.'s
Mot. to Dismiss (" Srey Mot. to Dismiss Decl." ), Ex.
B, Kevin Casey Dep. Tr. at 11-12.)

Plaintiff William Lynch was employed by USAA as
an SIU special investigator. At all relevant times,
Lynch lived and worked for USAA in the State of
New York. (Id., Ex. C, William Lynch Dep. Tr. at
64.)

B. The Purported Class

*2 Lynch brings this collective action complaint on
behalf of himself and all " similarly situated" USAA
employees, namely USAA's special investigators.

The primary job of USAA special investigator is to
investigate questionable, suspect, or fraudulent
claims in one of four areas: property, auto, theft and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 2

--- F.Supp.2d ----, 2007 WL 1288582 (S.D.N.Y.)

(Cite as: --- F.Supp.2d ----)

fire. (Declaration of Rachhana T. Srey in Supp. of Pl.'s Mot. for Conditional Class Certification (" Srey Certification Decl." ), Ex. C, Casey Dep. Tr. at 32, 49.) Indeed, special investigators are the only USAA employees responsible for investigating potential fraudulent claims. (*Id.* at 19.) Of the 72 current special investigators, 24 are assigned to investigate specific types of claims and 48 investigate all claims. (*Id.* at 49.)

USAA maintains one job description for all of its special investigators. (*Id.* at 42.) All new special investigators are required to attend a week-long training class held at USAA's headquarters in San Antonio, where they receive a common set of training and orientation materials. (*Id.* at 42-46.) All investigators must perform their job duties in accordance with the *USAA SIU Standard Operating Guidelines,* a handbook drafted by USAA regional managers. (*Id.* at 33, 34; Ex. K.)

All special investigators typically receive assignments in one of two ways. (*Id.,* Ex. C, Casey Tr. at 46.) One process-the " back room" method-begins when an adjuster observes something unusual about a claim, and refers the claim to SIU. These referrals are processed at USAA's headquarters in San Antonio, where the claim is referred to a special investigator based on experience, location, work load, and eligibility. (*Id.* at 46-47, 53.) Under the second process-the " split diary" method-adjusters refer claims directly to special investigators' managers. (*See, e.g., id.,* Ex. E, Judith Burcham Dep. Tr. at 144-45.) Regardless of method, special investigators do not have control over which claims are assigned to them, (*see, e.g., id.,* Ex. D, Lynch Dep. Tr. at 77), nor do they decide whether to investigate a referral. (*See, e.g., id.,* Ex. F, Andrew McFeeley Dep. Tr. at 258-59.)

Similarly, investigators do not have the authority to decide whether to use a private investigator or other outside vendor without their manager's approval. (*See, e.g., id.,* Ex. G, Larry Pangle Dep. Tr. at 102-08.) All outside vendors must be chosen from a pre-approved list. (*See, e.g., id.* at 85.)

Once a claim has been referred for investigation, all special investigators typically use the same research tools such as the Insurance Services Office (" ISO" ) database, which confirms similar losses filed by the claimant in the past, and the National Crime Bureau Investigation (" NICB" ) database. (*Id.,* Ex. C, Casey

Dep. Tr. at 55-56.) Many special investigators also contact local federal law enforcement officials and work with NICE agents on their investigations. (*Id.,* Ex. I, Robert Cliff Decl at ¶ 7, Robert DeGroot, Sr. Decl. at ¶ 6, Stig Larson Decl. at ¶ 6.)

*3 In addition to reviewing these databases, special investigators conduct interviews, obtain statements, review damaged property, and take photographs. (*Id.,* Ex. D, Lynch Dep. Tr. at 73; Ex. E, Burcham Dep. Tr. at 182-83; Ex. F, McFeeley Dep. Tr. at 123.) After they have conducted their investigations, special investigators participate in meetings where they report the facts of the investigation to those who decide whether to pay or deny a claim. (*Id.,* Ex. D, Lynch Dep. Tr. at 133; Ex. E, Burcham Dep. Tr. at 186-90; Ex. F, McFeeley Dep. Tr. at 126.) During these meetings, the special investigators do not decide whether further investigation is necessary or whether to conduct an Examination Under Oath of the insured. (*Id.,* Ex. D, Lynch Dep. Tr. at 133; Ex. E, Burcham Dep. Tr. at 183-84; Ex. F, McFeeley Dep. Tr. at 268.) Nor do special investigators provide recommendations or give their opinions regarding whether a fraud has occurred; they simply report the facts learned during their investigation. (*Id.,* Ex. D, Lynch Dep. Tr. at 136-37; Ex. E, Burcham Dep. Tr. at 195-97; Ex. F, McFeeley Dep. Tr. at 126, 271-73.)

During the last several years, special investigators have witnessed a dramatic increase in the number of hours they have worked. (*Id.,* Ex. G, Pangle Dep. Tr. at 53; Ex. H, Ulick Dep. Tr. at 260; Ex. I, DeGroot Decl. at ¶ 8.) Regardless of what type of claim being investigated, all special investigators are expected to investigate 288 claims per year. (*Id.,* Ex. C, Casey Dep. Tr. at 51.) Special investigators routinely work over forty hours per week in order to investigate all of their files. (*Id.,* Ex. D, Lynch Dep. Tr. at 158; Ex. E, Burcham Dep. Tr. at 287; Ex. F, McFeeley Dep. Tr. at 288-90, 339; Ex. G, Pangle Dep. Tr. at 62; Ex. I, Cliff Decl. at ¶ 9, DeGroot Decl. at ¶ 8, Larson Decl. at ¶ 10.) USAA does not keep a record of the actual number of hours worked by any special investigator. (*Id.,* Ex. C, Casey Dep. Tr. at 59.)

USAA evaluates the job performance of all special investigators using the same standards. (*Id.* at 36.) All special investigators receive an annual salary, consideration for merit increases, and consideration for both a holiday bonus and a performance bonus. (*Id.* at 62-63.) No special investigator is paid overtime compensation because they are all classified

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                Page 3

--- F.Supp.2d ----, 2007 WL 1288582 (S.D.N.Y.)

(Cite as: --- F.Supp.2d ----)

as " exempt." (*Id.* at 65-66.)

### C. The Florida Litigation

On August 4, 2006, the law firm Nichols, Kaster and Anderson, PLLP (" NKA" ) filed a complaint in the Middle District of Florida, on behalf of Zell Armstrong and other " similarly situated" employees against USAA. (*Armstrong v. USAA,* No. 06-CV-1439 (M.D.Fla. Aug. 4, 2006), Docket Entry (" D.E." ) 1, Compl.) In this complaint, named plaintiff Armstrong, a Florida resident and special investigator in USAA's regional branch office in Tampa, FL, alleged that USAA failed to pay overtime compensation to its special investigators in violation of the FLSA, 29 U.S.C. § 207(a)(1). (*Id .* ¶¶ 7-9.) Armstrong further alleged that USAA failed to " preserve records with respect to each of its employees sufficient to determine their wages, hours ... in violation of the FLSA." (*Id.* ¶ 10.)

*4 Shortly after Armstrong filed his complaint, several other former USAA special investigators filed " USAA Plaintiff Consent Forms" (" Consent Forms" ), seeking to join the litigation as opt-in plaintiffs. Andrew McFeeley, another special investigator based in Florida, filed his Consent Form on August 8, 2006. (*Armstrong,* D .E. 4.) Lynch, the named plaintiff in the instant action and a resident and former USAA employee based in New York, filed his Consent Form on September 25, 2006. (*Armstrong,* D.E. 13.)

On October 17, 2006, the *Armstrong* parties met and conferred pursuant to the Middle District of Florida's local rules. (*Armstrong,* D.E. 22, Case Mgmt. Report.) The substance of that meeting was memorialized in a joint Case Management Report, filed on October 23, 2006. (*Id.*) According to the report, the parties disagreed over whether USAA was entitled to conduct discovery regarding Armstrong's allegation that he was similarly situated to a nationwide class of special investigators. (*Id.*) Believing it had such a right, USAA served discovery requests on Armstrong on October 17, 2006, including interrogatories, production requests and deposition notices for the nine individuals, including Lynch, who had at that point filed Consent Forms in *Armstrong.* (*Id.*) The following day, October 18, 2006, Armstrong responded by serving his own interrogatories, production requests, requests for admission, and Fed.R.Civ.P. 30(b)(6) deposition notice. (*Id.*)

Shortly thereafter, on October 27, 2006, Armstrong filed his motion for conditional class certification and judicial notice. (*Armstrong,* D.E. 24.) In his motion, Armstrong argued that conditional certification was appropriate because nine other former USAA special investigators had filed Consent Forms, thereby demonstrating that other USAA employees were " similarly situated" to Armstrong. Armstrong further contended that these Consent Forms rendered discovery on the issue of conditional certification unnecessary.

In response to Armstrong's motion, on October 31, 2006, USAA filed a motion for an extension of time to respond to the certification motion, so that it could conduct discovery regarding Armstrong's contention that he was similarly situated to a nationwide class of USAA employees. (*Armstrong,* D.E. 25.) Following oral argument on November 1, 2006, the court granted USAA's motion, extending its deadline to respond to Armstrong's certification motion until December 4, 2006, and permitting both parties to take limited discovery. (*Armstrong,* D.E. 29, Order.) Accordingly, the parties proceeded to respond to the already served discovery requests, and coordinate a deposition schedule. [FN1]

On November 7, 2006, NKA requested that Armstrong's deposition be rescheduled to the last week of November and that the location be moved from Orlando to Tampa. (Declaration of Andrew Voss in Supp. of Mot. to Dismiss (" Voss Decl." ) ¶ 12.) In response, USAA served an amended notice of Armstrong's deposition for November 27, 2006 in Orlando. (Voss Decl., Ex. 9.)

*5 By November 20, USAA had received discovery responses from several of the opt-in plaintiffs; however, USAA had not received responses from other opt-in plaintiffs, nor had it received responses from Armstrong. On November 21, USAA contacted NKA to inquire why it had not served discovery responses on Armstrong's behalf. One day later NKA responded to USAA: " As you likely already know, Mr. Armstrong has decided to withdraw from participation in the lawsuit, leaving us with no named Plaintiff. Therefore, we intend to move the Court to substitute parties." [FN2] (Voss Decl., Ex. 10.)

However, NKA never filed such a motion and Armstrong failed to attend his scheduled November 27 deposition. Accordingly, on December 7, 2006,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1288582 (S.D.N.Y.)

(Cite as: --- F.Supp.2d ----)

USAA filed-concurrently with its opposition to Armstrong's certification motion-a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 37(d) and 41(b). (*Armstrong*, D.E. 38, 40.) In this motion, USAA requested the " dismissal of all Opt-in Plaintiffs without prejudice." (*Armstrong*, D.E. 38 at 1.) Furthermore, USAA did not seek costs or disbursements from Armstrong or NKA as part of its motion. (*Id.*)

On December 22, Armstrong filed his response to USAA's motion to dismiss, which reads in its entirety:
Named Plaintiff Zell Armstrong does not oppose Defendant's motion to dismiss under Fed.R.Civ.P. 41(b) and 37(d). Mr. Armstrong's claim should be dismissed with prejudice and the claims of all other individuals who consented to join this case as " opt-in" Plaintiffs should be dismissed without prejudice so that these individuals may have an opportunity to re-file the claims in the proper venue.

(*Armstrong*, D.E. 42.)

On January 10, 2007, the court granted USAA's motion and dismissed Armstrong's complaint with prejudice. (*Armstrong*, D.E. 44, Dismissal Order.) However, in its brief order the court noted that, " While numerous consent forms were file [sic] by potential opt-in plaintiffs, the Court did not grant permission for these potential opt-in plaintiffs to join this case, thus this order has no effect on such opt-in plaintiffs' claims and they are free to file a separate action in the proper venue." (*Id.*)

*D. The Current Litigation*

On January 24, 2007, Lynch filed the instant complaint in this court on behalf of himself and other " similarly situated" employees. (Compl., caption.) In his complaint, Lynch-a New York state resident who worked as a USAA special investigator in New York-makes precisely the same allegations as the named plaintiff in *Armstrong* regarding USAA's failure both to pay overtime compensation and maintain adequate employee time records. (*Id.* ¶¶ 10-13.) In addition, several of the opt-in plaintiffs from the Florida action joined Lynch as opt-in plaintiffs in his New York action, by signing identical consent forms and attaching those forms to Lynch's complaint. (*Id.*, attachments.) Zell Armstrong was not among these opt-in plaintiffs.

*6 USAA filed its answer on March 7, 2007 and its motion to dismiss on March 14, 2007. In its motion, USAA alleges that Lynch is both judicially and equitably estopped from filing this lawsuit because he, " through his counsel ... represented to a federal court in Florida that it was the proper venue to hear and decide whether to conditionally certify a class of alleged aggrieved USAA special investigators-*the same alleged aggrieved group, alleging the same injuries*-as in this case." (Def.'s Mot. to Dismiss at 10) (emphasis in original.) Alternatively, USAA seeks sanctions pursuant to 28 U.S.C. § 1927 in the amount of $227,853.46, the total costs and fees incurred by USAA in defending *Armstrong*.

Two weeks after USAA filed its motion to dismiss, Lynch filed his motion seeking conditional class certification, court-authorized notice pursuant to section 216(b) of the FLSA, and an order directing USAA to produce a list of special investigators.FN3

II. *USAA's Motion to Dismiss*

*A. Standard of Review*

Although USAA filed a motion to dismiss, both USAA and Lynch submitted extrinsic evidence regarding the issues of judicial and equitable estoppel. Because this court could take judicial notice of some, but not all, of this extrinsic evidence, *see Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir.2000) (holding courts may take judicial notice of pleadings, testimony, and decisions from prior lawsuits)-because additional discovery would not shed any additional light on the issues raised in USAA's motion-this court will convert USAA's motion to dismiss into a motion for summary judgment. *See Daddazio v. Katherine Gibbs School, Inc.*, No. 98-CV-6861, 1999 WL 228344, at *1 (S.D.N.Y. Apr.20, 1999).

A motion for summary judgment may be granted " if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In addressing a motion for summary judgment, " the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1288582 (S.D.N.Y.)

(Cite as: --- F.Supp.2d ----)

106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989).

*B. Lynch is Neither Judicially Nor Equitably Estopped from Filing this Complaint Because He Was Not a Party to the Armstrong Litigation*

*1. Judicial Estoppel*

USAA's primary contention is that Lynch should be judicially estopped from filing a collective action complaint in this court because Lynch previously " represented to a ... Florida [court] that it was the proper venue to ... decide whether to conditionally certify a class of alleged aggrieved USAA special investigators," and Lynch is now representing to this court that it is the proper venue to decide whether to certify what is essentially the identical class with identical injuries. (Def.'s Mot. to Dismiss at 10.)

*7 The Supreme Court recently discussed the doctrine of judicial estoppel in *Zedner v. U.S.*, --- U.S. ----, ----, 126 S.Ct. 1976, 1987, 164 L.Ed.2d 749 (2006). There, the Court explained, " [W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him. This rule ... generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Zedner,* 126 S.Ct. at 1987 (internal quotation marks and citations omitted).

The *Zedner* Court further reiterated that although this doctrine could not be reduced to a precise formula or test, " several factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position.... A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (citations and internal quotation marks omitted); *cf. Uzdavines v. Weeks Marine, Inc.,* 418 F.3d 138, 148 (2d Cir.2005) (" Our circuit has consistently limited

the application of judicial estoppel to ' situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, and has had that earlier position adopted by the tribunal to which it was advanced." ' ) (quoting *Stichting v. Schreiber,* 407 F.3d 34, 45 (2d Cir.2005)).

It is unnecessary to consider any of these factors, for the simple reason that Lynch was not a party to the *Armstrong* litigation. Despite USAA's protestations that Lynch signed a Consent Form " seeking to join" *Armstrong,* (Def.'s Mot. to Dismiss at 10), the *Armstrong* court explicitly " did not grant [Lynch] permission to join this case." (*Armstrong,* D.E. 44, Dismissal Order at 1.) Therefore, USAA's claim that Lynch is judicially estopped from offering a position in the current litigation that seems inconsistent with his previous effort to litigate in Florida is simply wrong. Indeed, when Lynch and the other opt-in plaintiffs were not permitted to join the Florida litigation, the *Armstrong* court gave Lynch its judicial blessing " to file a separate action in the proper venue." (*Id.*)

*2. Equitable Estoppel*

Alternatively, USAA urges this court to dismiss Lynch's collective action complaint on the basis of equitable estoppel.

Equitable estoppel is " A bar that prevents one from asserting a claim or right that contradicts what one has said or done before or what has been legally established as true." Black's Law Dictionary (8th ed.2004). The doctrine is thus " grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result." *In re Ionosphere Clubs, Inc.,* 85 F.3d 992, 999 (2d Cir.1996); *see also Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 301 (2d Cir.1996). The doctrine is " imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought." *Ionosphere Clubs,* 85 F.3d at 999; *see also Readco,* 81 F.3d at 301.

*8 Lynch is no more equitably estopped from maintaining his complaint in this court, than he is judicially estopped. In its moving papers, USAA

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1288582 (S.D.N.Y.)

(Cite as: --- F.Supp.2d ----)

Page 6

argues that Lynch has employed a " disingenuous litigation strategy" by " previously pursuing the same lawsuit, involving the same parties, alleging the same legal claims, and then short-circuiting the process so [Lynch, other opt-in plaintiffs and NKA] could file in a forum that they perceived as more favorable after ' testing the waters' in the Middle District of Florida." (Def's Mot. to Dismiss at 14.) But Lynch did not file the *Armstrong* litigation. He sought to join it, yes, but the court prevented him from doing so-leaving him free to file a claim on his own behalf elsewhere. USAA does not cite a single authority that supports estopping a plaintiff from seeking relief because he tried unsuccessfully to opt into a similar action in another jurisdiction on behalf of a different plaintiff, that was dismissed in short order.

Because he was never a party until now, Lynch could not have " contradict[ed] what [he] has said or done before." Black's Law Dictionary (8th ed.2004). Nor would " injustice ... otherwise result," *Ionosphere Clubs,* 85 F.3d at 999, given that USAA sought " dismissal of all opt-in Plaintiffs without prejudice," (*Armstrong,* D.E. 38, USAA's Mot. to Dismiss at 1), and the *Armstrong* court specifically stated that Lynch and the other opt-in plaintiffs were " free to file a separate action in the proper venue." (*Id.,* D.E. 44, Dismissal Order at 1.)

The party USAA really wants to " estop" is NKA, the law firm that brought both lawsuits. USAA offers no basis for doing so. Instead, it seeks sanctions against NKA. That motion is no more meritorious than its estoppel motion against Lynch.

### C. *§ 1927 Sanctions are Not Warranted*

Alternatively, defendant USAA seeks sanctions against NKA pursuant to 28 U.S.C. § 1927, for $227,853.46 in costs and fees incurred in defending the Florida action. USAA argues that NKA's " blatant forum-shopping" means that USAA " will be required to duplicate the substantial effort undertaken to confront this same claim in the *Armstrong* litigation," and that sanctions are therefore proper. (Def's Mot. to Dismiss at 2, 18.)

§ 1927 provides that, " Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys fees reasonably incurred because of such

conduct." An award under this statute is proper " when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* No. 99-CV-10175, 2001 WL 1154669, at *3 (S.D.N.Y. Oct. 1, 2001); *see also Bowler v. INS,* 901 F.Supp. 597, 604-05 (S.D.N.Y.1995) (" the purpose of § 1927 is to deter unnecessary delays in litigation" ). The Second Circuit further requires " that an award made under § 1927 must be supported by a finding of bad faith similar to that necessary to invoke the court's inherent power." *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir.1986); *see also Patsy's Brand,* 2001 WL 1154669, at *3 (" Bad faith is the touchstone of an award under this statute." ); *Colucci v. New York Times Co.,* 533 F.Supp. 1011, 1013-14 (S.D.N.Y.1982) (" To justify the imposition of excess costs of litigation upon an attorney his conduct must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation." ) " Unlike Rule 11 sanctions which focus on particular papers, the inquiry under § 1927 is on a course of conduct." *Bowler,* 901 F.Supp. at 605.

*9 While USAA's moving papers accuse NKA of " playing fast and loose with court proceedings," and implementing a " disingenuous litigation strategy," (Def's Mot. to Dismiss at 8, 14), the evidentiary record does not support such allegations. The record merely shows that NKA filed a lawsuit on behalf of Armstrong and other similarly situated USAA employees. When Armstrong chose to withdraw from the suit, NKA attempted to substitute another named plaintiff in the Florida case. When that effort proved unsuccessful, NKA and Armstrong consented to dismissal of the complaint, and NKA commenced a new action on behalf of Lynch, who had the Florida court's explicit blessing to bring suit in what was (for Lynch) a proper forum.

USAA offers no unseemly explanation for why NKA aborted the Florida litigation. USAA does not argue, for example, that the Second Circuit is more hospitable to FLSA claims than the Eleventh Circuit. Nor do the two chain emails submitted by the parties-the sole pieces of evidence that exist outside the *Armstrong* record-reflect anything more than apparently good faith efforts by counsel to coordinate a deposition schedule. (*See* Voss Decl., Ex. 9; Srey Mot. to Dismiss Decl., Ex. L.) Thus, on the record before this court, the only reasonable explanation offered by either party for NKA's consenting to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                          Page 7

--- F.Supp.2d ----, 2007 WL 1288582 (S.D.N.Y.)

**(Cite as: --- F.Supp.2d ----)**

dismissal in *Armstrong* is the withdrawal of the Florida resident/named plaintiff and NKA's inability to locate a replacement. That is a good faith reason to consent to dismissal in a particular forum.

That USAA was forced to file or respond to various collateral motions during the lifespan of Armstrong's complaint hardly amounts to bad faith conduct by NKA. USAA argues that it expended unnecessary resources both in responding to Armstrong's certification motion and in moving to dismiss the complaint, given that NKA eventually consented to dismissal. But only two weeks passed between Armstrong's withdrawal (November 21) and USAA's deadline for opposing certification and decision to file a motion to dismiss (both on December 7). The record reflects that NKA believed it could and would substitute named plaintiffs. (*See* Srey Mot. to Dismiss Decl., Ex. L.) Such a belief was particularly well-founded, since another Florida resident had already signed a Consent Form. (*Armstrong*, D.E. 4.) Nothing in the record suggests that NKA actually knew during this two week period that it would be unable to substitute another named plaintiff, or that NKA intended to run up USAA's legal fees or otherwise delay the litigation. Moreover, NKA did not oppose USAA's motion to dismiss once it realized its efforts were futile; rather, NKA consented to dismissal two weeks after USAA filed its motion. Given this record, NKA's inability to substitute a named plaintiff inside a two week window hardly demonstrates that NKA acted in bad faith. *Cf. Apex Oil Co. v. Belcher Co. of N.Y.*, 855 F.2d 1009, 1019 (2d Cir.1988) (upholding sanctions on counsel for forcing plaintiffs to make successive motions to compel discovery); *Steinberg v. St. Regis/Sheraton Hotel*, 583 F.Supp. 421, 426 (S.D.N.Y.1984) (awarding § 1927 sanctions in " one of the most frivolous employment discrimination actions ever brought" ); *Aller v. New York Bd. of Elections*, 586 F.Supp. 603, 608 (S.D.N.Y.1984) (awarding sanctions where counsel advised plaintiffs to pursue constitutional claims that were legally precluded from being litigated in that forum).

**\*10** Furthermore, any merits-based work that USAA's attorneys have done in connection with the *Armstrong* action can be used in this action, which will reduce the attorney fees expended in this case. So it all evens out.

I am constrained to note that by making this patently ridiculous motion to dismiss or for sanctions, USAA

has unnecessarily increased its own legal fees, and has caused Lynch and NKA to incur completely unnecessary fees-a fact the court will remember at fee award time should plaintiff prevail in this action.

### III. *Lynch's Motion for Conditional Class Certification*

Plaintiff seeks conditional certification and court-facilitated notice in this collective action pursuant to the FLSA, 29 U.S.C. § 216(b). The FLSA specifically contemplates employees pursuing their claims collectively:

An action ... may be maintained against any employer ... in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). The collective action procedure allows for efficient adjudication of similar claims, so " similarly situated" employees, whose claims are often small and not likely to be brought on an individual basis, may join together and pool their resources to prosecute their claims. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989).

An FLSA collective action under section 216(b) contains three essential features. First, in order to participate in a collective action, an employee must " opt-in," meaning the employee must consent in writing to join the suit and that consent must be filed with the court. Second, the statute of limitations runs on each employee's claim until his individual Consent Form is filed with the court. Third, to better serve the FLSA's " broad remedial purpose," courts may order notice to other potential similarly situated employees to inform them of the opportunity to opt-in the case. *Id.* at 173.

In light of these features, court-supervised notice is the preferred method for managing the notification process for several reasons: it avoids " multiplicity of duplicative suits;" it allows the court to set deadlines to advance the disposition of an action; it furthers the " wisdom and necessity for early judicial intervention" in multi-party actions; and it protects plaintiffs' claims from expiring under the statute of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1288582 (S.D.N.Y.)

(Cite as: --- F.Supp.2d ----)

Page 8

limitations. *Id.* at 171-72.

*A. The FLSA's Two-Stage Certification Process*

Federal district courts in New York have adopted a two-step approach to determine whether certification is proper. *See Iglesias-Mendoza v. La Belle Farm, Inc.,* 239 F.R.D. 363, 367 (S.D.N.Y.2007). The first step is the notice stage in which the court determines, based on plaintiffs' pleadings and affidavits, whether the plaintiffs and potential opt-in plaintiffs are sufficiently " similarly situated" to issue notice and allow the case to proceed as a collective action through discovery. *Id.* Once the court determines that potential opt-in plaintiffs may be " similarly situated" for the purposes of authorizing notice, the court " conditionally certifies" the collective action, and the plaintiff sends court-approved notice to potential members. *Id.* Those potential plaintiffs may then elect to opt-in pursuant to section 216(b) by filing Consent Forms with the court. *Id.* Once notice is accomplished, the action proceeds as a collective action throughout the discovery process. *Lee v. ABC Carpet & Home,* 236 F.R.D. 193, 197 (S.D.N.Y.2006).

*11 During the second stage, the court undertakes a more stringent factual determination as to whether members of the class are, in fact, similarly situated. *La Belle Farm,* 239 F.R.D. at 367. This stage typically occurs on a defendant's motion for decertification. As a result of this two-step stage, the initial " conditional certification" determination is merely a preliminary finding. *Lee,* 236 F.R.D. at 197. If, after discovery, it is apparent that plaintiffs and others are not similarly situated, the court may " de-certify" the class and dismiss the claims of the opt-in plaintiffs without prejudice. *See La Belle Farm,* 239 F.R.D. at 367.

*B. The Standard for Conditional Class Certification and Court-Facilitated Notice*

The burden for demonstrating that potential plaintiffs are " similarly situated" is very low at the notice stage. Plaintiff need only make a " modest factual showing" that plaintiff and potential collective action members were victims of " a common policy or plan that violated the law." *Id.* at 367-68 (concluding that plaintiffs had " easily made the modest showing that is required of them at this preliminary stage" through their allegations of common wage and overtime practices that violate the FLSA). Plaintiff's burden is

thus " minimal" at this stage. *Id.* at 368; *see also Mazur v. Olek Lejbzon & Co.,* No. 05 Civ. 2194, 2005 WL 3240472, at *5 (S.D.N.Y. Nov. 30, 2005) (" Plaintiffs ... face only a very limited burden ... purposes of proceeding as a collective action." ) (internal citations and quotation marks omitted). This initial burden is limited, in part, because " the determination that the parties are similarly situated is merely a preliminary one" and may be modified or reversed at the second stage certification stage. *Lee,* 236 F.R.D. at 197.

At this procedural stage, the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations. *See Barrus v. Dick's Sporting Good, Inc.,* No. 05-CV-6253, 2006 WL 3373117, at *4 (W.D.N.Y. Nov. 3, 2006). Indeed, a court should not weigh the merits of the underlying claims in determining whether potential opt-in plaintiffs may be similarly situated. *Young v. Cooper Cameron Corp.,* 229 F.R.D. 50, 54 (S.D.N.Y.2005) (" The focus ... is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are similarly situated ... with respect to their allegations that the law has been violated." ); *Hoffmann v. Sbarro, Inc.,* 982 F.Supp. 249, 262 (S.D.N.Y.1997) (" the Court need not evaluate the merits of plaintiffs' claims in order to determine that a definable group of similarly situated plaintiffs can exist here." ).

Because courts do not weigh the merits of the claim, extensive discovery is not necessary at the notice stage. *See Masson v. Ecolab, Inc.,* No. 04-CV-4488, 2005 WL 2000133, at *14-15 (S.D.N.Y. Aug. 17, 2005) (noting defendant's stated need for " extensive" discovery does " not bear on whether this case can proceed as a collective action. Indeed, approval of this collective action is for purposes of discovery as well as notice." ); *La Belle Farm,* 239 F.R.D. at 368 (" The court is not obliged to wait for the conclusion of discovery before it certifies the collective action and authorizes notice." ). As this court noted in *La Belle Farm,*

*12 If the fruits of full discovery reveal that plaintiffs are not, in fact, similarly situated to defendants' other employees, or that only employees who worked at the same facility or engaged in a particular job are similarly situated, I may later decertify the class and divide it into subclasses, if appropriate.

*Id.* at 369 (internal citations and quotation marks

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                            Page 9

--- F.Supp.2d ----, 2007 WL 1288582 (S.D.N.Y.)

**(Cite as: --- F.Supp.2d ----)**

omitted). Thus, any factual variances that may exist between the plaintiff and the putative class do not defeat conditional class certification. *Id.* (" For the moment, the factual variations defendants rely on do not undercut plaintiffs' allegations of common wage and overtime practices that violate the FLSA." ).

Additionally, the standard for class certification under Federal Rule of Civil Procedure 23 is not relevant to an FLSA collective action. Unlike Rule 23, section 216(b) of the FLSA requires no showing of numerosity, typicality, commonality, or representativeness. *Id.* (citing *Young,* 229 F.R.D. at 54). As a result, the " similarly situated" standard for certifying a 216(b) collective action is " considerably more liberal than class certification under Rule 23." *Id.*

Finally, informal efforts by plaintiffs and their counsel to provide notice to potential opt-ins through advertisement letters or other means are not factors to be considered by courts when determining whether to approve court-authorized notice. *See Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988).

### C. Plaintiff Has Met the " Similarly Situated" Standard

Lynch's motion for conditional class certification and court-authorized notice is supported by the allegations in his complaint, the deposition testimony of four opt-in plaintiffs and USAA's 30(b)(6) representative, and three opt-in plaintiff declarations. Courts have routinely authorized notice to putative class members on far more modest records than present in this case. *See, e.g., Sipas v. Sammy's Fishbox, Inc.,* No. 05-CV-10319, 2006 WL 1084556, at *2 (S.D.N.Y. Apr. 24, 2006) (conditionally certifying class on basis of three affidavits and complaint's allegations); *Masson,* 2005 WL 2000133, at *14 (conditionally certifying on basis of three opt-in plaintiffs).

Conditional class certification is appropriate under the facts of this case because the evidence far exceeds that which is necessary to meet the low " similarly situated" standard. First, all special investigators perform their jobs under the same management structure. Second, all special investigators perform the same job duties, namely the investigation of questionable, suspicious or fraudulent claims. They are all subject to the same job description and

perform their jobs under the same performance standards. All special investigators receive the vast majority of their new referrals from a centralized location, USAA's corporate headquarters in San Antonio. Special investigators do not have the authority to decline a referral because all referrals generated by the home office must be investigated. Regardless of whether the special investigator is assigned to auto, property, casualty, or theft/fire claims, they all conduct their investigations in accordance with *USAA SIU Standard Operating Guidelines.* Special investigators interview witnesses and insureds, obtain statements, take photographs, and use other investigatory tools such as the ISO and NICB databases. They also have relationships with local law enforcement and NICB agents to help them in their investigations. If special investigators want to use a private investigator or an outside vendor during their investigations, they must first obtain approval from their Regional Manager. Even if they obtain approval, they are limited to a pre-approved vendor list.

\*13 After the special investigators complete their investigations, they participate in meetings with their Regional Manger, the claims adjuster, and USAA attorneys. During these meetings, the special investigators' responsibility is to report the facts of their investigation. In accordance with the *USAA SIU Standard Operating Guidelines,* special investigators are not to give a recommendation or provide their opinion as to whether the claim is fraudulent. Additionally, special investigators do not decide whether an Examination Under Oath of the insured is required, or whether to pay or deny a claim.

Given that Lynch shares these similar job duties with other USAA special investigators, his motion for conditional certification should be granted.

### D. Plaintiff Sufficiently Alleges that USAA Misclassified its Special Investigators as " Exempt" from the FLSA

Courts typically authorize dissemination of Section 216(b) notice upon a simple showing that other employees may also have been subjected to the employers' practice of " misclassifying." Recently, in *Patton v. Thompson Corp.,* the Eastern District of New York concluded that § 216(b)'s " similarly situated" standard had been satisfied where the plaintiff alleged that she had worked over forty hours

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 10

--- F.Supp.2d ----, 2007 WL 1288582 (S.D.N.Y.)

**(Cite as: --- F.Supp.2d ----)**

per week without overtime compensation, that her position was misclassified as exempt, that other employees in her position had the same job duties, and that the employer had admitted it paid all employees in plaintiff's position in the same manner and had classified the position as exempt. 364 F.Supp.2d 263 (E.D.N.Y.2005). Similarly, the *Lee* court approved judicial notice, finding plaintiff's allegation that employees were misclassified as independent contractors " sufficiently alleged a common policy or plan." 236 F.R.D. at 198.

The deposition testimony, declarations, and allegations attached to Lynch's motion establish that USAA misclassified its special investigators as exempt employees and failed to pay them overtime compensation for hours worked above forty per week. As confirmed by USAA's 30(b)(6) witness, the Assistant Vice President responsible for special investigators, the policies and practices relative to the misclassification of special investigators do not vary, but rather affect all special investigators the same nationwide. In light of this strong evidence, it is clear that Lynch met his burden of showing that he is " similarly situated" to other special investigators and Lynch's motion should therefore be granted.

### E. Lynch's Collective Action is Appropriate for Court-Facilitated Notice

Having decided that Lynch's complaint states a colorable claim for relief, this court will now turn to Lynch's request for court-authorized notice informing potential plaintiffs of their opportunity to " opt-in" to the present lawsuit.

The Supreme Court has held that the benefits to the judicial system of collective actions " depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Hoffmann-La Roche,* 493 U.S. at 170. Courts are encouraged to become involved in the notice process early, to insure " timely, accurate, and informative" notice and to help maintain control over the litigation. *Id.* at 172. The *Hoffmann-La Roche* Court further held that a court-approved notice to potential plaintiffs in FLSA collective actions is proper in " appropriate cases." *Id.* at 169. Determining what is an " appropriate case" lies within the " discretion" of district courts. *Id.*

**\*14** The instant action is just such an " appropriate

case." Prompt court action is needed because potential opt-in plaintiffs' claims are in risk of being extinguished by the running of the statute of limitations. *See Hoffmann,* 982 F.Supp. at 260. Unlike Rule 23 class actions, the statute of limitations for those who have not filed Consent Forms is not tolled by the commencement of this action. *Id.* As a result, the statute of limitations continues to run on each individual's claim until they file a Consent Form with this court. *Id.* Thus, every day that passes is a day of damages each potential opt-in plaintiff will be unable to recover. Court-facilitated notice will prevent the continued erosion of these claims.

Moreover, such court-authorized notice will promote judicial economy. Because identical issues of law and fact exist amongst all of USAA's special investigators, collective resolution of their claims-at least during the discovery phase-benefits the judicial system. *See Hoffmann-La Roche Inc.,* 493 U.S. at 170. Collective adjudication will avoid the proliferation of individual lawsuits that could result in disparate rulings and wasting of judicial and party resources. Requiring Lynch and opt-in plaintiffs to file separate cases in multiple federal district courts would not be an economic use of judicial resources.

In addition, notice is warranted because Lynch has established by submission of additional Consent Forms and declarations that other putative class members exist who may be interested in opting-into this litigation. These special investigators were employed during the same liability period and therefore were subject to the same unlawful compensation policy.

For all of these reasons, Lynch's proposed judicial notice form (Srey Certification Decl., Ex. A), is approved. A signed copy is attached to this decision.

### F. USAA is Ordered to Produce a List of Special Investigators

Because all special investigators employed by USAA in the past three years are " similarly situated" employees for FLSA purposes, their identification is necessary so that Lynch can provide them with notice of this action. *See Hoffmann-La Roche Inc.,* 493 U.S. at 170; *Patton,* 364 F.Supp.2d at 266. Therefore, USAA is ordered to produce to Lynch the following within five days of this court's order:
A list, in electronic and importable format, of all persons employed by defendant as special

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1288582 (S.D.N.Y.)

(Cite as: --- F.Supp.2d ----)

investigators from three years prior to the date of this order to the present, including their name, address, telephone number, dates of employment as a special investigator, location of employment, date of birth, and last four digits of their Social Security Number.

IV. *Conclusion*

For the foregoing reasons, defendant USAA's motion to dismiss plaintiff William Lynch's collective action complaint, or in the alternative, for sanctions pursuant to 28 U.S.C. § 1927, is denied. Plaintiff's motion for conditional class certification, court-authorized notice pursuant to section 216(b) of the FLSA, and an order directing USAA to produce a list of special investigators, is granted.

**\*15** This constitutes the decision and order of the court.

> FN1. Both parties later agreed to extend USAA's deadline until December 7, 2006 to accommodate the parties' deposition schedule. (*Armstrong,* D.E. 35.)

> FN2. According to Lynch's opposition papers, NKA attempted to substitute Andrew McFeeley-the only other opt-in plaintiff who was also a Florida resident-as the named plaintiff in *Armstrong* . But, " For reasons NKA will share only with the Court, *in camera,* those efforts were unsuccessful." (Pl.'s Opp. Br. at 5.) NKA's inability to substitute McFeeley for Armstrong is irrelevant to the motions pending before this court, and an *in camera* explanation is therefore unnecessary.

> FN3. USAA's subsequent motion to stay its response to Lynch's certification motion pending the outcome of USAA's motion to dismiss, was summarily denied on April 11, 2007.

S.D.N.Y.,2007.

Lynch v. United Services Auto. Ass'n

--- F.Supp.2d ----, 2007 WL 1288582 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.