

Not Reported in F.Supp.2d                                                                              Page 1

Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac. Dec. P 40,844

**(Cite as: Not Reported in F.Supp.2d)**

▷
Manning v. New York University
S.D.N.Y.,2001.

United States District Court, S.D. New York.
George MANNING, Plaintiff,
v.
NEW YORK UNIVERSITY, Defendant.
No. 98 CIV. 3300(NRB).

Aug. 22, 2001.

MEMORANDUM AND ORDER
BUCHWALD, District J.
*1 Plaintiff, George Manning (" Mr. Manning" or " plaintiff" ), moves pursuant to Fed.R.Civ.P. 60(b) to vacate an in-court settlement he reached with defendant, New York University (" NYU" or " defendant" ), on January 30, 2001. Mr. Manning contends that the settlement is voidable because it was not " knowing and voluntary" under the terms of the under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, as amended by the Older Workers Benefit Protection Act of 1990 (" OWBPA" ), Pub.L. No. 101-433, 104 Stat. 978, codified in 29 U.S.C. § 626(f). For the reasons discussed below, plaintiff's motion is denied and he is ordered to sign the version of the settlement agreement agreed upon by counsel and the Court during the April 4, 2001 conference call.

BACKGROUND

The events underlying Mr. Manning's lawsuit are of little relevance to issue before us and are discussed at length in Magistrate Judge Pittman's July 28, 2000 Report and Recommendation.[FN1] Briefly, Mr. Manning's lawsuit arose out of his termination as Director of Protection Services at NYU in 1997, when he was 67 years old. He was hired as Director in 1981, prior to which he had been a police officer with the New York City Police Department for 25 years.

> FN1. Unless otherwise indicated, all facts are drawn from the Complaint, submissions in conjunction with the previously decided summary judgment motion, submissions in

conjunction with the instant motion and matters which occurred in the presence of the Court.

Mr. Manning filed suit on May 8, 1998, alleging that he was wrongly discharged in violation of the ADEA, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (" Title VII" ), and various state causes of action. NYU defended on the grounds that Mr. Manning was discharged because of his poor communications skills, contentious relationships with his colleagues and superiors, and inability to represent the University adequately to outside agencies and visiting dignitaries. On October 22, 1999, the case was transferred to this Court's docket from Judge Rakoff. NYU moved for summary judgment which we granted in part and denied in part on August 31, 2000, adopting Magistrate Judge Pittman's Report and Recommendation, subject to our clarification.

On September 21, 2000, both parties appeared before the Court for a settlement conference. Mr. Manning appeared with his counsel, Antonia Kousoulas.[FN2] With both parties' permission, the Court commenced the conference by speaking ex parte to each about its settlement position. Mr. Manning suggested that he would accept a package consisting of (1) tuition remission for his stepdaughter, (2) reinstatement, (3) retirement severance benefits, and (4) a large lump sum payment, in exchange for a release and confidentiality agreement. He initially stated that the size of the lump sum payment would depend on whether the release was a general release or simply a release of the claims in the suit, whether the confidentiality agreement would prevent him from writing a book about his experience at NYU, and whether he was reinstated. NYU, in turn, said that it would settle for: (1) tuition remission for Mr. Manning's stepdaughter, (2) retirement severance benefits, and (3) a payment of up to $100,000, in return for a general release and a confidentiality provision covering Mr. Manning's tenure at NYU, the lawsuit and its settlement.

> FN2. Mr. Manning had previously been represented by Arthur H. Forman, Esq.

*2 The Court communicated the essential terms of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac.
Dec. P 40,844

**(Cite as: Not Reported in F.Supp.2d)**

each side's offer to the other. Based on these initial positions, the two sides engaged in vigorous bargaining through the Court's offices for over two hours. The tuition remission, severance benefits, confidentiality agreement and general release remained constant terms throughout the discussions. At the end of the day, Mr. Manning stated that he would consider NYU's offer.

On October 2, 2000, Ms. Kousoulas informed that Court that Mr. Manning had made a settlement demand that would cost NYU ran in the ≤ high $200,000's." She reported that NYU had refused the demand and planned to retain outside counsel. The Court scheduled a one-week trial to begin on January 29, 2001. For trial, NYU retained Dona S. Kahn, Dana J. Scher and Meredith Fein Lichtenberg from the firm of Anderson Kill & Olick, P.C. and Mr. Manning retained Bonnie Mussman in addition to Ms. Kousoulas.

The trial began on January 29, 2001. On that day, the Court empaneled the jury, both parties made opening statements and Mr. Manning gave substantial testimony on direct examination. In a sad turn of events, however, Ms. Kahn's husband died unexpectedly that evening. When Ms. Lichtenberg informed the Court and Mr. Manning on the morning of January 30, 2001, all agreed that the only appropriate course of action was to declare a mistrial. Furthermore, in light of the Court's trial schedule, both parties consented to have the next trial in front of Magistrate Judge Pittman.

Once it had declared a mistrial, the Court suggested that both parties seize the opportunity to discuss settlement once again. In speaking with the parties, the Court learned that they had continued negotiating (including during the trial) and had narrowed the difference between their positions considerably-Mr. Manning had demanded $225,000 while NYU was prepared to offer $185,000. As in the September 21, 2000 settlement conference, the Court met *ex parte* with the parties to discuss their positions and communicate the other party's concerns. During these discussions, Mr. Manning negotiated vigorously and down to the last detail. For example, Mr. Manning declared that he wished to write a book based in part on his experiences at NYU. After much back-and-forth with NYU, he succeeded in narrowing the scope of the confidentiality clause so that it would only cover matters related his termination from NYU and lawsuit, and not his professional experiences.

Similarly, towards the end of the settlement talks, Mr. Manning persuaded his attorneys to accept a reduction in their fees in order to boost his personal recovery. Pursuant to this arrangement, he even negotiated to have separate checks cut to himself and his attorneys, apparently for tax reasons. Finally, Mr. Manning accepted the settlement number of $199,000, along with the terms previously discussed-tuition remission, changing his discharge status to " retiree," a confidentiality agreement and a general release.

*3 In communicating the final offer from NYU, the Court explained each of these terms to him once again. Following that explanation, defense counsel wrote-out a summary of the terms on a sheet of paper which Mr. Manning reviewed, assisted by his two lawyers. The parties having agreed upon the written terms, the Court summoned a reporter in order to place the settlement on the record. Finally, in open court, on the record, and with the presence of counsel, Mr. Manning affirmed these settlement terms once again.[FN3] Pursuant to the confidentiality agreement, the transcript was placed under seal. The Court issued an order that day closing the case

> FN3. The transcript of this exchange reads as follows (January 30, 2001 11:45am Transcript at 2-4.):
> THE COURT: ... At this time do one of the two counsel want to put the terms of the settlement on the record?
> MS. LICHTENBERG: Yes, your Honor. The terms we have agreed to are as follows: First, Crystal Hicks, the plaintiff's step-daughter, finish [sic] her bachelor degree from NYU without paying tuition. Second, George Manning will be considered on the record as a retiree from NYU. Third, the plaintiff George Manning will not publish anything pertaining to this lawsuit or the underlying events of his separation from employment from NYU. Fourth, the terms of this agreement shall be confidential. Fifth, NYU will pay to George Manning the sum of $199,000 in separate checks. Counsel for the plaintiff will advise counsel for NYU as to the denomination of the two separate checks.
> THE COURT: I guess it should be clear that one check will be payable to counsel and the other directly to Mr. Manning.
> MS. LICHTENBERG: Yes, your Honor.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3

Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac.
Dec. P 40,844

(Cite as: Not Reported in F.Supp.2d)

THE COURT: Mr. Manning, you have heard the terms of the settlement as Ms. Lichtenberg has recited them. Do those accurately reflect the terms you agreed to previously?

PLAINTIFF MANNING: They do.

THE COURT: It also should be clear that there will be a written agreement of settlement that will be entered into by the parties consistent with the summary terms that have been listed here, and obviously releases will also be exchanged and the case will be discontinued. Is there anything further at this time?

MS. KOUSOULAS: No, judge.

This Court next heard from Mr. Manning through new counsel, Gerard Tucker of Tucker & McCabe, LLP, on March 2, 2001, via a fax dated February 28, 2001. In his letter, Mr. McCabe petitioned the Court to withdraw the settlement on the ground that Mr. Manning was coerced in settling. He explained:

The Plaintiff maintained his position not to settle even subsequent to the mistrial, despite what he considers pressure from his legal counsel and from the Court. Plaintiff only relented to settle this matter after his wife was brought into chambers and broke down in tears with threats that her [sic] and her husband would lose everything if he refused to settle. The Plaintiff simply wanted to end his wife's anguish, not settle this case on the terms and conditions therein.

NYU did not receive a fax of the February 28 letter until March 5, 2001 and no copy was ever sent to NYU's counsel. Declaration of Meredith Fein Lichtenberg (hereinafter " Lichtenberg Decl." ), at ¶ 26, Ex. H. After receiving an opposition letter from Dona Kahn and a reply from Mr. McCabe, the Court held a conference call on March 8, 2001 in which Ms. Kousoulas, Mr. McCabe, Ms. Kahn and Ms. Lichtenberg participated.

During the call, the Court first explained that it has made a clerical error in issuing the closing order and would immediately correct it. The Court's clerk mistakenly drafted an order dismissing the action without prejudice to either party re-opening the case within 30 days. However, this Court never intended to issue a dismissal without prejudice and it issued a corrective order on March 13, 2001 clarifying that the original dismissal was with prejudice. The Court then explained to plaintiff's new counsel that no coercion

occurred at any time, that the Court had found Mr. and Mrs. Manning totally composed, and that counsel would be wise to consult further with his client concerning these allegations. Mr. McCabe said that he would do so. We never heard from Mr. McCabe again (until he submitted an affidavit in conjunction with the motion at bar) and he never filed a notice of appearance with the Court.

The parties continued negotiating the final language of the settlement agreement throughout this time, exchanging drafts and comments. Lichtenberg Decl. at ¶ 29, Ex. F, J. On March 27, 2001, Ms. Kousoulas informed the Court that Mr. Manning refused to sign the settlement papers prepared by NYU, claiming: (1) he only agreed to release his employment claims, not to a general release, (2) he never consented not to apply for reinstatement, (3) he did not agree to waive his right to sue if he applied for reinstatement and was denied, and (4) he never agreed that he would not participate in other lawsuits against NYU. She sought a ruling from the Court or Magistrate Judge Pittman on the settlement terms. The Court scheduled a conference call for April 4, 2001 to settle the disagreements. On April 2, 2001, Mr. Manning called chambers and declared that he wished to make a Fed.R.Civ.P. 60(b) motion.

*4 On April 4, 2001, the Court held a conference call with Ms. Kousoulas and Ms. Kahn. When the Court asked Ms. Kousoulas about the proposed Rule 60(b) motion, we learned that Mr. Manning had never consulted with her about it. Nevertheless, the Court heard from both sides and offered the following guidance: (1) the only release discussed was general and there is no doubt that this is what Mr. Manning agreed to, and (2) Mr. Manning's " retiree" status implied that he would not re-apply for his job. However, on the Court's suggestion, NYU withdrew its demand that Mr. Manning consent not to participate in any lawsuits against it. Mrs. Kousoulas said that she would speak to Mr. Manning, but declared that she might be forced to withdraw if he continued to refuse to sign. On April 4, 2001, Ms. Lichtenberg faxed Ms. Kousoulas a revised copy of the settlement papers incorporating the Court's guidance. Lichtenberg Decl. Ex. K.

On April 24, 2001, the Court received a letter from Mr. Manning's current counsel, Leonard N. Flamm, dated April 19, 2001. In his letter, Mr. Flamm raised for the first time the issue of whether the settlement violated the OWBPA as well as other grounds he

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac.
Dec. P 40,844
(Cite as: Not Reported in F.Supp.2d)

argued merited rescinding the settlement. The court held a conference call on April 30, 2001 at which time it set a briefing schedule for this motion.

## STANDARD OF REVIEW

Fed. R. Civ. P 60(b), provides that a district court may relieve a party or a party's legal representative from a final judgment, order, or proceeding in five enumerated circumstances and, according to a sixth subclause, for " any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b)(6). Although to justify relief, the movant must demonstrate " extraordinary circumstances" or " extreme and undue hardship," _DeWeerth v. Baldinger,_ 38 F.3d 1266, 1272 (2d Cir.1994), arising from the error, the Second Circuit has held that Rule 60(b)(6) " should be liberally construed when substantial justice will thus be served." _Radack v. Norwegian America Line Agency, Inc.,_ 318 F.2d 538, 542 (2d Cir.1963).

## DISCUSSION

Mr. Manning seeks to have his " on the record" stipulated settlement with NYU voided on the ground that he was given insufficient time to consider its terms, in violation of the OWBPA. We find that assuming, _arguendo,_ the OWBPA is applicable to an " on the record" settlement made before the court, at the trial stage, and with the assistance of counsel, NYU has met its burden of proving that Mr. Manning's settlement complied with its requirement. However, we believe that the OWBPA does not apply to a settlement " on the record" such as Mr. Manning's and, hence, that the settlement is enforceable in the same manner as any other stipulated settlement. Nonetheless, regardless of the application of the OWBPA, we conclude that Mr. Manning is obligated to sign the version of the settlement agreement agreed upon by counsel and the Court during the April 4, 2001 conference call.

## I. Mr. Manning's Waiver was Valid under the OWBPA

*5 The Older Workers Benefit Protection Act (" OWBPA" ) provides that " [a]n individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f)(1). Section 626(f)(2), in turn, enumerates the six requirements necessary for a " knowing and voluntary" waiver for a plaintiff in Manning's

position: [FN4]

> FN4. Specifically, 29 U.S.C. § 626(f)(2) provides:
> " (2) A waiver in settlement of... an action filed in court by the individual ... alleging age discrimination... under section 623 or 633a of this title may not be considered knowing and voluntary unless at a minimum -
>
> (A) subparagraphs (A) through (E) of paragraph (1) have been met; and
> (B) the individual is given a reasonable period of time within which to consider the settlement agreement."

" (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
(B) the waiver specifically refers to rights or claims arising under this chapter;
(C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
(D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
(E) the individual is advised in writing to consult with an attorney prior to executing the agreement." 29 U.S.C. § 626(f)(1)(A-E)
(G) " the individual is given a reasonable period of time within which to consider the settlement agreement." 29 U.S.C. § 626(f)(2)(B)

In _Oubre v. Entergy,_ 522 U.S. 422 (1998), the Supreme Court ruled that 29 U.S.C. § 626(f) should be interpreted strictly and that failure gives a plaintiff grounds for nullifying his settlement. It explained that " [t]he OWBPA implements Congress' policy via a strict, unqualified statutory stricture on waivers, and we are bound to take Congress at its word." _Id._ at 427; _see also_ S.Rep. 101-263 at 31-32. However, strict interpretation does not require placing form entirely over function and we must evaluate the circumstances surrounding each waiver in light of Congress' objectives embodied in the OWBPA. _See American Airlines, Inc. v. Cardoza-Rodriguez,_ 133 F.3d 111, 118 n. 6 (1st Cir.1998) (_citing Raczak v. Ameritech Corp._ 103 F.3d 1257, 1260 (6th Cir.1997) (" Holding an employer strictly accountable for what might be a technical violation of [the OWBPA's] imprecise terms, with no indication that this would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                         Page 5

Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac.
Dec. P 40,844

(Cite as: Not Reported in F.Supp.2d)

facilitate the provision's purpose and might even hamper it, is untenable and would elevate form over substance." ).

The burden is on NYU to prove that Mr. Manning's waiver was " knowing and voluntary." 29 U.S.C. § 626(f)(3).[FN5] We consider each of Section 626(f)(2) requirements, in turn, and conclude that NYU has met its burden. Mr. Manning's waiver was " knowing and voluntary" and, hence, is enforceable.

> FN5. " In any dispute that may arise over whether any of the requirements, conditions, and circumstances set forth in... paragraph (2), have been met, the party asserting the validity of a waiver shall have the burden of proving in a court of competent jurisdiction that a waiver was knowing and voluntary pursuant to paragraph... (2)." 29 U.S.C. § 626(f)(3).

### Section 626(f)(1)(A)

Section 626(f)(1)(A) requires that the settlement agreement be written in a manner " calculated to be understood" by the plaintiff. There can be no doubt but that Mr. Manning understood the agreement's terms perfectly well. First, they were presented to him in writing prior to his settlement " on the record" . See Lichtenberg Decl., Ex. C.[FN6] This handwritten summation is clearly expressed in layman's terms. Both Mr. Manning and his counsel reviewed the paper in the presence of the Court.

> FN6. The handwritten settlement outline stated:
> " • Crystal Hixenbaugh can finish her BA degree from NYU without paying for tuition.
> • George Manning will be considered on the record as a ' retiree.'
> • George Manning will not publish anything pertaining to this lawsuit or the underlying events of his separation from employment[.]
> • [T]erms of the agreement to be confidential[.]
> • NYU to pay the following sum $ 199,000 in separate checks counsel for [plaintiff] will advise."

*6 Second, the settlement terms were read into the record, in open court, and with the presence of counsel. In New York, " [t]he rule had always been

that oral stipulations or concessions made in open court, despite statutory or rule requirements for writings, would be enforced over the objection of lack of a subscribed writing." See In re Dolgin Eldert Corp., 31 N.Y.2d 1, 8-10, 334 N.Y.S.2d 833, 838-40 (1972) (citations omitted). Indeed, an " on the record" stipulation can even satisfy the Statute of Frauds writing requirement. See Anders v. Anders, 6 A.D.2d 440, 441-442, 179 N.Y.S.2d 274, 275-277 (1972), Rudolph v. Cinco, 34 Misc.2d 1016, 1017, 229 N.Y.S.2d 892, 894 (1962). Although federal law applies because we sit in federal question jurisdiction, the Second Circuit has indicated that, " the federal rule regarding oral stipulations does not differ significantly from the New York rule." Monaghan v. SZS 33 Associates, L.P., 73 F.3d 1276, 1283 n. 3 (2d Cir.1996); Willgerodt on Behalf of Majority Peoples' Fund for the 21st Century, Inc. v. Hohri, 953 F.Supp. 557, 560 (S.D.N.Y.1997). This suggests that recitation of the agreement's terms into the record alone could have satisfied Section 626(f)(1)(A)'s writing requirement. However, regardless of whether this recitation independently satisfied the writing requirement, the " most solemn undertaking" of reciting and affirming the agreement in court further supports the conclusion that Manning understood and agreed to the written settlement terms he received prior to his affirmation record. In re Cuffee, 232 B.R. 53, 56 (E.D.N.Y.1999).

Finally, there is no question but that Mr. Manning understood settlement terms perfectly well because he had negotiated them for hours, in the Court's presence, in the months prior to trial and on the date of settlement itself. The basic terms of the settlement had been negotiated since at least September 21, 2000, when the Court held a settlement conference that lasted over two hours. At that conference, the key issues discussed were (1) tuition relief for Mr. Manning's stepdaughter, (2) the legal status of Mr. Manning's termination, i.e. could he be considered a retiree?, (3) the confidentiality of any settlement, and (4) monetary compensation. Mr. Manning bargained before the Court, at length and in the presence of counsel on each of these issues. On the morning of the settlement, Mr. Manning again engaged in vigorous negotiation, in the Court's presence, on each of these issues. Indeed, Mr. Manning's command of the agreement's terms and consequences was so complete that at the very end of the negotiations, after he had agreed in principle to make any settlement confidential, he held out for the right to publish works based on his professional experiences

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 6

Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac.
Dec. P 40,844
(Cite as: Not Reported in F.Supp.2d)

at NYU, as opposed to the particular events surrounding his dismissal. NYU ultimately agreed to this distinction and it is reflected in the final settlement language that specifically only prohibited Mr. Manning from " publish[ing] anything pertaining to this lawsuit or the underlying events of his separation from employment." He even required that NYU execute separate checks to his and his counsel in the hope of avoiding any tax liability on the portion of his recovery that paid for his counsel. Thus, we find that the settlement's terms were presented to him clearly and in writing and we find that he understood them fully when he agreed to them.

### Section 626(f)(1)(B)

*7 To be enforceable, " the waiver [must] specifically refer[ ] to rights or claims arising under this chapter." 29 U.S.C. 626(f)(1)(B). In the hours of negotiations before the Court on September 21, 2000 and January 30, 2001, NYU insisted that there could be no settlement without a complete release of all claims Mr. Manning had or could bring against NYU for events prior to the date of settlement. This position was expressed to Mr. Manning directly by NYU's counsel in open court and repeatedly to Mr. Manning by the Court itself in facilitating settlement talks. At the beginning of the September 21, 2000 conference, Mr. Manning attempted to negotiate limiting the claims waived to only those in the suit, but NYU adamantly refused to accept anything short of a general release. Nothing other than a general release was ever discussed thereafter. Furthermore, when the Court communicated defendant's final settlement offer, the one Mr. Manning accepted, it stated explicitly that the offer was for a general release of all claims against NYU that arose prior to the date of settlement. Mr. Manning agreed to this general release and the Court " specifically refer[red]" to it in describing the settlement on the record. See January 30, 2001, 11:45am Tr. at 4 (Lichtenberg Decl., Ex. A) (" obviously, releases will also be exchanged..." ).[FN7]

> FN7. If the Court's reference to the releases was in any way technically deficient, the deficiency was plainly de minimis, see American Airlines, 133 F.3d at 118 n. 6; Raczak v. Ameritech Corp. 103 F.3d at 1260, in light of the surrounding circumstances and Mr. Manning's plain understanding of the general release's

consistent term.

### Section 626(f)(1)(C-E)

There can be no serious question but that Mr. Manning's waiver satisfied Sections 626(f)(1)(C-E). Section 626(f)(1)(C) requires that the plaintiff " not waive rights or claims that may arise after the date the waiver is executed." NYU never requested such a release, either in court or in the settlement papers memorializing the in-court settlement, and does not seek one now.

Section 626(f)(1)(D) ensures that a plaintiff only waives claims in exchange for meaningful consideration. Id. In the wake of his termination, Mr. Manning had no legal right to tuition remission for his stepdaughter, classification as a " retiree," or a $199,000 payment from NYU. These benefits certainly constituted adequate consideration for his waiver and, in the Court's estimation, a very attractive package in light of his case's strength.[FN8]

> FN8. It will be recalled that on the first day of trial that Mr. Manning had testified at some length.

Section 626(f)(1)(E) requires that the plaintiff be " advised in writing to consult with an attorney prior to executing the agreement ." This requirement is plainly met by the fact that plaintiff was advised by counsel throughout his negotiations on September 21, 2000 and by two attorneys during his negotiations and settlement on January 30, 2001.

### Section 626(f)(2)(B)

The final requirement is that " the [plaintiff] [be] given a reasonable period of time within which to consider the settlement agreement." 29 U.S.C. § 626(f)(2)(B). Congress did not specify how a court should determine what constitutes a " reasonable period of time." The Federal Regulations governing of Section 626(f), Title 29 C.F.R. § 1625.22(g)(4) simply state that " [t]he term ' reasonable time within which to consider the settlement agreement' means reasonable under all the circumstances, including whether the individual is represented by counsel."

*8 In the absence of specific congressional guidance or authoritative caselaw at odds with 29 C.F.R. § 1625.22(g)(4), we engage in a case-specific analysis to determine whether Mr. Manning enjoyed a "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac.
Dec. P 40,844
(Cite as: Not Reported in F.Supp.2d)

reasonable time" to consider his waiver. Had Congress wished courts to apply a specific set of standards, it would have enumerated them as it did for waivers signed outside of lawsuits and United States Equal Employment Opportunity Commission (" EEOC" ) proceedings. 29 U.S.C. § 626(f)(1).[FN9] However, it consciously chose to treat waivers in settlement of lawsuits differently; see S.Rep. No. 101-263 at 32, Older Workers Benefit Protection Act (April 5, 1990), and to leave the determination of " reasonable time" to the court's judgment.[FN10]

> **FN9.** Section 626(f)(1)(F-G) places additional requirements on settlements prior to lawsuits or EEOC proceedings-that " [F](i) the individual is given a period of at least 21 days within which to consider the agreement; or (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement; (G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired."

> **FN10.** The Senate Report explained that Congress imposed less burdensome statutory requirements for waivers in the context of litigation or EEOC proceedings because " [i]n the context of ADEA waivers, the Committee recognizes a fundamental distinction between individually tailored separation agreements and employer programs targeted at groups of employees. Individual separation agreements are the result of actual or expected adverse action against an individual employee. The employee understands that action is being taken against him, and he may engage in arms-length negotiation to resolve any difference with the employer." Id. at 32.

In considering the reasonableness of Mr. Manning's opportunity to consider the proposed settlement and waiver, we are always guided by Congress' stated goals in enacting the OWBPA. Congress' concern in enacting Section 626(f)(2)(B) was to give employees recently informed of their termination time to

consider their interests and solicit professional advice. The Senate Report accompanying the OWBPA explained:

[A] a waiver is not valid unless the individual is given a reasonable period of time in which to review and consider the settlement agreement. An employee who is terminated needs time to recover from the shock of losing a job, especially when that job was held for a long period. The employee needs time to learn about the conditions of termination, including any benefits being offered by the employer. Time also is necessary to locate and consult with an attorney if the employee wants to determine what legal rights may exist. Id. at 33.

Although these concerns are quite sensible in the case of a recently terminated employee, they plainly do not apply to Mr. Manning's case. Mr. Manning commenced settlement negotiations with NYU in front of this Court in September 2000, three years after his termination, and did not finalize negotiations until January 30, 2001. Clearly, Mr. Manning's judgment was in no way clouded by " the shock of losing a job." Furthermore, Mr. Manning retained three counsel during the nearly three years from when he filed his complaint in May 1998, to when he settled in January 2001. He received ample professional advice about his rights and enjoyed ample opportunity to consider his course of action in light of that advice.

In considering all of the circumstances surrounding Mr. Manning's acceptance of the settlement, we conclude that there is no doubt but that he had " reasonable time" to consider his waiver. Our confidence in this determination is particularly strong because the Court was physically present for hours of the settlement negotiations leading to the final agreement.

To begin, the basic terms of the settlement were discussed in great detail at the September 21, 2000 settlement conference. As previously described, the Court solicited proposals from both parties ex parte. Mr. Manning communicated that he would accept a package consisting of tuition remission for his stepdaughter, reinstatement, " retiree" classification, and a large lump sum payment, in exchange for a release and confidentiality agreement. NYU, in turn, offered tuition remission for Mr. Manning's stepdaughter, a change in Mr. Manning's discharge status to " retiree," and a payment of up to $100,000 in return for a general release and a confidentiality

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac. Dec. P 40,844

Page 8

(Cite as: Not Reported in F.Supp.2d)

provision covering Mr. Manning's tenure at NYU, the lawsuit and its settlement. Throughout the two hours of bargaining that ensued, the tuition remission, discharge status, confidentiality agreement and general release remained constant terms. Thus, five months prior to the settlement, Mr. Manning knew its key provisions. The only term in true dispute was the dollar figure-NYU was reluctant to pay over $100,000 while Mr. Manning stated that he believed the settlement value of his case lay in the range of $200-300,000.

*9 The settlement terms were discussed further during the January 30, 2000 settlement conference. As previously discussed during the negotiations that followed, all of which occurred in the Court's presence, Mr. Manning negotiated vigorously and down to the last detail. He demonstrated a firm understanding of the agreement's terms when he negotiated narrowing the confidentiality clause so that it would only cover matters related his termination from NYU and lawsuit, and would not prevent him from writing general professional pieces based on his work experience. He exhibited a clear comprehension of the precise impact his lawyers' fees would have on his " take-home" recovery when he negotiated with his two trial counsel to substantially reduce their fees. When the court communicated NYU's final offer, which Mr. Manning accepted, it explained each of the terms to him once again. Then, in open court, on the record, and with the presence of counsel, he affirmed the terms one more time.

Mr. Manning was calm, collected and in complete control throughout all of the proceedings in front of this Court. His temperament reflected his tenure as a New York City police officer and a sixteen-year tenure as the Director of Protection Services at NYU. Throughout all of the negotiations, we observed that he was assertive, confident, and steadfast in his positions. In over twenty years on the bench, we have seen few plaintiffs this strong-willed and forceful. Furthermore, Mr. Manning faced no time pressure in making his decision-NYU placed no deadline on accepting its offer and no new trial date had been set-and he did not request more time to consider the offer.

It is plain to us that Mr. Manning was keenly aware of exactly the terms he agreed to in his settlement and had considered them at length. He had known all of the key settlement terms, save the dollar figure, for over five months and had vigorously bargained for

the monetary settlement to which he finally agreed. Indeed, the final settlement figure was not significantly less than some of his earlier bargaining positions. Mr. Manning's situation could not be any further from the paradigm Congress painted in justifying the OWBPA of an ill-informed, emotionally overwrought, uncounseled older worker pressured to sign a technical boilerplate waiver on threat of losing his severance package or basic benefits like health insurance. This Court has no reservations whatsoever about whether Mr. Manning had " reasonable time" to consider the settlement agreement.[FN11]

FN11. We also note that even if we were, hypothetically, to rule that Mr. Manning did not have " reasonable time" to consider the settlement terms prior to accepting them on January 30, 2001, his " reasonable time" to disavow them surely ran long before he first informed NYU in early March and the Court that he wished to rescind the agreement. See Morris v. Waste Mgmt. of Va., Inc., 95 F.Supp.2d 586, 587 (E.D.Va.2000) (plaintiff could not use the OWBPA to rescind an oral settlement agreement of her ADEA claim 27 days later because the delay was " unreasonable")

However, we are compelled to express our gravest reservations about the affidavit Mr. Manning submitted in conjunction with this motion. Under oath, Mr. Manning alleged that the following occurred in the final settlement negotiation:

5. Thereupon, Ms. Kousoulas' associate brought my wife into Judge Buchwald's Chambers, at the Court's suggestion. My wife became upset as the discussion in Chambers ensued, and then she left. My attorney and I left Chambers a short while later and Defendant's Counsel then went in.
*10 6. While I was waiting outside Chambers, my wife was still emotionally upset. I was fearful for her mental and physical condition.
7. Shortly after Defendant's Counsel had been in Chambers, I and my attorney were recalled to Chambers. The Judge stated that Defendant had made a final offer of $199,000. In view of the aforementioned pressure from my wife and my attorney, and because my wife was so upset, I stated that I would accept the offer. Both counsel then hastened in to the Courtroom to put the settlement on the record.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac.
Dec. P 40,844
(Cite as: Not Reported in F.Supp.2d)

George Manning's Affidavit in Support of Motion Pursuant to F.R.C.P. 60(b), at ¶¶ 5-7.

The truth differs substantially from Mr. Manning's account. Partway through the January 30, 2001 negotiation, we asked Mr. Manning whether he would like to invite his wife to join him so that he could consult with her about the settlement terms under discussion. He stated that he would and brought her into the robing room. Throughout the entire time Mrs. Manning was in the robing room, she appeared relaxed and comfortable. Indeed, when Mr. Manning and his counsel left the room to consult privately for a few minutes, Mrs. Manning chose to remain and we engaged in social conversation with her about the experience of having children in college and the challenges of early career choices. Mrs. Manning appeared at all times calm, amiable and sociable. Certainly, there was not the slightest hint that she was " emotionally upset," let alone so upset that Mr. Manning should have been " fearful for his mental and physical condition."

Furthermore, Mr. Manning's sworn allegation that his attorneys pressured him into accepting the offer is unbelievable. Throughout the negotiations in front of the Court, Mr. Manning was far more vocal and aggressive than his attorneys. And as previously discussed, Mr. Manning concluded the negotiations by convincing them to accept a fee reduction in order to boost his recovery. While it was apparent that Mr. Manning's attorneys thought that the substantial settlement was advisable, Mr. Manning's actions were not the actions of a man coerced into settlement by his counsel.

Finally, when the Court relayed NYU's ultimate proposal of $199,000, Mr. Manning chuckled at the fact that NYU appeared so sensitive to settling below $200,000, before he agreed to the figure. Later, after the parties agreed to the settlement on the record, the Court observed Mr. Manning and his wife smiling and embracing one another, and laughing with his counsel. Indeed, Ms. Kousoulas purportedly told Ms. Lichtenberg later that " she, Mr. Manning and Mrs. Manning shared a celebratory drink after the Court Supervised Settlement." Lichtenberg Decl. at ¶ 20. In light of these observations and the obvious materiality of the issue of coercion to the resolution of this motion, the submission by Mr. Manning of his wholly uncorroborated affidavit was, at the very least, highly ill-advised.

To conclude, considering all of the circumstances, we find that Mr. Manning had a " reasonable time" in which to consider the agreement and waiver. Accordingly, we find that NYU has met its burden of proving that Mr. Manning's waiver was " knowing and voluntary" under Section 626(f)(2) and, hence, is valid.

**II. The OWBPA is Not Applicable to Mr. Manning's Settlement**

**\*11** Our discussion above proceeded on the assumption that the OWBPA is applicable to an in-court on the record settlement at the trial stage. However, we believe that when Section 626(f)(1) is read alongside other provisions of the ADEA, in the light of precedent, and bearing in mind Congress' stated objectives in enacting the ADEA and OWBPA, that it does not. Our conclusion derives from the ADEA's explicit incorporation of the Fair Labor Standards Act's (" FLSA"), 29 U.S.C. § 201 et seq., enforcement mechanism. Notwithstanding FLSA's general prohibition on individuals waiving claims in conjunction with private settlements, the FLSA has long made an exception for settlement of private lawsuits made " on the record" and subject to judicial scrutiny. Further, we conclude that this exception continues to apply to settlements under the ADEA in the wake of the OWBPA's passage.

A. *Statutory History of Judicially-Supervised Settlement Under the ADEA*

In the course of constructing the ADEA, Congress considered several models for its substantive and enforcement provisions including the National Labor Relations Act (" NLRA" ), 29 U.S.C. § 151 et seq., Title VII, and the FLSA. In the end, Congress settled upon a hybrid scheme, " it modeled ADEA's definition of unlawful discriminatory action and other substantive prohibitions on the language of [Title VII], and modeled ADEA enforcement procedures substantially after [FLSA]." H.R.Rep. No. 101-664 at 17.

Accordingly, the ADEA provides that " amounts owing... as a result of a violation of [the ADEA] shall be deemed to be unpaid minimum wages or unpaid overtime compensation [under the FLSA]" and these rights are to be " be enforced in accordance with the powers, remedies, and procedures" of specified FLSA provisions. 29 U.S.C. § 626(b). In other words, except as otherwise provided, the ADEA is to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 10

Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac. Dec. P 40,844

(Cite as: Not Reported in F.Supp.2d)

enforced in the same manner as the FLSA. *See Lorillard v. Pons,* 434 U.S. 575, 582 (1978) (" This selectivity that Congress exhibited in incorporating provisions and in modifying certain FLSA practices strongly suggests that but for those changes Congress expressly made, it intended to incorporate fully [into ADEA] the remedies and procedures of the FLSA." ); *E.E.O.C. v. Kidder, Peabody & Co., Inc.* 156 F.3d 298, 302 (2d Cir.1998).

Traditionally, FLSA placed strict limits on an employee's ability to waive claims for unpaid wages or overtime under 29 U.S.C. § 216 for fear that employers would coerce employees into settlement and waiver. *See Barrentine v. Arkansas-Best Freight System,* 450 U.S. 728 (1981); *Brooklyn Savings Bank v. O'Neill,* 324 U.S. 697, 706-7 (1945). With only two exceptions, employees cannot waive FLSA claims for unpaid wages or overtime, for less than full statutory damages. The two exceptions are for: (1) settlements supervised by the Secretary of Labor, and (2) judicially-approved stipulated settlements.

Title 29 U.S.C. § 216(c), explicitly carves-out the exception for settlements supervised by the Secretary of Labor. It specifies that " the [supervised] agreement of any employee to accept such a payment shall upon payment in full constitute a waiver by such employee" of his FLSA claims. This provision was intended to create an incentive for employers to accept voluntarily settlements supervised by the Secretary of Labor. *Sneed v. Sneed's Shipbuilding, Inc.,* 545 F.2d 537, 539 (5th Cir.1977).

*12 In contrast, the exception for judicially-supervised stipulated settlements finds its basis in case law. Its genesis lies in *D.A. Schulte, Inc. v. Gangi,* 328 U.S. 108 (1946), a case in which the Supreme Court held that employees generally may not waive FLSA unpaid wage or overtime claims pursuant to private settlements with employers. *Id. at 116.* In dicta, however, the Court suggested that an exception to FLSA's strict waiver requirements could exist for judicially-supervised stipulated settlements: " Even though stipulated judgments may be obtained, where settlements are proposed in controversies between employers and employees over violations of the Act, by the simple device of filing suits and entering agreed judgments, we think the requirement of pleading the issues and submitting the judgment to judicial scrutiny may differentiate stipulated judgments from compromises by the parties."

*Id.* at 113, fn. 8.

In the wake of this dicta, a number of Circuit courts held that judicially-supervised settlements were an exception to the rule that employees may not waive FLSA claims. In *Urbino v. Puerto Rico Ry. Light & Power Co.,* 164 F.2d 12 (1st Cir.1947), the First Circuit ruled:
" It seems to us instead that the Supreme Court in the [*D.A. Schulte* ] statement quoted above must have meant to indicate that it was disposed to permit employees, at least when acting as free agents honestly and fairly advised, and when paid minimum wages and overtime compensation in full, to settle such genuine disputes with their employers as may arise under the Act by foregoing liquidated damages in whole or in part provided such settlement receives the judicial approval implicit in the entry of a consent judgment. *Id. at 14.*

That same year, the Fifth Circuit, in upholding a lower court decision giving res judicata effect to a stipulated settlement of FLSA claims, held:" [T]hat a bona fide dispute of both law and fact was involved in the litigation, and that the proposed settlement agreed upon was fair and equitable to all parties concerned... The cases of [*D .A. Schulte* ], and [*Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697 (1945) ], relied upon by appellants, are not in conflict with our holding here. They were dealing with settlements between the parties. Here we have a solemn and binding stipulated judgment entered upon disputed issues of both law and fact."

*Jarrad v. Southeastern Shipbuilding Corp.,* 163 F.2d 960, 961 (5th Cir.1947). *See also Bracey v. Luray,* 161 F.2d 128 (4th Cir.1947)(citing *D.A. Schulte* footnote eight in holding that judicially-supervised settlement agreement of FLSA claims between employees and employer was enforceable).

More recent cases have continued to recognize this exception. In *Lynn's Food Stores, Inc. v. U.S. By and Through U.S. Dept. of Labor, Employment Standards Admin., Wage and Hour Div.,* 679 F.2d 1350 (11th Cir.1982), the Eleventh Circuit explained:
*13 " There are only two ways in which back wage claims arising under the FLSA can be settled or compromised by employees. First, under section 216(c), the Secretary of Labor is authorized to supervise payment to employees of unpaid wages owed to them... [Second] [w]hen employees bring a private action for back wages under the FLSA, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 11

Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac. Dec. P 40,844

**(Cite as: Not Reported in F.Supp.2d)**

present to the district court a proposed settlement, the district court may enter a stipulated judgment after scrutinizing the settlement for fairness." *Id.* at 1352-53.

See *Druffner v. Mrs. Fields, Inc.,* 828 P.2d 1075, 1078 (C.A.Utah 1992); *McKeown v. Kinney Shoe Corp.,* 820 P.2d 1068, 1071 fn.3 (Alaska 1991); *Thomas v. State of La.,* 534 F.2d 613, 614-15 (C.A.La.1976); H.R.Rep. No. 101-664 at 18-19 (" Alternatively, under section 16(b) of the FLSA, once a private action for back wages has been brought, the plaintiff employees may present to the district court a proposed settlement. The court may then enter a stipulated judgment after scrutinizing the settlement for fairness." ). Thus, it is well-settled that an employee may waive a FLSA claim for unpaid wages or overtime pursuant to a judicially-supervised stipulated settlement.

From the ADEA's enactment in 1967 through the mid-1980's, the FLSA's prohibition against unsupervised waivers governed all ADEA claims, subject only to the exceptions for EEOC [FN12] and court supervision. However, in 1985, faced with a growing number of ADEA suits, the EEOC proposed a rule permitting " knowing and voluntary" unsupervised waivers under the ADEA. Exemption Allowing for Non-EEOC Supervised Waivers Under the ADEA, 52 Fed.Reg. 32293 (August 27, 1987). It explained that the proposal arose out of its concern that older workers' claims were being prejudiced by the delay in obtaining EEOC supervision of settlements. *Id.* Although the EEOC acknowledged that the rule conflicted with the FLSA's prohibition on unsupervised settlements, it found that the ADEA's remedial purpose differed from the FLSA's and was better served by allowing " knowing and voluntary" unsupervised waivers similar to those allowed under Title VII. *Id.*

> FN12. On July 1, 1979, the EEOC assumed enforcement and administrative authority for the ADEA from the Secretary of Labor. H .R. Rep. No. 101-664 at 19. Reorg. Plan No. 1 of 1978, 3 C.F.R. 321 (1978).

Congress disapproved and quickly suspended the rule for one year, 133 Cong. Rec. S14383-84 (Oct. 15, 1987); 113 Cong. Rec. 2401, 12534 (Dec. 21, 1987), concerned that it was " without legal foundation and contrary to public policy." 135 Cong. Rec. E816

(1989) (statement of Rep. Hawkins). Over the next several years, Congress held hearings on the issue, [see Age Discrimination in Employment Act-Waiver of Rights, S. Hrg. 100-717 (100th Cong., 2d Sess.)(1988); Oversight Hearing on Waivers Under the Age Discrmination in Employment Act, H. Hrg. 100-68 (100th Cong., 2d Sess.) (1988) ], and renewed the rule's suspension. 134 Cong. Rec. S10022 (July 27, 1988); 134 Cong. Rec. H8399 (Sept. 27, 1988).

However, while Congress debated, lower courts began enforcing unsupervised waivers of ADEA claims under different theories. Compare *Bormann v. AT & T Communications, Inc.,* 875 F.2d 399, 403 (2d Cir.), cert. denied, 493 U.S. 924 (1989) (applying federal waiver law standard of " totality of the circumstances" ); *Coventry v. United States Steel,* 856 F.2d 514, 518 (3d Cir.1988) (same), with *O'Shea v. Commercial Credit Corp.,* 930 F.2d 358, 362 (4th Cir.), cert. denied, 502 U.S. 859 (1991) (applying common law contract principles); *Lancaster v. Buerkle Buick Honda Co.,* 809 F.2d 539, 541(8th Cir.), cert. denied, 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987) (same); *Runyan v. National Cash Register Corp.,* 787 F.2d 1039, 1044, n. 10, 1045(6th Cir.) (en banc), cert. denied, 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986) (same). In 1990, Congress passed the OWBPA and thereby resolved the circuit dispute by establishing clear and uniform requirements for unsupervised waivers of ADEA claims.

*B. The OWBPA Did Not Displace the ADEA's Provision for Judicially-Supervised Settlements*

\*14 The question before us is whether in adding Section 626(f)'s provisions for unsupervised waivers, Congress displaced the traditional FLSA exceptions for EEOC and court supervised waivers. The answer is not entirely resolved by an examination of the language of Section 626(f). However, the legislative history indicates that it did not. It appears that the new waiver provision's purpose was to expand employees' ability to settle suits with employers in appropriate circumstances, not to limit it.

Repeatedly, the House and Senate reports that accompanied the OWBPA stated that the Act's provision applied only to " unsupervised" settlements. See, e.g., H.R.Rep. No. 101-664 at 26 (" [T]he bill creates for the first time a class of valid, *unsupervised* waivers," ) (emphasis added); S.Rep. No. 101-263 at 32 (" The *unsupervised* waiver must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 12
Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac.
Dec. P 40,844
(Cite as: Not Reported in F.Supp.2d)

be knowing and voluntary." )(emphasis added).
Indeed, the House Report explained that one of the
aims of OWBPA's aims was to " lessen" the burden
on the EEOC and courts of supervising waivers:

   c. Lessening the burden on the EEOC and the
   capacity of the courts to supervise waivers

Under the provisions of [Section 626(f) ], a valid
waiver obtained in the settlement of a bona fide claim
of age discrimination does not require the supervision
of either the EEOC or the courts. Thus, this
legislation actually lessens the burden on the EEOC
for supervision of valid ADEA waivers... [by]
creat[ing] for the first time a class of valid,
unsupervised waivers.
H.R.Rep. No. 101-664 at 26. Nowhere in the
legislative history is there any mention of Section
626(f) replacing EEOC and court authority to
supervise ADEA waivers. It would be bizarre for
Congress to speak of " lessening" this burden if, in
fact, it was eliminating it altogether.

This absence is important in light of Congress' FN13
and the Supreme Court's repeated insistence that the
ADEA incorporates FLSA enforcement provisions
unless otherwise expressly provided. As explained
earlier, the Supreme Court unanimously ratified this
interpretation in Lorillard, where it held that " this
selectivity that Congress exhibited in incorporating
provisions and in modifying certain FLSA practices
strongly suggests that but for those changes Congress
expressly made, it intended to incorporate fully [into
ADEA] the remedies and procedures of the FLSA."
Lorillard, 434 U.S. at 582 (emphasis added).
Nowhere in the OWBPA's legislative history is there
any indication that Congress intended it to overrule
Lorillard. Indeed, quite the opposite-in passing the
OWBPA, Congress reaffirmed its intent once again: "
The Committee has explained in great detail the
Supreme Court's unanimous 1978 [Lorillard ]
decision that the ADEA borrowed its enforcement
provisions (including supervision of waivers ) from
the Fair Labor Standards Act. Congress has
expressed unequivocal approval for the decision
reached in Lorillard." H.R.Rep. No. 101-664 at 26-
27 (emphasis added); see also id. at 17-18. Thus, the
combination of Congress' repeated description of the
OWBPA as applying to " unsupervised" waivers and
the utter absence of any indication that it intended the
OWBPA to supplant the FLSA's provisions for
supervised waivers is strong evidence that EEOC and
court supervised waivers were not displaced by

Section 626(f).

   FN13. When Congress enacted the ADEA in
   1967, Senator Javits explained that " [t]he
   enforcement techniques provided by [the
   ADEA] incorporate by reference, to the
   greatest extent possible, the provisions of
   the [FLSA]." 113 Cong. Rec. Rec. 31254
   (1967) (S.Javits) (emphasis added); see
   H.R.Rep. No. 805, 90th Cong., 1st Sess. 2
   (1967).

*15 Furthermore, reading the OWBPA to permit on
the record judicially-supervised settlements is
consistent with the ADEA's goals of encouraging the
swift disposition by avoiding the delays which, as
one sponsor noted, " plague so many of our agencies,
such as the EEOC and the NLRB. The EEOC, for
example, is already years behind in disposing of its
docket. Such delay is always unfortunate, but is
particularly so in the case of older citizens to whom,
by definition, relatively few productive years are
left." Age Discrimination in Employment: Hearings
on S. 830 and S. 786 Before the Subcommittee on
Labor of the Senate Committee on Public Welfare,
90th Cong., 1st Sess. 24-25 (1967) (Remarks of Sen.
Jacob Javits (N.Y.)); see 123 Cong.Rec. S17275
(daily ed. Oct. 19, 1977) (Remarks of Sen. Harrison
Williams (N.J.) (Senator Williams, another sponsor
of the legislation, explained that the ADEA should
allow an employee to " resolve the dispute himself or
work out a compromise with an employer." ). Indeed,
the entire purpose of the OWBPA was to encourage
and facilitate " knowing and voluntary" settlement of
ADEA claims by establishing requirements to ensure
reliability and informed decisionmaking in
unsupervised agreements. It would certainly have
been odd for Congress, in doing so, to have
prohibited the class of court-supervised settlements
that it had deemed reliable for decades.

Finally, prohibiting courts from enforcing " on the
record" settlement of ADEA claims would seriously
impair their ability to facilitate settlement at what is
often the most opportune time. We take judicial
notice of the fact that imminent prospect of a trial's
emotional, physical and economic toll often causes
settlements to occur " on the courthouse steps" or
after a jury has been empaneled. Furthermore,
settlements at this time are more likely to be well
considered and meaningful, occurring as they do after
discovery, motion practice and other pre-trial
activity. Moreover, court supervision and scrutiny of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 13

Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac.
Dec. P 40,844
(Cite as: Not Reported in F.Supp.2d)

these settlements also has the benefit of the court's substantial trial preparation. Thus, these settlements are generally well-informed, knowledgeably scrutinized, and desirable from the perspectives of both the parties and the court.

However, if in-court supervised settlements were not binding, many could not occur. Much of what a defendant gains with a settlement is the saved effort and expense of avoiding a trial. That value is significantly diminished if the defendant, who has arranged his counsel and witnesses schedules for the trial, faces the prospect of having to do so all over again if the plaintiff decides days later to revoke his acceptance.

Furthermore, were binding " on the record" settlements prohibited, scarce judicial resources would be wasted. See Media Group v. HSN Direct Intl., No. 00 Civ. 7967(GEL), 2001 U.S. Dist. LEXIS 3497 at *5 (S.D.N.Y.2001) (" The rule plaintiff seeks... is extraordinary, in that recission of the settlement agreement would in effect restore to the Court's calender a civil action that was settled in the midst of trial... [T]he burden on the parties and on the court of doing so are particularly severe." ). A rule that gives a plaintiff a right new trial if he settles a case mid-trial but then withdraws, is a rule ripe for abuse. Id. (" [T]he Court must be careful to guard against the possibility that parties will seek to manipulate settlements to gain strategic advantage, settling and ' unsettling' litigation to suit their immediate purposes." ). Certainly, a court cannot keep a jury empaneled for several days while a plaintiff decides whether he wishes to rescind his " on the record" settlement. As the Second Circuit explained in Janus Films v. Miller, 801 F.2d 578, 583 (2d Cir.1986):

*16 Even if the settlement agreement does not include a completely drafted consent judgment, a court is not obliged to place a trial on hold, to be resumed if the parties fail to agree on the precise wording of a judgment. Due regard for the proper use of judicial resources requires that a trial judge proceed with entry of a settlement judgment after affording the parties an opportunity to be heard as to the precise content and wording of the judgment, rather than resume the trial and precipitate an additional lawsuit for breach of a settlement agreement. This authority should normally be exercised whenever settlements are announced in the midst of a trial.

See also Hallock v. State, 64 N.Y.2d 224 (1984)(" Stipulations of settlement are favored by the courts and not lightly cast aside. This is all the more so in the case of ' open court' stipulations within CPLR 2104, where strict enforcement not only serves the interest of efficient dispute resolution but also is essential to the management of court calendars and integrity of the litigation process." ) (citations omitted).

In the absence of any evidence that Congress intended the OWBPA to prohibit enforceable " on the record" settlements, we find that it does not. Moreover, if ever there was an " on the record" settlement made knowingly, voluntarily and knowledgeably, it was Mr. Manning's. Further, the result urged by Mr. Manning would not only be impractical, but would undermine Congress' entire objective in enacting the OWBPA of facilitating knowing and voluntary settlements of ADEA claims. Therefore, we find that Mr. Manning is bound by the " on the record" settlement agreement he struck with NYU.

CONCLUSION

" Where the agreement is made, as here, under the eyes of the court, it is a most solemn undertaking, requiring the lawyers, as officers of the court, to make every reasonable effort to carry it through to a successful conclusion." Warner v. Rossignol, 513 F .2d 678 (1st Cir.1975). Indeed, " [a] court's authority to enforce a settlement by entry of judgment in the underlying action is especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings." Janus Films v. Miller, 801 F.2d at 583. This Court clearly has jurisdiction to compel Mr. Manning to comply with the terms of the Settlement Agreement. See Morris, 95 F.Supp.2d at 588 (enforcing settlement agreement involving ADEA waiver after finding that the agreement complied with the OWBPA); see also In re Air Crash Disaster, 687 F.2d 626, 629 (2d Cir.1982) (" It is beyond a district judge's discretion to... refuse to enforce a settlement agreement, absent special circumstances..." ); Meetings & Expositions, Inc. v. Tandy Corp., 490 F.2d 714, 717 (2d Cir.1974) (" [T]he district court had not only the power but the duty to enforce a settlement agreement which it had approved... [meaning] a district court has the power to enforce summarily, on motion, a settlement agreement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 14

Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac. Dec. P 40,844

**(Cite as: Not Reported in F.Supp.2d)**

reached in a case that was pending before it." ); _Scharf v. Levittown Public Schools,_ 970 F.Supp. 122, 129 (S.D.N.Y.1997). Accordingly, for the reasons discussed above, plaintiff's Fed.R.Civ.P. 60(b) motion to vacate his " on the record" settlement with defendant is denied and we order Mr. Manning to sign the version of the settlement agreement agreed upon by counsel and the Court during the April 4, 2001 conference call.

**\*17 IT IS SO ORDERED.**

S.D.N.Y.,2001.
Manning v. New York University
Not Reported in F.Supp.2d, 2001 WL 963982 (S.D.N.Y.), 86 Fair Empl.Prac.Cas. (BNA) 1240, 81 Empl. Prac. Dec. P 40,844

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2005 WL 2000133 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

**C**
Masson v. Ecolab, Inc.
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Troy MASSON, individually and on behalf of others
similarly situated, Plaintiff,
v.
ECOLAB, INC., Defendant.
No. 04 Civ. 4488(MBM).

Aug. 17, 2005.

Michael J.D. Sweeney, Tara Bernstein, Law Office of
Dan Getman, New Paltz, NY, for Plaintiff Troy Masson.
Marc S. Wenger, Jeffrey W. Brecher, Jackson Lewis LLP,
Melville, NY, for Defendant Ecolab, Inc.

OPINION AND ORDER

MUKASEY, J.
*1 Plaintiff Troy Masson, individually and on behalf of
others similarly situated, sues Ecolab, Inc. for overtime
pay under the Fair Labor Standards Act (" FLSA" ), 29
U.S.C. § 201 et seq. Ecolab moves for summary
judgment, arguing that Masson is subject to the authority
of the United States Secretary of Transportation with
respect to his qualifications and maximum hours of
service and thus exempt from the overtime requirement of
the FLSA. Masson opposes the motion and seeks
approval for distribution of collective action notices and
opt-in consent forms to potential plaintiffs. So far, two
others, Claude Gerald Hester, Jr. and Justin Duffie, have
submitted opt-in forms. Although the record does not
contain enough evidence for this court to determine as a
matter of law which plaintiffs, if any, are entitled to
overtime compensation under the FLSA, the parties have
provided enough evidence for this court to determine
which job activities potential plaintiffs would have had to
have performed at Ecolab so as to be exempt from the
FLSA's overtime requirement. Hence, for the reasons set
forth below, Ecolab's motion is denied and Masson's is
granted.

I.

Ecolab develops and markets cleaning, sanitizing, pest
control, and other maintenance products and services.
(Ecolab Rule 56.1 Statement ¶ 1; Affidavit of Gilbert
Lewis (" Lewis Aff." ) ¶ 4) It employs more than 21,000

people worldwide. (Ecolab Rule 56.1 Statement ¶ 2) Its
customers, located in over 160 countries, include hotels,
restaurants, health and educational facilities, convenience
and grocery stores, commercial and institutional
laundries, food and beverage processors, and car washes.
(Id.)

Ecolab's leases of commercial equipment include regular
preventive maintenance and repair services. (Id. ¶ 9)
Ecolab's Route Managers provide these services. (Id. ¶
10) According to Ecolab, Route Managers are assigned to
specific geographic territories, of which some cover parts
of two states. (Id. ¶ 14) Ecolab claims that as of February
2005, it employs approximately 642 Route Managers
throughout the country and that approximately 17 percent
of these Route Managers are assigned to territories
covering more than one state. (Id.)

Masson worked as a Route Manager from April 7, 2003
to May 21, 2004 (Ecolab Rule 56.1 Statement ¶¶ 15-16),
Duffie from April 8, 2002 to January 15, 2004 (Id. ¶¶ 23-
24),[FN1] and Hester from June 2, 2003 to July 9, 2004. (Id.
¶¶ 31-32) All three worked in the Southeast Area of
Ecolab's Institutional Division, which serves the
foodservice and hospitality industries. (Lewis Aff. ¶ i1)
The Southeast Area appears to cover South Carolina,
North Carolina, most of Georgia, and part of Tennessee.
(Ex. B to Lewis Aff.) However, plaintiffs provided
maintenance and repair services for dishwashing
machines leased by Ecolab to customers only in the
Atlanta metropolitan area; none left Georgia as part of
their employment with Ecolab. (Pls.' Rule 56.1 Response
¶¶ 19, 27, 35) Ecolab provided them with company
vehicles to drive to customer locations. (Ecolab Rule 56.1
Statement ¶¶ 20, 28, 36) None reported regularly to an
Ecolab office. Instead, they drove from customer to
customer during the work day and at day's end returned to
their respective homes. (Id. ¶¶ 21, 29, 37)

> FN1. Duffie began his employment as a "
> Sales/Service Representative" but was renamed
> a Route Manager in January 2003. According to
> Ecolab, his duties were the same under either
> title. (Ecolab Rule 56.1 Statement ¶ 23)

*2 Plaintiffs did not fill out timesheets. (Ecolab Rule 56.1
Statement ¶ 11) However, they were required to fill out "
Edge Reports" that identified customers served each day.
(Id.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 2000133 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Masson states that he had about 115 to 130 customers on his route, and on average made between eight and 10 service calls per day. (Ex. 3 to Affidavit of Tara Bernstein (" Bernstein Aff." )) Hester served 156 customers, and on average made 45 service calls per week. (Ex. 4 to Bernstein Aff.) He made an additional 10 to 12 service calls every third weekend. (*Id.*) Duffie states that " the number of customers on [his] route fluctuated between about 110 and 180, depending on the time period" and that during an average week, would make 45 service calls. (Ex. 5 to Bernstein Aff.) Like Hester, he made about 15 additional service calls every third weekend. (*Id.*)

According to Ecolab, when customers needed equipment or other products from Ecolab, plaintiffs ordered the products from Ecolab's manufacturing facilities located outside Georgia, most often from Beloit, Illinois. (Ecolab Rule 56.1 Statement ¶ 41) The products were shipped either to each customer's location or to the Route Manager's home address. (Lewis Aff. ¶ 48)

Ecolab has submitted lists of products ordered by plaintiffs during their employment with Ecolab that show most orders were shipped to plaintiffs' homes. (Ex. C to Lewis Aff.) For example, the first entry, Order Number 299402, indicates that Masson ordered four items on May 3, 2004 from the Beloit, Illinois facility. (*Id.*) These items were shipped to Masson's home in McDonough, Georgia. (*Id.*) In contrast, the second entry lists " A & A Steakhouse" as the customer and the location where the item was shipped. (*Id.*) The lists show a total of 605 orders by Masson, 473 by Duffie, and 114 by Hester.[FN2]

> **FN2.** Duffie's list encompasses his orders from December 2002 through December 2003; Ecolab claims that it does not have any ordering records for the first eight months of Duffie's employment with Ecolab, but that those available " can be used as an accurate estimate of the type and frequency of orders during the first eight months of his employment." (Lewis Aff. ¶ 45)

According to Gilbert Lewis, a former Area Route Manager for the Southeast Area of Ecolab's Institutional Division,[FN3] " some of the equipment and products that were ordered by Plaintiffs and shipped directly to their homes were for use as truck stock, while other equipment and products were for specific customers." (Ecolab Rule 56.1 Statement ¶ 49; Lewis Aff. ¶ 52) Separate lists submitted by Ecolab show which orders, according to Lewis, were shipped to plaintiffs' homes pursuant to specific customer orders as opposed to orders to fill

plaintiffs' inventory. (Ex. 3 to Lewis Aff.) Of such orders 64 are attributed to Masson, 242 to Duffie, and 13 to Hester. (*Id.* ¶¶ 53-55) Lewis stated also that " [b]ecause any of Plaintiffs' customers could, at any time, require replacement parts or products, Plaintiffs could be called upon to transport a shipment of goods in interstate commerce at any time." (*Id.* ¶ 61)

> **FN3.** Within each Ecolab region, the hierarchy and reporting structure is as follows: Route Managers report to a Route Supervisor; the Route Supervisor to an Area Route Manager; the Area Route Manager to the Area Manager; and the Area Manager to the Vice President of Sales, who is located at Ecolab's corporate headquarters in St. Paul, Minnesota. (Lewis Aff. ¶ 9)

Lewis " was able to identify which products and equipment were customer specific orders based on [his] approximate ten years of experience working in the Institutional Division [the Division in which Plaintiffs were employed], in various supervisory positions." (Lewis Supplemental Aff. ¶ 4) He cites three examples. The first " customer-specific item listed for [ ] Masson ... is one of Ecolab's dispensing systems" for certain detergents and sanitizers. (*Id.* ¶ 5) Lewis claims that the dispenser " would not be a dispenser [ ] Masson would have kept as truck stock" and that " [i]t was probably ordered because" one such dispenser " that a customer was using malfunctioned." (*Id.*) Moreover, according to Lewis, " Route Managers do not keep dispensers as truck stock, nor do they have large enough trucks that would enable them to do so." (*Id.*)

*3 The second example is " a solid rinse additive" that Lewis surmises " was likely ordered for a specific customer as a means to improve customer relations because a dispenser malfunctioned." (*Id.* ¶ 6) The third item, a dishwasher motor, is " too heavy to keep as truck stock." (*Id.* ¶ 7) Lewis noted also that chemical products are not kept as truck stock. (*Id.* ¶ 6)

Plaintiffs contend that they have not had adequate opportunity to discover how these lists were compiled. In any event, plaintiffs state that they kept an inventory of products and equipment needed to maintain and repair customers' dishwashing machines. (Ex. 3 to Bernstein Aff. ¶ 4; Ex. 4 to Bernstein Aff. ¶ 4; Ex. 5 to Bernstein Aff. ¶ 4) Masson and Duffie kept inventory in their trucks and homes (Ex. 3 to Bernstein Aff. ¶ 4; Ex. 5 to Bernstein Aff. ¶ 4); Hester states that he kept inventory in his truck. (Ex. 4 to Bernstein Aff. ¶ 4) Plaintiffs claim that they ordered new inventory to be sent directly to their homes

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3

Not Reported in F.Supp.2d, 2005 WL 2000133 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

so that they could restock whenever they used a part on a service call or when inventory ran low. (Exs. 3-5 to Bernstein Aff. ¶ 4) Hester states that he never ordered products for specific customers to be sent to his home and that such products were sent directly to the customer. (Ex. 4 to Bernstein Aff. ¶ 4) Masson claims that " [o]nly under extraordinary circumstances would [he] order a part for a specific customer delivered directly to [him]" instead of to the customer. (Ex. 3 to Bernstein Aff. ¶ 4) Upon his " information and belief," such deliveries " occurred only 10 times in the entire time [he] worked for Ecolab," constituting " approximately 0.4 % of [his] service calls." (Id.) Duffie remembers " two instances that a product or equipment for a specific customer was delivered directly to [his home address]," constituting " approximately 0.04 % of the calls that [he] made." (Ex. 5 to Bernstein Aff. ¶ 4)

From some customers, the three plaintiffs picked up checks payable to Ecolab for services, parts, or equipment, either because the customer preferred to pay the Route Manager or because the customer's payment was late or the account not fully paid. (Ecolab Rule 56.1 Statement ¶¶ 22, 30, 39) Ecolab claims that on each such occasion, the Route Managers delivered the customer check to a local post office or the local Ecolab office for mailing to North Carolina where Ecolab collects and processes the checks. (Id. ¶¶ 22, 30, 39) Ecolab states also that none of the checks were processed at the local office in Georgia and that customer invoices " specifically state that payment must be sent to Charlotte, North Carolina." (Supplemental Affidavit of Gilbert Lewis (" Lewis Supplemental Aff." ) ¶ 8)

Masson claims that he picked up checks from customers only about three times per week and " typically deliver[ed] [them] to Ecolab's local office in Georgia." (Pls.' Rule 56.1 Response ¶ 22) He gave the checks to his supervisor or another repairman to bring back to the local office. (Id.) Only about two or three times per month did he mail a customer's check himself. (Id.) Duffie claims that he picked up checks from customers approximately once in every 45 service calls as payment on overdue accounts. (Id. ¶ 30) He " almost always delivered the check to his supervisor" and " remembers only two occasions when he mailed a customer's check" himself. (Id.)

**\*4** Hester participated in an Ecolab pilot program referred to as the " Atlanta Delivery Model," from December 2003 to July 2004. (Ecolab Rule 56.1 Statement ¶ 38) Under this program, Ecolab itself shipped products to a warehouse in Georgia, instead of using a third party

carrier such as the United Parcel Service. (Id.) According to Ecolab, Hester then would pick up a product from the warehouse and deliver it to the customer. He collected a check from the customer and delivered it to a local post office, where it was mailed to an Ecolab office in North Carolina. (Id.) Hester claims that under the program, he picked up products from the warehouse to store on his truck and distribute to customers as they needed them–i.e., as inventory, and that " [a]ny checks he picked up from customers were not for the specific products, but for payment on the customer's account." (Pls.' Rule 56.1 Response § 38) In addition, as part of the pilot program, he claims that he " ordinarily went to the local Ecolab office each work day and delivered any checks he received from customers at that time." (Id.)

Before Hester participated in the pilot program, " a substantial part of his customers did not ask him to accept checks" and of the times he did pick up checks from customers, he remembers only two occasions when he mailed them. (Id. ¶ 39) He delivered all of the other checks to the local Ecolab office in Georgia. (Id.)

Plaintiffs claim that they regularly worked more than 40 hours per week for Ecolab and that Ecolab failed to pay them overtime compensation at the rate of time and one-half for all hours worked over 40. (Compl. ¶¶ 16-17; Declaration of Troy Masson dated 2/15/05 (" Masson Decl." ) ¶¶ 7, 9; Declaration of Justin Duffie dated 2/15/05 (" Duffie Decl." ) ¶¶ 8, 10); Declaration of Claude Gerald Hester, Jr. dated 2/16/05 (" Hester Decl." ) ¶¶ 7, 9) Ecolab admits that it did not pay Masson overtime at the one and one-half rate. (Ex. D to Pls.' Brief (Ecolab Answer) ¶ 17) Moreover, Ecolab admits that " it does not pay time-and-one-half overtime premium pay to salaried employees." (Id. ¶ 8)

Masson filed the instant complaint on June 15, 2004, suing for a declaration that Ecolab violated the FLSA willfully, and for damages in the amount of unpaid overtime wages as well as liquidated damages. On October 25, 2004, Hester filed a consent form " opting in" to the lawsuit. (Ex. 1 to Affirmation of Marc Wenger (" Wenger Aff." ) Duffie did the same on November 5, 2004. (Id.)

II.

Congress' goal in enacting the FLSA was " to protect all covered workers from substandard wages and oppressive working hours, ' labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

workers." ' *Barrentine v. Arkansas-Best Freight Sys., Inc.,* 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)). Section 207 of the FLSA provides that covered employees who work more than 40 hours in a workweek shall be paid at least one and one-half times their regular pay rate for those hours worked above 40 hours. *See* 29 U.S.C. § 207(a)(1).

*5 Three years before passing the FLSA, Congress enacted the Motor Carrier Act of 1935 (" MCA" ). The purpose of the MCA was to promote efficiency, economy, and safety in the motor transportation industry and, to help achieve that purpose, the MCA gave the Interstate Commerce Commission (" ICC" ) the authority to regulate the maximum hours of work for employees of " common carriers" and " contract carriers" by motor vehicle. The MCA also gave the ICC similar regulatory authority over employees of " private carriers" by motor vehicle if the ICC concluded that such regulation was necessary to promote safety on the nation's roadways. *See Friedrich v. U.S. Computer Servs.,* 974 F.2d 409, 412 (3d Cir.1992). These regulatory powers have been transferred since from the ICC to the Department of Transportation (" DOT" ). *See id.*

So that the overtime provisions of the FLSA and MCA do not overlap or interfere with each other, those employees whose working hours are regulated by the DOT are exempt from the FLSA's requirements. *See* 29 U.S.C. § 213(b)(1) (FLSA overtime requirements " shall not apply with respect to ... any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 ...." ) (hereafter referred to as " motor carrier exemption" ). The exemption applies to employees over whom the Secretary of Transportation has jurisdiction regardless of whether he has actually exercised his power as to those employees. *See* 29 C.F.R. § 782.1(a) (2004); *Bilyou v. Dutchess Beer Distrib., Inc.,* 300 F.3d 217, 222 (2d Cir.2002).

Pursuant to his authority under the MCA, the " Secretary of Transportation may prescribe requirements for ... qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b)(2). For the motor carrier exemption to apply, the employee's activities first must " affect the safety of operation of motor vehicles engaged in such transportation." *Morris v. McComb,* 332 U.S. 422, 439 (1947). Second, in this case, the employer must be a " private motor carrier," which is defined as a person, other than a motor carrier, transporting property

by motor vehicle when-
(A) the transportation is as provided in section 13501 of this title;
(B) the person is the owner, lessee, or bailee of the property being transported; and
(C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102(13).[FN4] Section 13501 gives the Secretary of Transportation jurisdiction over transportation by private motor carrier if passengers or property are transported by such carrier

FN4. A " private motor carrier" is different from a " motor carrier" or " common carrier," which is defined as " a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(12).

(1) between a place in-
(A) a State and a place in another State;
(B) a State and another place in the same State through another State....

*6 49 U.S.C. § 13501.

Section 13501 has been interpreted to cover intrastate transportation of property that is part of a " ' practical continuity of movement' in the flow of interstate commerce." *Bilyou v. Dutchess Beer Distrib. Inc.,* 300 F.3d 217, 223 (2d Cir.2002) (quoting *Walling v. Jacksonville Paper Co.,* 317 U.S. 564, 568 (1943)). Put another way, if the shipper's " fixed and persisting transportation intent at the time of [interstate] shipment" was to deliver an item to a specified customer who had ordered the item, regardless of whether it was stored temporarily intrastate, the motor carrier exemption applies. *Id.* at 223-24; *see also McGuiggan v. CPC Int'l, Inc.,* 84 F.Supp.2d 470, 483 (S.D.N.Y.2000) (motor carrier exemption applied to drivers who delivered English muffins, baked out-of-state, to intrastate customers pursuant to specific orders). On the other hand, the exemption does not apply where items are delivered from out of state to an intrastate location, such as a warehouse, for future delivery to customers yet to be identified. In other words, the exemption is inapplicable where the final destination of any shipment is not decided " until after the goods had come to rest in the warehouse." *Southern Pac. Transp. Co. v. Interstate Commerce Comm'n,* 565 F.2d 615, 618 (9th Cir.1977).

III.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 5

Not Reported in F.Supp.2d, 2005 WL 2000133 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

Ecolab argues that plaintiffs' job activities at Ecolab satisfied the motor carrier exemption in two ways: through (i) plaintiffs' transport of equipment and parts pursuant to specific customer orders; and (ii) plaintiffs' handling of customer checks. The issues related to equipment and parts are addressed immediately below; those related to checks are addressed in Section IV.

The motor carrier exemption, like all exemptions to the FLSA, is " narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960).

Ecolab bears the burden of proving that the exemption applies. *See Bilyou,* 300 F.3d at 222. Because " the exemption depends ... upon the activities of the individual employees," Ecolab must present evidence as to " the character of the activities involved in the performance" of each plaintiff's job in order to determine whether Ecolab owes individual employees overtime compensation. *Goldberg v. Faber Indus., Inc.,* 291 F.2d 232, 235 (7th Cir.1961). Hence, the activities of one or a few plaintiffs cannot justify a blanket exemption as to all plaintiff-employees.

Similarly, the activities of a plaintiff in one workweek do not always determine that plaintiff's exempt status for his entire period of employment. On the one hand, if the employee is or " is likely" to be " called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities," he falls under the exemption " in all workweeks when he is employed at such job ... regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek." 29 C.F.R. § 782.2(b)(3). In such cases, " the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting ' safety of operation." ' *Id.*

*7 On the other hand, the exemption does not apply to an employee's entire term of employment if the " continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, or insignificant as to be de minimis." *Id.* For such employees, " [i]f in particular workweeks other duties are assigned to him which result, in those workweeks, in his performance of activities directly affecting the safety of operation of motor vehicles in interstate commerce on the public highways, the exemption will be applicable to him those

workweeks, but not in the workweeks when he continues to perform the duties of the non-safety-affecting job." *Id.* The Department of Labor recognizes that an employee's exempt status may vary from week to week if the employer shifts the employee " from one job to another periodically or on occasion." *Id.* § 782.2(b)(4). Hence, the only way to determine the overtime compensation owed to an employee is to examine the job duties of the employee for each week of employment.

As to Ecolab parts and equipment, plaintiffs do not dispute that Ecolab is a " person ... transporting property by motor vehicle" and thus a " private motor carrier." Nor is it contested that Ecolab is " the owner ... of the property being transported" and that " the property is being transported for sale ... or to further a commercial enterprise." 49 U.S.C. § 13102(13).

It is undisputed also that any intrastate transport by plaintiffs of equipment or parts ordered for specific customers constitutes " interstate commerce" for purposes of the motor carrier exemption. However, the parties disagree as to how much of plaintiffs' intrastate activities were of this character, and whether this quantum of activities was sufficient to bring plaintiffs under the DOT's jurisdiction.

Plaintiffs insist that, even if deliveries of items ordered by specific customers involve interstate commerce, the motor carrier exemption should not apply here because Ecolab has failed to prove that these deliveries constituted more than a de minimis portion of plaintiffs' job responsibilities. *See Pyramid Motor v. Ispass,* 330 U.S. 695, 708 (1947) (remanded with instructions that if the mere handling of freight before loading formed a " trivial, casual or occasional a part of an employee's activities," and hence did not affect the safety of operation, then the activity would not serve to bring the employees under the motor carrier exemption).

In determining whether an employee's activities have a " substantial direct effect" on the safety of motor vehicle operation in interstate commerce and if so, whether such activities are de minimis, it is important to focus on " the character of the activities rather than the proportion of either the employee's time or of his activities." *Levinson v. Spector Motor Serv.,* 330 U.S. 649, 674-75 (1947). The underlying concern is " the actual need for the [Secretary of Transportation]'s power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment." *Id.* In *Crooker v.. Sexton Motors, Inc.,* 469 F.2d 206, 210 (1st Cir.1972), the First Circuit observed:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2000133 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

*8 The de minimis rule has been applied ... where the employee's connection with anything affecting interstate motor carrier operations was so indirect and casual as to be trivial.... The activities of one who drives in interstate commerce, however frequently or infrequently, are not trivial. Such activities directly affect the safety of motor vehicle operations.

(citation omitted). Based on *Crooker* and other cases, Ecolab argues that the de minimis rule does not apply to drivers, regardless of how insignificant or infrequent their safety-affecting interstate activities are. *See also Badgett v. Rent-Way, Inc.,* 350 F.Supp.2d 642, 654 (W.D.Pa.2004); *Walton v. Louisiana Compressor Maint.,* No. 96-2156, 1997 WL 129393, at *3 (E.D. La. Mar. 19, 1997); *Brennan v. Cardinal Indus., Inc.,* No. 74-563, 1976 WL 1720, at *3-4 (S.D.Ohio Mar. 8, 1976).

Although the de minimis rule has limited applicability to drivers for the reasons stated by the First Circuit in *Crooker,* no court has adopted Ecolab's blanket proposition. Even in *Crooker,* the First Circuit, while remanding the case to the district court for a week-by-week determination of whether overtime was due to the driver-plaintiffs, recognized that the motor carrier exemption did not relieve an employer of all FLSA overtime obligations if driving in interstate commerce was not a regular and expected part of an employee's duties. *See* 469 F.2d at 210-11. To extend the motor carrier exemption to any driving activity, no matter how infrequent or trivial, would be to encourage employers to send their employees on a minimal number of interstate trips simply to avoid the overtime compensation provisions of FLSA.

Instead, where " the employer's interstate activities affecting the safety of interstate motor operations are de minimis," the employer's exemption from FLSA requirements under the MCA " consequently fades." *Peraro v. Chemlawn Servs. Corp.,* 692 F.Supp. 109, 114 (D.Conn.1988). Moreover, the cases relied on by Ecolab involved drivers' transport of property across state lines, as well as the " reasonable expectation" that drivers could be called on to drive across state lines. *Crooker,* 469 F.2d at 210 (driver made trips from New Hampshire to Massachusetts); *Badgett,* 350 F.Supp.2d at 654 (drivers " could have been called upon in the regular course of their employment to make trips affecting interstate commerce," including ones from Pennsylvania to Ohio); *Walton,* 1997 WL 129393, at *2-3 (plaintiff driver drove out of state regularly); *Brennan,* 1978 WL 1720, at *4-6 (interstate routes assigned indiscriminately among pool of drivers). It was this activity that courts deemed " not trivial,"

because it " directly" affected employers' interstate motor vehicle operations, *Crooker,* 469 F.2d at 209, and fell " plainly and unmistakably within [the] terms and spirit" of the motor carrier exemption. *Arnold,* 361 U.S. at 392; *see also* 49 U.S.C. § 13501 (DOT has jurisdiction over transport " between a place in a State and ... a place in another State" ). The same has not and cannot be said about wholly intrastate trips. Driving in interstate commerce alone does not trigger the motor carrier exemption. Such driving, however frequent, must have been an expected and regular part of an employee's job duties.

*9 Hence, determining the " character" of interstate driving involves a fact-specific analysis, including an examination of the method by which the employer assigns the interstate activity to the pertinent class of employees, the nature of the employer's business, and perhaps to a lesser degree, the proportion of interstate-to-intrastate employee activity. In *Morris v. McComb,* the Supreme Court held that although only 3.65 percent of the total trips made by the drivers of a general carriage business were out of state, the carrier was exempt from the overtime provision of the FLSA as to all drivers and certain mechanics. *See* 332 U.S. at 433. The Court based its decision on a few key characteristics of the carrier's regular operations. First, the carrier did not distinguish the interstate and intrastate routes and assigned the routes indiscriminately to all its drivers; hence, individual drivers at any time could be called on to drive across state lines. A closer look at the statistics revealed that each driver's interstate travel was more significant than was suggested by the 3.65 percent figure. Approximately one-quarter of all of the drivers made at least one interstate trip in each week of the relevant time period. There was a six-week period in which more than half the drivers made an out-of-state trip. Throughout the year, all but two of the drivers made at least one interstate trip. Finally, the Court found the general nature of the carrier's business significant: the carrier offered " to serve the normal transportation demands of the shipping public in an industrial metropolitan center [Detroit, Michigan].... If the common carrier is required, by virtue of that status, to take this interstate business he must perform the required service in accordance with the requirements established by the [Interstate Commerce] Commission." *Id.* at 434. In sum, the interstate trips were " a natural, integral and apparently inseparable part of the common carrier service of the petitioner and his drivers." *Id.* at 433.

In light of *Morris,* courts faced with determining the applicability of the motor carrier exemption to drivers focus on the route-assignment procedure. For example, in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2000133 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

*Brennan,* a carrier was held exempt from paying any of its drivers overtime compensation because the carrier assigned its drivers indiscriminately to interstate routes, although less than one percent of the drivers' total travel time involved the interstate routes. *See* 1978 WL 1720, at *4-6. Similarly, in *Griffin v. Consol. Foods Corp.,* the Fourth Circuit found the motor carrier exemption applicable to all of the employer's sales representatives because the representatives were indiscriminately reassigned to the sales circuits semi-annually. *See* 771 F.2d 826, 828-29 (4th Cir.1985).

In contrast, the Seventh Circuit in *Goldberg v. Faber Indus., Inc.,* held that the defendant was required to pay overtime compensation to 15 of its drivers who, unlike five other drivers, never traveled interstate on the defendant's behalf. *See* 291 F.2d at 235. The Court refused to grant a blanket exemption to the entire class of drivers because, except during absences, each driver was specifically assigned to a route. *Id.* The defendant failed to prove that any driver regularly assigned to an intrastate route ever drove an interstate route. *Id.*

*10 Over all, the de minimis rule has been held to apply to drivers who, as a class, spent less than one percent of their time traveling across state lines and were not in the regular course of their employment expected to drive across state lines. *Compare* Kimball v. Goodyear Tire and Rubber Co., 504 F.Supp. 544, 549 (E.D.Tex.1980) (no blanket exemption for defendant company where 0 .17 percent of total trips made by drivers were interstate, many drivers had never made interstate trips, and routes were assigned based on seniority); Coleman v. Jiffy June Farms, Inc., 324 F.Supp. 664, 670 (S.D.Ala.1970) (drivers were not subject to the motor carrier exemption where employer was involved in carriage " only as an incident of [its] poultry processing business," only 0 .23 percent of the activity was interstate, loads carried were light, and interstate deliveries were to a location on the state border); *with* Turk v. Buffets, Inc., 940 F.Supp. 1255, 1261 (N.D.Ill.1996) (holding that motor carrier exemption applied where more than one percent of plaintiff drivers' driving was out of state and drivers could expect to drive across state lines).[FN5]

FN5. Plaintiffs cite also a similar lawsuit brought against Ecolab in the Middle District of Florida, where the Court " decline[d] to agree with [Ecolab] that the 1% of Plaintiffs' orders, which are specifically requested for a customer, are sufficiently similar to cases in which the vast majority of orders were specific to a customer need." *Neely v. Ecolab, Inc.,* No. 03-597-J-20,

slip op. at 5 (M.D. Fla. June 22, 2004). The plaintiffs in that case were " Sales/Service Route Specialists" and as described by the Court, performed duties similar to those performed by Masson, Duffie, and Hester. *Id.* at 1-2. That case has since settled. *See Neely v. Ecolab, Inc.,* No. 03-597-J-20 (M.D.Fla. Sept. 21, 2004) (order dismissing case upon settlement).

Ecolab has submitted a Department of Labor " Compliance Action Report" that it claims applies to the plaintiffs in *Neely.* That Report found the motor carrier exemption applicable to Sales/Service Route Specialists employed in Ecolab's Puritan Services Division because (i) 71.5 percent of those employees were assigned to multi-state " territories" ; (ii) they regularly delivered items ordered for specific customers but shipped initially to the employees' homes; and (iii) all such employees were likely to cross state lines as part of weekend " on call" duties. (" WHISARD Compliance Action Report," Case ID 1393313 (attached to letter from Jeffrey Brecher to court dated 8/2/2005)) Whether the above Report does or should apply to plaintiffs in this case, who were Route Managers in Ecolab's Institutional Division, cannot be determined on the current record.

In this case, the parties' affidavits leave factual issues as to what portion of plaintiffs' service calls were at least in part deliveries of customer-specific product orders. According to Lewis, approximately 10 percent of Masson's orders, more than half of Hester's, and approximately 11 percent of Duffie's were such service calls.

Masson avers that only 10 such orders were shipped to his home, and that delivery of such orders constituted 0.4 percent of his service calls. Duffie recalls only two such orders as part of his employment. Hester asserts that the only products shipped to his home address were for his inventory and that he did not order any items for specific customers to be sent directly to his home.

However, the frequency of such orders is not dispositive. Also important is whether, or to what extent, certain orders were made with particular customers in mind and sent to plaintiffs' homes in anticipation of having to meet a particular customer's future needs. In *Walling v. Jacksonville Paper Co.,* the Supreme Court considered such circumstances when it formulated the following framework for determining whether intrastate movements are " interstate" for purposes of the motor carrier

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 8
Not Reported in F.Supp.2d, 2005 WL 2000133 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

exemption:
The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer ' in commerce' within the meaning of the Act.... [I]f the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain ' in commerce' until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers of whom they are intended. That is sufficient. Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce.

*11 317 U.S. at 568. The Court envisioned three circumstances when goods were brought from out of state but sold and distributed to customers within the state:

i) Goods purchased by the wholesaler or distributor upon order of a customer with the definite intention that they be carried at once to the customer;

ii) Goods obtained by the wholesaler or distributor to meet the needs of specified customers pursuant to an " understanding," contractual or otherwise, although not for immediate delivery; and

iii) Goods based on anticipation of customer need, rather than upon prior orders or contracts.

The Court held that the goods in the first two categories remain in interstate commerce until the time they are delivered to the retail customers. Goods in the third category could be held to remain in interstate commerce only when there is a " particularity" of evidence relating to a product and a customer, as opposed to " goods acquired and held by a local merchant for local disposition" to the general public. *Id.* at 570; *see also Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 673 (10th Cir.1993); *Middle West Motor Freight Bureau v. Interstate Commerce Comm'n*, 867 F.2d 458, 460 (8th Cir.1989). Whether any of the orders shipped to plaintiffs' addresses falls under any of the above categories cannot be determined at this stage.

There remain factual issues also as to whether plaintiffs could have been called on to cross state lines during their employment. Although Ecolab claims that 17 percent of its Route Managers are assigned to multi-state routes, it has not established or even suggested that out-of-state service calls were assigned indiscriminately among drivers such that plaintiffs could be " reasonably

expected" to travel interstate as part of their jobs. *See Goldberg*, 291 F.2d at 234 (motor carrier exemption inapplicable to certain employees because the parties had stipulated that the subject employees who were assigned to intrastate routes could not reasonably be expected to handle interstate runs in the normal course of their duties).

Likewise, it is disputed at this stage whether it was only under " extraordinary" circumstances (Ex. 3 to Bernstein Aff.) that plaintiffs ordered items for specific customers and then delivered them, or " likely" that they could be " called upon in the ordinary course of [their] work" to do so. 29 C.F.R. § 782.2(b)(3); *see also Badgett*, 350 F.Supp.2d at 657-58. At least as to plaintiffs' service calls, Ecolab fails to establish that plaintiffs were engaged in the kind and extent of activities that fall under the motor carrier exemption. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.1998) (on summary judgment motion, ambiguities and all reasonable factual inferences must be drawn in favor of non-movant).

IV.

Ecolab argues also that the motor carrier exemption applies to plaintiffs' handling of customer checks. Because the checks were bound ultimately for Charlotte, North Carolina to be processed, Ecolab contends that plaintiffs' carrying of the checks constitutes the requisite participation in interstate commerce for purposes of the motor carrier exemption.

*12 The DOL's Wage and Hour Division Field Operations Handbook provides that as to private motor carriers, " where the transportation of property is incidental to a trip and not the primary purpose," such transportation does not fall under the jurisdiction of the Secretary of Transportation. (Ex. 6 to Bernstein Decl.) The Handbook illustrates that an employee " would not be considered as engaged in transporting property for purposes of the Motor Carrier Act because of an arrangement to drive by the post office on his way to or from work to pick up or deliver his employer's interstate mail...." (*Id.*)

Although the DOT is not bound by the DOL's interpretation of the DOT's authority under the motor carrier exemption, the DOL's distinction is persuasive, particularly in the absence of contrary authority. It recognizes that a private motor carrier's primary business typically will involve something other than carriage. Such is the distinction between this case and *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180 (11th Cir.1991), on which Ecolab relies in arguing that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2000133 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

Page 9

transportation of checks places plaintiffs within the motor carrier exemption. In *Baez*, the Eleventh Circuit held that armored truck guards employed by a contract carrier who picked up checks and other monetary instruments from Miami area financial institutions, but traveled only intrastate, fell under the motor carrier exemption because the instruments were bound for banks outside the state of Florida. *Id.* at 181-82. However, the employer's business in *Baez* was carriage; transportation of the checks was the primary purpose of the employee's trips.

The Third Circuit's reasoning in *Friedrich* is instructive as well. The plaintiffs in that case were field engineers employed by a company that provided computer hardware and software installation, maintenance, and repair services. They routinely crossed state lines in the course of their duties, carrying with them a tool kit, replacement parts, and other equipment. The Court acknowledged that the MCA does not define property and that " it is arguable that the tools, parts, and equipment the plaintiffs transported were so trivial or insubstantial that they did not constitute property within the meaning of the MCA." 974 F.2d at 417. However, the Court concluded that because transportation of those items " was an independent and essential reason for their service trips " - in that the employees could not have performed their primary duties without them-the tools, parts, and equipment " constituted property within the meaning of the MCA." *Id.*

Even adopting the Third Circuit's " broad construction" of the term " property" as used in the MCA, *Gonzales v. New England Tractor Trailer Training School*, 932 F.Supp. 697, 700-701 (D.Md.1996) (describing *Friedrich*), it has not been demonstrated that plaintiffs' handling of customer checks, on its own, relieves Ecolab of its FLSA overtime obligations. Plaintiffs claim that their primary duties were preventive maintenance and repair of commercial dishwashing machines leased to customers by Ecolab. Although transport of Ecolab equipment and parts may have been necessary to execute those duties, as in *Friedrich*, the same cannot be said of plaintiffs' pick-up and delivery of customer checks. Ecolab has not demonstrated that the handling of customer checks is anything more than a minor, non-essential part of plaintiffs' duties as Route Managers, especially where it appears that with a few exceptions, customers themselves mailed their payments to Ecolab's processing office in North Carolina.

**\*13** Construing the motor carrier exemption narrowly and strictly against Ecolab, plaintiffs' handling of customer checks does not fall " plainly and unmistakably within the

[exemption's] terms and spirit." *Arnold*, 367 U.S. 392.

Accordingly, Ecolab's motion for summary judgment is denied.

V.

Section 216(b) of FLSA authorizes an employee to sue his employer for unpaid overtime compensation and liquidated damages on behalf of himself and other employees " similarly situated." 29 U.S.C. § 216(b). In order for an employee to " opt in" to the lawsuit and become a party plaintiff, he must file a written consent. *Id.* A court has the discretion to authorize notification to " similarly situated" potential plaintiffs and to direct an employer defendant to disclose the names and addresses of those parties. See *Patton v. The Thomson Corp.*, 364 F.Supp.2d 263, 266 (E.D.N.Y.2005) (citing *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989)). Sending a collective action notice to similarly situated individuals " comports with the broad remedial purpose of the [FLSA], ... as well as with the interest of the courts in avoiding multiplicity of suits." *Braunstein v. Eastern Photographic Laboratories, Inc.*, 600 F.2d 335, 336 (2d Cir.1979); see also *Hoffman v. Sbarro, Inc.*, 982 F.Supp. 249, 262 (S.D .N.Y.1997) (" [C]ourts have endorsed the sending of notice early in the proceeding, as a means of facilitating the FLSA's broad remedial purpose and promoting efficient case management." )

The class action requirements of Fed.R.Civ.P. 23 do not apply to the approval of a collective action under the FLSA, and thus " no showing of numerosity, typicality, commonality and representativeness need be made." *Foster v. Food Emporium*, No. 99-3860, 2000 WL 1737858, at \*1 (S.D.N.Y. Apr. 26, 2000). Instead, approval of a collective action under the FLSA involves a two-step inquiry. See, e.g., *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F.Supp.2d 91, 96 (S.D.N.Y.2003); *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir.1995). In the first step, the court examines the pleadings and affidavits of the proposed collective action and determines whether the proposed class members are " similarly situated." See *Mooney*, 54 F.3d at 1213-14. If they appear to be, the court " conditionally certifies" the class. *Id.* Putative class members are given notice and the opportunity to " opt in" and the action proceeds as a representative action through discovery. *Id.*

In this early phase, courts employ a relatively lenient evidentiary standard in determining whether a collective action is appropriate. " The inquiry at the inception of the lawsuit is less stringent than the ultimate determination

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10

Not Reported in F.Supp.2d, 2005 WL 2000133 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

that the class is properly constituted." *Jackson v. New York Tel. Co.,* 163 F.R.D. 429, 431 (S.D.N.Y.1995). Plaintiffs meet this burden by " making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Hoffman,* 982 F.Supp. at 261. The court must determine whether there is a " factual nexus between the [named plaintiff's] situation and the situation of other current and former [employees]." *Id.* at 262; *see also Patton,* 364 F.Supp.2d at 268 (authorization of notice " does not prejudice the defendants precisely because it is preliminary ... [and] may be revisited if it later appears, after appropriate discovery, that the additional plaintiffs ... are not similarly situated to [the named plaintiff]" ). Hence, the merits of plaintiffs' claims need not be evaluated nor discovery be completed in order for such a notice to be approved and disseminated. *See Hoffman,* 982 F.Supp. at 262.

**\*14** " The second phase of an FLSA collective action inquiry occurs after discovery is largely complete and ' is typically precipitated by a motion for " decertification" by the defendant." ' *Scott v. Aetna Servs., Inc.,* 210 F.R.D. 261, 264 (D.Conn.2002) (quoting *Mooney,* 54 F.3d at 1214). At that stage, the " similarly situated" issue must be revisited, based on the record produced through discovery. If it is found that the claimants are similarly situated, the collective action may proceed to trial. If the claimants are not similarly situated, the court decertifies the collective action, and the claims of the opt-in plaintiffs are dismissed.

In this case, the three named plaintiffs worked as Route Managers for Ecolab. Their primary duties were repair and preventive maintenance of commercial dishwashing machines. They routinely worked more than 40 hours per week for Ecolab, were paid weekly salaries, but were not compensated for any time over 40 hours per week. (Ex. A to Plls.' Brief in Support of Motion for Collective Action Notice (Declarations of Troy Masson, Justin Duffie, and Claude Gerald Hester, Jr.)) All three declare " upon information and belief" that other Ecolab Route Managers were denied the same compensation. (*Id.*) Ecolab admits that Masson was not paid time-and-a-half overtime. (Ecolab Answer ¶ 17) Moreover, Ecolab admits that " it does not pay time-and-one-half overtime premium pay to salaried employees." (*Id.* ¶ 8)

" Substantial allegations by plaintiffs that defendants' actions violated the FLSA, as well as an admission by defendants that such actions reflect a company-wide policy, sufficiently demonstrate a factual nexus between plaintiffs' situation and other potential class members, and

therefore, will support a finding that plaintiffs and class members are similarly situated for purposes of sending an FLSA notice." *Ayers v. SGS Control Servs., Inc.,* No. 03-9078, 2004 WL 2978296, at \*5 (S.D.N.Y. Dec. 21, 2004) (citing *Hoffman,* 982 F.Supp. at 261-62). Whatever the merits of plaintiffs' claims, the above allegations and admissions are sufficient to satisfy plaintiffs' burden at this stage of the litigation. *See Legrand v. Educ. Mgmt. Corp.* No. 03-9798, 2004 WL 1962076, at \*2 (S.D.N.Y. Sept. 2, 2004) (three named plaintiffs not paid overtime and were told by management of defendant company that defendant's employees across the country also had to work over 40 hours per week without overtime pay); *Foster,* 2000 WL 1737858, at \*2 (four named plaintiffs were hourly employees at defendant's food stores, worked through lunch breaks without being paid, worked past time that they punched time cards, and worked on Sundays without being paid double time).

Ecolab argues that issues individual to putative class members predominate and render a collective action notice inappropriate. With regard to the motor carrier exemption, Ecolab foresees extensive discovery as to (i) which Route Managers crossed state lines as part of their routes; (ii) how often they crossed state lines; (iii) for those with solely intrastate routes, what portion of their service calls included customer-specific deliveries; and (iv) whether a Route Manager assigned to an intrastate route could have expected at times to make an interstate trip.[FN6]

> FN6. In its brief opposing plaintiffs' motion to approve collective action notice, Ecolab argues that certain potential plaintiffs may be subject to what has been termed the " outside sales exemption" to the FLSA's overtime requirement. 29 U.S.C. § 213(a)(1). Section 213(a)(1) provides that the FLSA's overtime provisions " shall not apply with respect to ... [a]ny employee employed ... in the capacity of outside salesman...." According to a Department of Labor regulation, an employee " is employed in the capacity of outside salesman" if he
> (a) ... is employed for the purpose of and [ ] is customarily and regularly engaged away from his employer's place or places of business in:
> (1) Making sales within the meaning of [29 U.S.C. § 203(k) ], or
> (2) Obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
> (3) Whose hours of work of a nature other than described in paragraph (a)(1) or (2) of this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 11
Not Reported in F.Supp.2d, 2005 WL 2000133 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

section do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer ... provided, that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

29 C.F.R. § 541.5 (amended Aug. 23, 2004). Section 203(k) defines " sale" to include any " sale, exchange, contract to sell, consignment sale, shipment for sale, or other disposition." On August 23, 2004, the regulation was amended to provide:

(a) The term " employee employed in the capacity of outside salesman" ... shall mean any employee

(1) Whose primary duty is

(i) making sales within the meaning of [29 U.S.C. § 203(k) ], or

(ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

(2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.5 (as amended). Ecolab contends that because the individuals plaintiffs seek to include in the collective action were employed before and after the date of the regulation's amendment-August 23, 2004-both versions of the " outside salesman" exemption must be applied and that such individualized inquiry militates against approval of a collective action. Like factual questions raised by the motor carrier exemption, application of the " outside salesman" exemption bears on the merits of each plaintiff's claim. Where the parties have barely addressed the exemption and little, if any, discovery has been conducted on the issue, factual issues raised by the " outside salesman" exemption do not render a collective action inappropriate at this stage.

**\*15** There are issues also as to how many Route Managers, like Hester, participated in the Atlanta Delivery Model pilot program. Hester claims that under the program, he retrieved products from a Georgia warehouse-as opposed to having them shipped to his or a customer's home-to store on his truck and distribute to customers when needed. However, these issues bear on the applicability of the motor carrier exemption to certain periods of plaintiffs' employment under Ecolab, and not

whether they " were victims of a common policy or plan" that deprived them of overtime pay. Hoffman, 982 F.Supp. at 261; see also Brzychnalski v. Unesco, Inc., 35 F.Supp.2d 351, 353 (S.D.N.Y.2000). To reiterate, the merits of each plaintiff's claim need not be decided in order for a notice of collective action to be approved and disseminated. See Krueger v. New York Tel. Co., No. 93-178/179, 1993 WL 276058, at \*2 (S.D.N.Y. July 21, 1993) (" [E]ven if plaintiffs' claims turn out to be meritless or, in fact, all the plaintiffs turn out not to be similarly situated, notification at this stage, rather than after further discovery, may enable more efficient resolution of the underlying issues in this case." ).

At this stage, these factual issues do not bear on whether this case can proceed as a collective action. Indeed, approval of this collective action is for purposes of discovery as well as notice. See Frank v. Capital Cities Communications, Inc., 88 F.R.D. 674, 676 (S.D.N.Y.1981) (" [E]xperiences of other employees may well be probative of the existence vel non of a discriminatory policy...." ). The court need not and does not hold definitively that members of the proposed class to whom notices will be sent are in fact situated similarly to plaintiffs. Too little discovery has been taken to make such a determination now. Furthermore, should discovery reveal that plaintiffs in fact are not similarly situated, or that only a subset of the proposed class is similarly situated, the class may be decertified or reconstituted later in the litigation. See Gjurovich, 282 F.Supp.2d at 96.

Ecolab argues that even if this case is to continue as a collective action, plaintiffs' proposed notice must be modified. First, Ecolab contends that the notice should be sent only to those potential plaintiffs who work or have worked as Route Managers sometime during the last two years. Claims alleging violations of FLSA overtime requirements are subject to a two-year statute of limitations, except when the violation is determined ultimately to have been willful; in such cases, the statute of limitations is three years. See 29 U.S.C. § 255(a). Because discovery is at a preliminary stage, " it would be premature at this juncture to reach a determination as to whether the defendant's violations, if any, have been willful." Harrington v. Educ. Mgmt. Corp., No. 02-787, 2002 WL 1343753, at \*2 (S.D.N.Y. June 19, 2002). If it is held later that any violation is not willful, claims outside of the two-year limitations period simply can be barred.

**\*16** Second, Ecolab appears to argue that dissemination of the notice should be limited to Ecolab's Southeast Division. Without more support and in light of its own unqualified admission that it does not pay overtime to its

Not Reported in F.Supp.2d                                                Page 12

Not Reported in F.Supp.2d, 2005 WL 2000133 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

salaried employees-signaling a company-wide policy-I see no reason to grant that limitation.

Third, Ecolab claims that the job titles " sales route specialist" and " service professional" referred to in the proposed notice did not exist at Ecolab during " the applicable time period" and that " sales/service representative" was the only other position at Ecolab that carried duties similar to those of Route Managers. (Mem. of Law in Opp'n to Pls.' Motion to Approve Collective Action Notice at 18; *see also* Lewis Aff. ¶ 26 (" Ecolab never utilized the titles ' sales route specialists' or ' service professional." ' )) Ecolab contends that including these non-existent titles will cause " confusion" among those receiving the notice. According to a Department of Labor " Compliance Action Report," *see* supra note 5, there also exist at Ecolab, at least in its Puritan Services Division, employees with the title " Sales/Service Route Specialist." Regardless, if " sales route specialists" and " service professionals" indeed did not exist at Ecolab during the last three years, logic tells us that no such individuals will join the lawsuit.

Plaintiffs also seek discovery of the names and addresses of those current and former employees of Ecolab who are potential plaintiffs in this action, so that notice and consent forms may be sent to them. Such discovery is relevant to the subject matter of this action. Therefore, to insure that employees receive accurate and timely notice concerning the pendency of the collective action, the names of the potential plaintiffs, as defined in the notice, should be disclosed to plaintiffs by Ecolab.

For the reasons set forth above, Ecolab's motion for summary judgment is denied. Ecolab will furnish to plaintiffs within 20 business days hereof the names and last known addresses of all potential plaintiffs as defined in the attached Notice of Lawsuit. Notice, as modified in the attached Notice Of Lawsuit and Consent to Sue, may be sent to those potential plaintiffs. The parties are to appear at a conference on September 13, 2005, at 9:15 a.m.

SO ORDERED:

[To be printed on Plaintiff's lawyer's letterhead]

NOTICE OF LAWSUIT

1. Introduction to the Case

This notice is to inform you of a lawsuit pending against Ecolab, Inc. in United States District Court. This lawsuit claims that the defendant violated the Fair Labor Standards Act by failing to pay all eligible employees overtime at one-and-a-half times their regular pay rate for those hours worked in excess of 40 hours per week. The lawsuit claims that the defendant must award back pay and double liquidated damages as well as costs and attorneys' fees to such employees.

If you worked for Ecolab in the last three years as a Route Manager, Sales Route Specialist, Service Professional, or other position whose job duties primarily included repairing and providing preventive maintenance on leased commercial dish washing machines, and were not paid time and one-half for any work performed in excess of 40 hours per week, you may be eligible to join the lawsuit.

2. To Join the Case and Be Represented by Plaintiff's Counsel

**\*17** If you fit the definition above, you may join this case (that is, you may " opt in" ) by completing and mailing the attached " Consent to Sue" form to the plaintiff's lawyer no later than 60 days after the date of this notice at the following address:

Law Office of Dan Getman

9 Paradies Lane

New Paltz, N.Y. 12561

The lawyer's phone number is (845) 255-9370. You may call that number if you wish to have further information about the case or if you need more help in joining the lawsuit. If you fail to return the " Consent to Sue" form to the plaintiff's lawyer in time for it to be filed with the federal court on or before the above deadline, you may not be able to participate in this lawsuit.

If you choose to join in this case, you will be bound by the judgment, whether it is favorable or unfavorable.

The attorney for the class plaintiffs is being paid on a contingency fee basis, which means that if there is no recovery, there will be no attorneys' fee. If there is a recovery, the attorney for the class will receive either a fee from the defendant or a part of any settlement obtained or money judgment entered in favor of all members of the class, as specified in the attached Consent to Sue form. If you sign and return the " Consent to Sue" form attached to this Notice, you are agreeing to designate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 13

Not Reported in F.Supp.2d, 2005 WL 2000133 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

the class representatives to make decisions on your behalf concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. These decisions and agreements made and entered into by the class representatives will be binding on you if you join this lawsuit. However, the Court has retained jurisdiction to determine the reasonableness of any fee agreement entered into by plaintiffs with counsel, and to determine the adequacy of the plaintiffs' counsel.

### 3. To Join the Suit, But Not Be Represented by the Plaintiffs

You can join this lawsuit by representing yourself or by counsel of your own choosing. To do so, you or your attorney must file the appropriate documents with the Court. The address of the Court is: United States District Court, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, N.Y. 10007.

### 4. To Stay Out of the Lawsuit

If you do not wish to be part of the lawsuit, you need not do anything. If you do not join the lawsuit, you will not be part of the case in any way and will not be bound by or affected by the result, whether favorable or unfavorable. Your decision not to join this lawsuit will not affect your right to bring a similar case on your own in the future. However, claims under the Fair Labor Standards Act must be brought within two years, unless the employer's violation of the law was " willful," in which case the claims must be brought within three years of the alleged violation.

### 5. No Retaliation Permitted

**\*18** The defendant is prohibited by law from taking any

Dated:        Signature:

              Name:

              Address:

              Phone:

Mail this form within 60 days of the date of the Notice of Lawsuit to: Law Office of Dan Getman, 9 Paradies Lane, New Paltz 12561.

S.D.N.Y.,2005.
Masson v. Ecolab, Inc.

retaliatory action against any person, including a current employee, who joins this lawsuit. The defendant has denied the allegations of the lawsuit and has raised various defenses. No final decision on the merits of this lawsuit has been made by the Court.

Dated:

THIS NOTICE AND ITS CONTENTS HAVE BEEN AUTHORIZED BY THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK, THE HONORABLE MICHAEL B. MUKASEY, UNITED STATES DISTRICT JUDGE.

### CONSENT TO SUE

I hereby consent to be a plaintiff in the lawsuit named *Troy Masson, et al. v. Ecolab, Inc.* I hereby consent to the prosecution of any claims that I may have under the Fair Labor Standards Act for unpaid overtime, liquidated damages, attorney's fees, costs, and other relief, against the defendant.

I authorize the Law Office of Dan Getman, its successors and assigns, to represent me in this case.

By signing and returning this consent to sue, I understand that I will be represented by the Law Office of Dan Getman without prepayment of attorney's fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that the Law Office of Dan Getman may petition the court for an award of fees and costs to be paid by defendant on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendant or one-third of my total settlement or judgment amount (including fees), whichever is greater.

Not Reported in F.Supp.2d, 2005 WL 2000133 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3240472 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

Page 1

**C**
Mazur v. Olek Lejbzon & Co.
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Andrzej MAZUR, Tomasz Mryc, Miroslaw
Slupinski, and Zygmunt Sokolowski, on behalf of
themselves and on behalf of all others similarly
situated, Plaintiffs,
v.
OLEK LEJBZON & COMPANY, A & O Olek
Lejbzon & Company, Lejbzon Olek Custom
Refinishing, Treistman & Sons, Inc., and Peter
Treistman, Defendants.
**No. 05 Civ. 2194(RMB)DF.**

Nov. 30, 2005.

MEMORANDUM & ORDER
FREEMAN, Magistrate J.

*INTRODUCTION*

*1 Plaintiffs Andrzej Mazur (" Mazur" ), Tomasz
Mryc (" Mryc" ), Miroslaw Slupinski (" Slupinski" )
and Zygmunt Sokolowski (" Sokolowski" )
(collectively, " Plaintiffs" ) bring this action pursuant
to the Fair Labor Standards Act (" FLSA" ), 29
U.S.C. § 201 *et seq.,* against Defendants Olek
Lejbzon & Company, A & O Olek Lejbzon &
Company, Lejbzon Olek Custom Refinishing,
Treistman & Sons, Inc., and Peter Treistman
(collectively, " Defendants" ), to recover, *inter alia,*
unpaid overtime compensation on behalf of Plaintiffs
and other similarly situated employees of Defendants.

Plaintiffs now move for an order approving a
collective action, directing Defendants to provide the
names and addresses of potential members of the
collective action, and authorizing court-approved
notice to be mailed to such individuals to obtain their
written consent to join as plaintiffs in this action. For
the reasons set forth below, Plaintiffs' motion is
granted.

*BACKGROUND*

*A. Factual Background*

According to his declaration, which was submitted by
Plaintiffs in support of this motion, Mazur was
employed by Defendants as a carpenter helper from
October 11, 2001 through September 14, 2004. (*See*
Declaration of Andrzej Mazur, filed July 11, 2005 ("
Mazur Decl." ) (Dkt.20), ¶ 1.) Mazur, whose base
salary was $8.00-$9.00 per week over the course of
his employment with Defendants, worked 60-80
hours per week. (*Id.* ¶¶ 2, 4.) According to Mazur,
however, Defendants never paid him overtime
compensation for working over 40 hours per week.
(*Id.* ¶ 4.)

Similarly, Mryc states that he was employed by
Defendants as a carpenter at a regular rate of $9.00
per hour from January to October 2002, and as a
finisher-varnisher at a regular rate of $13.00 per hour
from December 2002 through August 2003. (*See*
Declaration of Tomasz Mryc, filed July 11, 2005 ("
Mryc Decl." ) (Dkt.22), ¶¶ 1-2.) During the course of
his employment, Mryc typically worked 70 hours per
week, but asserts that he was not paid overtime
compensation for his work in excess of 40 hours per
week. (*See id.* ¶ 4.)

Finally, according to a declaration signed by
Slupinski, he began his employment for Defendants "
in a variety of capacities, including welder, carpenter,
and laborer." (Declaration of Miroslaw Slupinski,
filed July 1, 2005 (" Slupinski Decl." ) (Dkt.21), ¶ 1.)
From November 2002 to January 2004, Slupinski
was employed as a project foreman at a rate of
$20.00-$23.00 per hour. (*Id.* at ¶¶ 1-2.) Slupinski
states that, at times, he worked more than 40 hours
per week as a foreman, for which Defendants did not
pay him overtime compensation. (*See id.* ¶ 5.)

Mazur, Mryc and Slupinski each state in their
declarations that they are aware of at least 20 other
carpenters, finisher-varnishers, woodworking
machine operators, installers, laborers, helpers, and
foremen who performed the same or similar work as
they did for Defendants; who, like Plaintiffs, worked
more than 40 hours per week; and who, like
Plaintiffs, were not paid overtime compensation. (*See*
Mazur Decl. ¶¶ 3-4; Mryc Decl. ¶¶ 3-4; Slupinski
Decl. ¶¶ 3-5.) Moreover, according to the
declarations submitted by Plaintiffs, Defendants
employed at least 20 and as many as 50 individuals-
consisting of carpenters, finisher-varnishers,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 2

Not Reported in F.Supp.2d, 2005 WL 3240472 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

woodworking machine operators, installers, laborers, helpers, and foremen-each year, because of a high employee turn-over rate. (*See* Slupinski Decl. ¶ 4; *see also* Mazur Decl. ¶ 4; Mryc Decl. ¶ 3.)

*2 Mazur and Mryc state that they have personal knowledge of the work hours of other employees because they worked alongside one another, and note that they knew that Defendants had not paid other employees overtime compensation because Mazur and Mryc frequently discussed the issue with other employees. (*See* Mazur Decl. ¶ 4; Mryc Decl. ¶ 4.) Similarly, Slupinski explains that the employees he supervised as foreman constantly complained to him that Defendants did not pay them for all hours worked, and did not pay them overtime. (*See* Supplemental Declaration of Miroslaw Slupinski, filed September 19, 2005 (" Slupinski Supp. Decl." ) (Dkt.26), ¶¶ 4-7.) Slupinski also names three individuals with whom he discussed wages, the lack of overtime pay, and the failure of Defendants to fully compensate him and these employees for all hours worked. (*See id.* ¶ 9.) Slupinski indicates that he had similar conversations with other employees whose names he cannot remember. (*See id.*)

Like Slupinski, Mazur names seven individuals that he personally knows to have regularly worked more than 40 hours per week for Defendants, and who were not fully paid for all of they hours they worked, nor paid overtime. (*See* Supplemental Declaration of Andrzej Mazur, filed September 19, 2005 (" Mazur Supp. Decl." ) (Dkt.26), ¶ 2.) According to Mazur, these seven employees worked with him as carpenters or carpenter helpers in Defendants' shop, in addition to others whom Mazur could not identify by name. (*See id.* ¶ 2(A), (C).) Mazur further states that the compensation owed to these employees by Defendants was often discussed by the employees at work. (*Id.* ¶¶ 2(D), 3.)

**B.** *Plaintiffs' Motion to Approve a Collective Action Notice* [FN1]

> FN1. In its opposition, Defendants argue that this Court does not have authority to decide Plaintiffs' motion to approve a collective action notice. (*See* Def. Opp. at 3-5.) Although Defendants correctly note that a magistrate judge does not have authority " to permit maintenance of a class action" absent consent by the parties or a referral by the district judge (*see id.* at 3 (citing 28

U.S.C. § 636(b)(1)(A)), Plaintiffs' motion does not seek to maintain a class action under Fed.R.Civ.P. 23. Rather, Plaintiffs only seek preliminary approval for service of a collective action notice pursuant to the FLSA, under which the standard for granting approval is far more lenient, and indeed, materially different, than the standard for granting class certification under Fed.R.Civ.P. 23. *See Abrams v. Gen'l Elect. Co.*, No. 95-CV-1734 (FJS), 1996 U.S. Dist. LEXIS 16869, at *5 and n. 3 (N.D.N.Y. Nov. 4, 1996). Defendants' reliance on 28 U.S.C Section 636(b)(1)(A), which speaks to class actions, is therefore misplaced, as it does not prohibit a magistrate judge from entertaining a motion to approve a collective action notice under the FLSA. *See, e.g., Young v. Cooper Cameron Corp.*, 229 F.R.D. 50 (S.D.N.Y.2005) (motion to authorize collective action granted by Magistrate Judge Gorenstein); *Patton v. Thomson Corp.*, 364 F.Supp.2d 263, 265-66 (E.D.N.Y.2005) (holding that magistrate judges have authority to decide a motion to " circulate a notice of pendency in a case brought under the FLSA" ).

Plaintiffs seek an order (1) allowing this case to proceed as a collective action; (2) directing Defendants to disclose the names and last-known addresses of those current and former employees that Plaintiffs contends are " potential plaintiffs and putative members of the class" ; and (3) authorizing service by mail upon potential plaintiffs of the proposed collective action notice. (*See* Notice of Motion, filed July 1, 2005) (Dkt.16). Plaintiffs have annexed to their motion papers a proposed collective action notice and consent form to be served on potential plaintiffs. (*See* Declaration of Robert Wisniewski, Esq., filed July 1, 2005 (" 7/1/05 Wisniewski Decl." ), at Exs. 1 and 2) (Dkt.16). Plaintiffs have also submitted a memorandum of law in support of their motion (Dkt.16), as well as the declarations of Mazur (Dkt.20), Slupinski (Dkt.21), and Mryc (Dkt.22). On July 19, 2005, Defendants filed its opposition to Plaintiffs' motion. (*See* Defendants' Memorandum of Law In Opposition to Plaintiffs' Motion, filed July 19, 2005) (" Def.Opp." ) (Dkt.23). Plaintiffs later submitted the supplemental declarations of Mazur and Slupinski. (Dkt.26.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2005 WL 3240472 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

Following a telephone conference to discuss various issues raised by the proposed notice submitted in Plaintiffs' initial papers on this motion, Plaintiffs submitted a revised proposed Notice of Lawsuit With Opportunity to Join (" Revised Proposed Notice" ) and consent form to the Court. (See Letter to the Court from Robert Wisniewski, Esq., dated October 17, 2005 (" 10/17/05 Letter" ) (Dkt.28), at Ex. 3.) Defendants notified the Court that, although they maintained their opposition to Plaintiffs' motion, they had few remaining disputes with Plaintiffs regarding the content and scope of the Revised Proposed Notice itself, should the Court decide to grant the motion. Pursuant to the Court's request, Defendants then submitted a letter, dated October 28, 2005, outlining the remaining disputes between the parties regarding the contents of the notice.

\*3 On this motion, Plaintiffs request that this Court approve a collective action notice for the following class of potential plaintiffs:
Current and former employees of [Defendants] who are or were employed within three (3) years preceding [the date of the Court's Order approving this notice], as foremen, carpenters, finishers, varnishers, woodworking machine operators, laborers, helpers and other employees who performed the same or similar work, and who did not receive overtime compensation at the rate of one and one-half times the regular rate at which they were employed for work they performed in excess of 40 hours each week.

(See Revised Proposed Notice, at 1.) Plaintiffs argue that, through the declarations of three of the named Plaintiffs, they have met the standard for approval of this collective action notice. First, Plaintiffs contend that the declarations demonstrate that Defendants violated Section 207 of the FLSA by, inter alia, requiring their employees to work in excess of 40 hours per week without paying them overtime compensation. (See Memorandum of Law in Support of Plaintiffs' Motion for Approval of Collective Action Notice, filed July 1, 2005 (" Pl.Mem." ), at 4-5.) Second, Plaintiffs argue that the declarations " demonstrate that the number of similarly situated current and former employees is quite large." (Id. at 5-6.) Finally, Plaintiffs argue that the district courts have the power to send notice to potential plaintiffs and to require Defendants to disclose the names and addresses of potential plaintiffs, and that Defendants should be ordered to do so " in both paper and digital

format, to expedite the distribution of the notices." (Id. at 6-7.)

Defendants' primary argument in opposing Plaintiffs' motion is that Plaintiffs have failed to make a showing that they are " similarly situated" to other employees, and that, as a result, the Court should not allow this case to proceed as a collective action. (See Def. Opp. at 5-13.)

*DISCUSSION*

*I. APPLICABLE LEGAL PRINCIPLES UNDER THE FLSA*

The FLSA was designed to eliminate " labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). " The purpose of the FLSA ... was to ' guarantee[ ] compensation for all work or employment engaged in by employees covered by the Act.' " Reich v. New York City Transit Auth., 45 F.3d 646, 648-49 (2d Cir.1995) (quoting Tenn. Coal, Iron & R. Co. v. Muscoda Local, 321 U.S. 590, 602, 64 S.Ct. 698, 88 L.Ed. 949 (1944)) (alteration in original).

Under the FLSA, employers must pay overtime for " employment in excess of [40 hours per week] at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1). Certain employees, however, are exempt from the FLSA's overtime requirements, including " any employee employed in a bona fide executive, administrative, or professional capacity...." Id. § 213(a)(1). The Second Circuit has held that " because the FLSA is a remedial act, its exemptions are to be narrowly construed" and that, in addition, the " employer bears the burden of proving that its employees fall within an exemption in the FLSA." Coke v. Long Island Care At Home, Ltd., 376 F.3d 118, 123 (2d Cir.2004) (citations omitted).

\*4 Section 216(b) of the FLSA provides in part that:
[A]n action ... may be maintained against any employer ... by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 4

Not Reported in F.Supp.2d, 2005 WL 3240472 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

29 U.S.C. § 216(b). Pursuant to this section, potential plaintiffs who wish to be bound by and benefit from the judgment must " opt in" to a " collective action." *Hoffmann v. Sbarro, Inc.,* 982 F.Supp. 249, 260 (S.D.N.Y.1997). Further, a district court may permit an opt-in notice to be sent to potential plaintiffs. *See Hoffman-La Roche, Inc. v. Sperling,* 493 U.S. 165, 169-70, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989).

Significantly, the requirements of Fed.R.Civ.P. 23 do not apply to the approval of a collective action and thus, " no showing of numerosity, typicality, commonality and representativeness need be made" as a pre-requisite to approval. *Foster v. Food Emporium,* No. 99 Civ. 3860(CM), 2000 U.S. Dist. LEXIS 6053, at *3 (S.D.N.Y. Apr. 26, 2000). Rather, in deciding whether to authorize a collective action notice under the FLSA, the only issue for the Court is " whether plaintiffs have demonstrated that potential class members are ' similarly situated.' " *Young v. Cooper,* 229 F.R.D. 50, 54 (S.D.N.Y.2005) (citing *Hoffmann,* 982 F.Supp. at 261 (citation omitted)). A plaintiff may meet this burden " by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Hoffman,* 982 F.Supp. at 261 (citing cases). A plaintiff need not show an actual violation of law; rather, the inquiry centers on whether the proposed plaintiffs are " similarly situated" with respect to their allegations that the law has been violated. *Young,* 229 F.R.D. at 54. The named plaintiff may satisfy the " similarly situated" standard merely by demonstrating a " factual nexus" between his or her situation and the situation of other current and former employees. *See id.; see also Hoffmann,* 982 F.Supp. at 261 (" The burden on plaintiffs is not a stringent one, and the Court need only reach a preliminary determination that potential plaintiffs are similarly situated." ).

## II. *APPROVAL OF COLLECTIVE ACTION NOTICE*

As a threshold matter, the potential plaintiffs in this action do not appear to fall within an exemption to the FLSA, and Defendants, who would have the burden on this issue, *see Coke,* 376 F.3d at 123, have not argued nor established otherwise. Rather, Defendants argue that this Court should not authorize this case to proceed as a collective action because Plaintiffs have failed to demonstrate that other employees of Defendants " were subjected to any

unlawful conduct." (Def. Opp. at 8-9.) In Defendants' view, Plaintiffs " rely on nothing more than boilerplate conclusory allegations" that other employees were not paid overtime. (*Id.* at 9.) Glossing over the fact that Plaintiffs have already submitted the declarations of three individuals, which identify others by name and/or job description, Defendants argue that Plaintiffs " have not submitted a single affidavit from a potential class member that anyone else was paid in violation of the FLSA." (*Id.*) Further, Defendants argue that Plaintiffs have not demonstrated that potential class members are " similarly situated" because, according to Defendants, Plaintiffs (1) set forth nine job classifications to be notified,[FN2] although Plaintiffs themselves only worked in six; (2) worked for four different corporate Defendants at different times and different places; and (3) " have not articulated a common practice or policy to which they and similarly situated potential opt-ins were subject to." (*Id.*)

> FN2. Although Defendants argue that there are nine job classifications, both the Proposed Notice of Lawsuit With Opportunity to Join (*see* 7/1/05 Wisniewski Decl., at Ex. 1) and the Revised Proposed Notice actually specify only seven categories-foremen, carpenters, finishers, varnishers, woodworking machine operators, laborers, and helpers-in addition to the general category of " other employees who performed the same or similar work."

*5 Plaintiffs, however, face " only a very limited burden ... for purposes of proceeding as a collective action." *Young,* 229 F.R.D. at 55 (citing cases). Notably, it is not the Court's function at this time to determine whether the potential class members identified by Plaintiffs are, in fact, similarly situated to Plaintiffs. *See Gjurovich,* 282 F.Supp.2d at 96. Rather, Plaintiffs' " burden for proving that [they are] similarly situated to these potential plaintiffs is minimal for this preliminary determination-a determination that can be modified or reversed after discovery is complete." *Id.* Given this minimal burden, Plaintiffs have established that approval of this case as a collective action is appropriate. First, Plaintiffs have sufficiently alleged a common policy or plan of Defendants' failure to pay overtime wages. Through the declarations they submitted, Plaintiffs have also provided evidence that Defendants did not pay Mazur, Mryc, and Slupinski overtime compensation to which they were entitled under the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3240472 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

Page 5

FLSA, and have preliminarily established that, like Plaintiffs, other employees also did not receive overtime compensation from Defendants. Further, in their declarations, Mazur, Mryc and Slupinski state that, based on their conversations with other employees, they have personal knowledge that Defendants did not pay these other employees overtime compensation.

Second, Plaintiffs have established a sufficient " factual nexus" between their situation and the situation of other employees who were also subjected to the Defendants' alleged failure to pay overtime wages. Contrary to Defendants' implication, Plaintiffs need not show that they are " identically situated to potential class members" for approval of a collective action; rather, Plaintiffs need only provide evidence that a " demonstrated similarity" exists among individual situations. *See Abrams,* 1996 U.S. Dist. LEXIS 16869, at *6. Plaintiffs have done this. Each of the declarations submitted by Plaintiffs establishes a likelihood that at least some of Defendants' other employees, who are alleged to have performed the same or similar work as Plaintiffs, for the same or similar amount of hours per week, were also not paid overtime as required under the FLSA. In addition, Mazur and Slupinski identify by name a number of employees, aside from the named Plaintiffs, who are alleged to have held the same or similar positions as Plaintiffs; who, like Plaintiffs, are alleged to have worked over 40 hours per week; and who, like Plaintiffs, appear to be owed overtime compensation, as Mazur and Slupinski learned through discussions with these other employees. Further, Mazur and Slupinski each indicate that there may be additional employees who meet the same criteria, but whose names they either do not know or cannot remember.

In light of the minimal nature of Plaintiffs' burden on this motion, Plaintiffs have sufficiently demonstrated that an identifiable " factual nexus" binds them as victims of Defendants' alleged violation under the FLSA with the potential class members described by Plaintiffs. *See, e.g., Realite v. Ark Restaurants Corp., 7 F.Supp.2d 303, 308 (S.D.N.Y.1998); Abrams,* 1996 U.S. Dist. LEXIS 16869, at *6. Accordingly, the Court finds that allowing this case to proceed as a collective action would be appropriate.

### III. *SCOPE AND FORM OF NOTICE*

*6 " No courts have specifically outlined what form court-authorized notice should take, or what

provisions notice issued pursuant to § 216(b) should contain." *Gjurovich,* 282 F.Supp.2d at 97. Here, Plaintiffs have submitted a Revised Proposed Notice, and Defendants do not disagree with its contents, except in three minor respects, which are discussed below.

#### A. *Contingency Fee*

With regard to the statement in the Revised Proposed Notice that " [t]he attorneys representing the plaintiffs are being paid on a contingency-fee basis" (*see* Revised Proposed Notice, at 3), Defendants request that the percentage of the contingency fee be added so that individuals who opt-in will know precisely how much the attorney will be compensated if Plaintiffs should prevail. It has not, however, been customary in this Court for the specific percentage of the contingency fee sought by plaintiffs' attorneys to be included in collective action notices. *See, e.g., Masson v. Ecolab, Inc.,* No. 04 Civ. 4488(MBM), 2005 U.S. Dist. LEXIS 18022, at *47-50 (S.D.N.Y. Aug. 18, 2005) (approving collective action notices that alerted potential plaintiffs to contingency fee without including specific percentage); *Gjurovich,* 282 F.Supp.2d at 98-99 (same); *Hoffmann,* 982 F.Supp. at 264 (same). Nor does the Court believe it necessary or reasonable to include the specifics of counsel's feel arrangements in the notice. Accordingly, the Court declines to modify the Revised Proposed Notice in this respect.

#### B. *Language Providing No Assurance of the Validity of Potential Plaintiffs' Claims or Entitlement To Monetary Recovery*

Defendants also request that the following language be added to the Revised Proposed Notice: " This notice does not mean that you are entitled to any monetary recovery. Any such determination must still be made by the Court." Plaintiffs do not object to the content of this phrase, but the parties disagree on the placement of this language. Although Plaintiffs' position on the placement of this language is not clear, Defendants argue that the phrase should be placed as a separate paragraph at the end of the " Description of the Lawsuit" section (*see* Revised Proposed Notice, at 2).

Defendants' third and final request is related, in that Defendants seek to add the following language to the middle of the first paragraph of the " Effect of Not Joining This Case" section (*see id.* at 4): " This

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 3240472 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

notice is not intended to imply in any way that you have a valid claim or that you are entitled to any monetary recovery." Again, such language is not customarily included in collective action notices, and the particular language proposed by Defendants in its last request may confuse potential plaintiffs and lead them to believe that they do not have a valid claim when, in fact, they may. Nonetheless, the substance of the request is reasonable, and thus, the Court will modify the Revised Proposed Notice by adding the following language as a separate and final paragraph of the section entitled "Your Right To Participate in This Suit" (*see* Revised Proposed Notice, at 3): " This notice does not mean that you have a valid claim or that you are entitled to any monetary recovery. Any such determination must still be made by the Court."

*7 In all other respects, the Court finds the Revised Proposed Notice to be appropriate and authorizes its service upon the potential plaintiffs identified therein.

## CONCLUSION

For the foregoing reasons, Plaintiffs's motion is granted. Defendants are ordered to provide Plaintiffs with the names and addresses of current and former employees of Defendants who are or were employed by Defendants in the three years preceding the date of this Order as foremen, carpenters, finishers, varnishers, woodworking machine operators, laborers, helpers, or who performed the same or similar work. Defendants shall provide this information within two weeks of the date of this Order in a paper and digital format agreeable to Plaintiffs. In addition, Plaintiffs' counsel is authorized to mail to the employees, as identified by Defendants, the Revised Proposed Notice and consent form attached hereto, with the modifications set forth above. Plaintiffs shall mail the notice and consent form within two weeks of the receipt of such names and addresses.
SO ORDERED

S.D.N.Y.,2005.
Mazur v. Olek Lejbzon & Co.
Not Reported in F.Supp.2d, 2005 WL 3240472 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                Page 1

Not Reported in F.Supp.2d, 2001 WL 1035132 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

**H**
Ralph Oldsmobile, Inc. v. General Motors Corp.
S.D.N.Y.,2001.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
RALPH OLDSMOBILE INC., on behalf of itself and
all others similarly situated, Plaintiff,
v.
GENERAL MOTORS CORPORATION, Defendant.
No. 99 Civ. 4567(AGS).

Sept. 7, 2001.

*MEMORANDUM ORDER*
SCHWARTZ, J.
*1 Plaintiff moves, pursuant to Fed.R.Civ.P. 23, for
an order requiring defendant " to cease and desist its
practice of obtairting *ex parte* releases from putative
Class members," voiding those releases already
obtained, and requiring defendant " to send a Court-
approved corrective notice" that any such releases
have been voided.[FN1] As set forth more fully below,
the motion is granted in part and denied in part.

> FN1. Plaintiff also sought the name and
> address of each dealer who signed a release
> after this action was filed. Because
> defendant has provided that information
> (Aff. of Charles F. Seaburg dated July 11,
> 2001 (" Seaburg Aff." ) Ex. A), this portion
> of the motion is denied as moot.

I. Background

Plaintiff Ralph Oldsmobile Inc. (" Ralph Olds" ) filed
this purported class action on behalf of all franchised
General Motors dealers in New York State. Ralph
Olds alleges that defendant General Motors
Corporation (" GM" ) violated New York Vehicle
and Traffic Law § 465 (" VTL § 465" ), which
requires that franchisor car manufacturers reimburse
their franchised dealers for warranty repairs at not
less than market rates. According to Ralph Olds, GM
paid its franchised dealers less than the statutory rate
for parts used in warranty repairs. (*See generally* Am.
Compl.) On September 29, 2000, the Court denied
GM's motion for summary judgment, 2000 WL
1459767, and on January 23, 2001 denied GM's
motion for reconsideration or, in the alternative, for

leave to proceed with an interlocutory appeal. 2001
WL 55729. Familiarity with those decisions is
assumed herein. On January 29, 2001, the Court
issued an order allowing plaintiff's counsel to send a
notice to all putative class members, responding to a
letter sent to GM dealers by another law firm (which
letter allegedly included misrepresentations about this
action).

While this action has been pending, GM announced
that it will discontinue its Oldsmobile line. (Seaburg
Aff. ¶ 2.) In connection with the discontinuance, GM
has offered Oldsmobile dealers throughout the
country certain transition payments, above and
beyond what GM is required by its dealer contracts to
pay for termination of Oldsmobile dealerships. (*Id.* ¶¶
2-4.) To obtain these transition payments, an
Oldsmobile dealer must sign a termination and
release agreement. (*Id.* ¶¶ 5-6.) The agreement
provides, in relevant part, that the dealer releases all
Oldsmobile-related claims against GM except, *inter
alia,* claims relating to " reimbursement to Dealer of
unpaid warranty claims for warranty services
performed by Dealer within six (6) months prior to
the effective date of termination...." (Aff. of Lester
L. Levy in Support of Pl. Ralph Oldsmobile Inc.'s
Mot. to Enjoin General Motors Corp. from Obtaining
*ex parte* Releases from Putative Class Members and
Other Relief dated June 27, 2001 (" Levy Aff." ) Ex.
B at 2.) Plaintiff sent a letter to defendant voicing
concern about the releases, and requesting the exact
language of the release and information about dealers
who had signed releases. (Levy Aff. Ex. A.)
Defendant provided the release language, refused to
identify the dealers who had signed releases, and
asserted that plaintiff's January 2001 notice had
advised putative class members of their rights. (Levy
Aff. Ex. B.) Plaintiff replied that it considers
improper GM's offering this release without referring
to this action and without informing dealers of the
fact that dealers signing the release may have waived
or limited their rights in this action. Plaintiff
requested that GM stop obtaining such releases and
treat all previously obtained releases as null and void.
(Levy Aff. Ex. C.) GM did not agree to this request.
Plaintiff then filed the instant motion.

II. Discussion

*2 The Supreme Court has held that Rule 23 allows a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1035132 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

court, in appropriate circumstances, to restrict communications between a party and members of a class or putative class. *Gulf Oil v. Bernard,* 452 U.S. 89 (1981). Acknowledging the possibility of abuses in class action litigation, but seeking to avoid infringing parties' rights, the Supreme Court held that:

> an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties.... In addition, such a weighing-identifying the potential abuses being addressed-should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.

*Id.* at 101-02 (footnotes omitted). Although *Gulf Oil* concerned communications between counsel for the named plaintiff and potential class members, its rationale has been found to apply to communications between defendants and potential class members as well. *See, e.g., Bublitz v. E.I. DuPont de Nemours & Co.,* 196 F.R.D. 545, 547 (S.D.Iowa 2000); *Abdallah v. Coca-Cola Co.,* 186 F.R.D. 672, 675 n. 1 (N.D.Ga.1999). *Gulf Oil,* and a court's power to restrict communications between parties and potential class members, apply even before a class is certified. *See, e.g., Bublitz,* 196 F.R.D. 545; *Burrell v. Crown Cent. Petroleum, Inc.,* 176 F.R.D. 239, 242-43 (E.D.Tex.1997).

Ralph Olds contends on this motion that the Court should restrict GM's communication with members of the putative class because GM's unilateral obtaining of releases is abusive. Specifically, Ralph Olds contends that GM's communications with Oldsmobile dealers are coercive and do not provide adequate information about the rights waived by the releases. (Mem. of Law in Supp. of Pl. Ralph Oldsmobile Inc.'s Mot. to Enjoin General Motors Corp. from Obtaining *ex parte* Releases from Putative Class Members and Other Relief (" Pl.'s Mem." ) 6-11.) GM responds that it is entitled to settle with individuals prior to class certification, that there is no coercion, and that there is no evidence that any dealer has waived its rights unknowingly or involuntarily. GM further argues that the relief sought by plaintiff is overbroad, but offers to add a minimal notice about this litigation to its agreements with Oldsmobile dealers in New York. (Opp. of Def. General Motors Corp. to Pl. Ralph Oldsmobile Inc.'s

Mot. to Enjoin General Motors Corp. from Obtaining *ex parte* Releases from Putative Class Members and Other Relief (" Def.'s Mem." ) at 7-16.) In reply, plaintiff acknowledges that Second Circuit precedent authorizes GM to settle with individuals who may potentially be class members, but states that GM is acting improperly because it is obtaining releases without properly disclosing what is being released and without providing adequate consideration for the released claims. Plaintiff also rejects GM's proposed notice as inadequate. (Reply Mem. of Law in Supp. of Pl. Ralph Oldsmobile Inc.'s Mot. to Enjoin General Motors Corp. from Obtaining *ex parte* Releases from Putative Class Members and Other Relief (" Reply Mem." ) at 3-13.)

**\*3** The record supports findings of potential abuse in GM's communications with Oldsmobile dealers regarding the releases. Specifically, the record supports findings of potential coercion and potentially unknowing waivers of the rights asserted in this action. The record does not support a finding of lack of adequate consideration. As to coercion, " [a] unilateral communications scheme ... is rife with potential for coercion. ' [I]f the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive." ' *Kleiner v. First Nat'l Bank,* 751 F.2d 1193, 1202 (11th Cir.1985). In *Kleiner,* the Eleventh Circuit agreed with the district court that it was coercive for the defendant bank to call borrowers who were potential class members and ask them to opt out of the litigation. The Eleventh Circuit noted that many of the potential class members were not only current borrowers, but might depend upon the bank for future financing, might need " discretionary financial indulgence from their loan officers" and might not have easy access to other sources of credit. *Id.* Similarly, the court found coercion in a continuing business relationship in *Hampton Hardware, Inc. v. Cotter & Co.,* 156 F.R.D. 630 (N.D.Tex.1994). In that case, one retail hardware store filed a purported class action against a member-owned hardware wholesaler, of which the retailer was one member-owner. The wholesaler sent three letters to all of its Texas members, who were also the potential class members. The letters denigrated the suit, claimed it would cost the wholesaler (and therefore its members-owners) substantial sums, and asked potential class members not to participate. *Id.* at 631-32. Citing *Kleiner,* the court found a potential for coercion. The court noted that potential class

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1035132 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

members relied upon the defendant for information and for low prices on hardware. As such, the court found the potential class members " particularly susceptible to believing defendant's comments that the lawsuit [would] cost them money." *Id.* at 633.

*Hampton Hardware* was distinguished, however, by the court in *Jenifer v. Delaware Solid Waste Auth.,* Nos. CIV.A 98-270 MMS, CIV.A 98-565 MMS, *1999 WL 117762 (D.Del. Feb. 25, 1999).* In *Jenifer,* solid waste haulers filed putative class actions challenging regulations implemented by the defendant. The regulations required the plaintiffs to dispose of waste in Delaware, where disposal fees were higher than in other states. Plaintiffs contended that the defendant contacted potential class members and offered them a new pricing plan. Under this plan, the regulations would be eliminated and fees in Delaware would remain at then-current rates. However, potential class members who signed a three-year contract to dispose of their waste in Delaware, and agreed to release defendant from any liability relating to the regulations, would receive a substantial rebate on their disposal fees. *Id.* at *1. The court acknowledged that an ongoing business relationship may give rise to coercion, citing, *inter alia, Kleiner* and *Hampton Hardware. Id.* at *4. The court noted that " where there is a relationship that is inherently coercive, the court does not need to make a finding that a particular abuse has occurred.... The court, however, must still require a clear record of threatened abuses." *Id.* On the record presented, the court did not find coercion. It could not conclude that the pricing plan was or was not formulated in response to the lawsuit. It could not conclude that potential class members would be threatened into abandoning their claims. Unlike the letters in *Hampton Hardware,* which pertained solely to the lawsuit, the communications about the pricing plan " relate[d] to a business proposition which potential class members are free to reject if they decide the costs outweigh the benefits." *Id.* at *5. Accordingly, the court refused to forbid the defendant from communicating with potential class members. However, the court did order defendant to notify potential class members of the pendency of the lawsuit before they agreed to the release included in the pricing contracts. *Id. at 7-8.*[FN2]

> FN2. Courts have reached different conclusions about whether an employer-employee relationship is sufficiently coercive to warrant restrictions on communication between a defendant and potential class members. *Compare Bublitz, 196 F.R.D. 545* (restrictions imposed) *and Abdallah, 186 F.R.D. 672* (same) *with Burrell, 176 F.R.D. 239* (no restrictions imposed) *and Matarazzo v. Friedly Ice Cream Corp., 62 F.R.D. 65 (E.D.N.Y.1974)* (stating that its is a better practice to have releases from potential class members pre-approved by court but not requiring approval nor precluding defendant from communicating with potential class members).

**\*4** While the instant action appears somewhat similar to *Jenifer,* a finding of potential coercion is warranted here. Concededly, there is no evidence of actual coercion; and Oldsmobile dealers can refuse to sign the release, choosing to forgo the transition payments in favor of the combination of termination payments under the dealer agreement and the potential for damages in this action. (*See* Seaburg Aff. ¶¶ 2-8.) Also, as GM argues (Def.'s Mem. at 9), its communications about the transition payments do not relate solely to this action. However, the relationship between the parties here is distinguishable from that in *Jenifer.* Here, as in *Kleiner* and *Hampton Hardware,* the potential class members depend upon the defendant for information, supplies, and credit. (*See, e.g.,* Aff. of Celeste Dorsey-Grooms Submitted in Supp. of Mot. of Def. General Motors Corp. for Summ. J. dated Sept. 29, 1999, Ex. A.) Like the borrowers in *Kleiner* who had no other source of credit, the GM dealers have no other source of GM vehicles. (*Id.*) This is important because some of the dealers who have already signed releases sell not only Oldsmobiles, but other GM lines as well. (Seaburg Aff. ¶ 9, Ex. A.) Their continued success and, indeed, existence may depend upon GM's good will. The record, therefore, presents the clear potential for abuse.

The record also warrants a finding of a potential for unknowing waivers resulting from a lack of information. Although the release purports to waive a dealer's claims for unpaid warranty claims that are more than six months old, the release does not mention this action. (Levy Aff. Ex. B at 2.) Nor does the record reflect any mention of this action in any other communications made to date by GM regarding the transition payments. There is thus a risk that dealers may sign the release without knowing what

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

they are releasing. Such an unknowing release would be abusive and warrant relief. GM contends that the notice sent by plaintiff to potential class members, and the letter to which it was responding, advised all potential class members of this action. (Def.'s Mem. at 11.) There is no evidence, however, as to whether any particular dealer received that notice or read it. Moreover, as plaintiff points out, the notice from plaintiff states that, because this is putatively a class action, dealers need do nothing to preserve their rights under VTL § 465. (Reply Mem. at 11-12.) Such language may lead dealers who read the notice to think that the release does not affect their claims under VTL § 465. GM also argues that former named plaintiff John Martin Motors signed a release agreement. (Def.'s Mem. at 6-7, 11.) What John Martin Motors knew or did, however, is not necessarily indicative of what any other dealer knew or did. Finally, GM offers to provide certain notice " in order to avoid the remote possibility that dealers will unknowingly waive claims." (Def.'s Mem. at 16.) Even in *Jenifer*, where the court found no coercion, the court did express concern about releases possibly granted without adequate notice and did order notice. The record sufficiently supports a finding of potential unknowing waivers.

**\*5** The record does, however, support a finding as to the presence of consideration for the releases. Ralph Olds argues in its reply memorandum that because the transition payments are the same in New York as they are in every other state, no consideration is being paid for the warranty claims that are being waived. (Reply Mem. at 5-7.) However, Ralph Olds assumes more than is justified by the record. Certain states other than New York have statutes that require manufacturers to reimburse dealers for warranty repairs. *See, e.g.,* 2000 WL 1459767, at \*6. While this Court's prior decisions in this action distinguish those statutes from VTL § 465, 2000 WL 1459767, at \*6; 2001 WL 55729, at \*2, those statutes do provide dealers in other states with certain rights. The record contains no information as to what actions may or may not be pending in other states under those states' analogs to VTL § 465. Whether or not any such actions are pending, dealers in other states are waiving their rights under applicable warranty reimbursement statutes to the same extent, if any, that dealers in New York are waiving their rights under VTL § 465. (Seaburg Aff. ¶¶ 2-7.) Thus, dealers in New York are not necessarily receiving any less than dealers in any other state. Since dealers in New York and elsewhere are providing the release as part of a

broader agreement under which they receive certain payments, the Court is unable to find, absent additional evidence not present in the record, that no consideration is being provided for the releases.

Balancing the findings supported by the record against the need to limit GM's speech as little as possible in the circumstances, *see Gulf Oil,* 452 U.S. at 101-02, the appropriate remedy is to require that notice be given. *See, e.g., Jenifer,* 1999 WL 117762, at \*7- \*8. GM offers to include the following notice in future agreements:

The release covers any claims arising from Oldsmobile dealership operations, including, without limitation, any claims relating to reimbursement for warranty parts used in Oldsmobile vehicles. Such claims have been asserted in *Ralph Oldsmobile, Inc. v. General Motors Corp.,* No. 99 Civ. 4567(AGS), a lawsuit brought by a former GM dealer as a potential class action in the United States District Court for the Southern District of New York. The Transition Agreement does not include a release of claims arising from Dealership Operations for GM lines other than Oldsmobile.

(Def.'s Mem. at 16.) Plaintiff argues that this is insufficient because it believes the dealers are receiving no consideration. (Reply Mem. at 12-13.) As noted above, the record does not support plaintiff's consideration argument. The Court does agree, however, that GM's proposed notice is inadequate. The notice does not state which dealers may be in the class, if a class is certified. It does not provide information as to the status of the action. It does not indicate how a dealer may obtain more information about the case or contact plaintiff's counsel. It does not clearly state that signing the release may prevent a dealer from recovering damages in this action. And it does not speak at all to the releases that have already been executed. This information should, in the opinion of the Court, be included in such notice.

**\*6** Plaintiff's proposed relief, forbidding GM from entering into the agreements that include the release, is inappropriate. First, it is not warranted by the potential abuses. Requiring that notice be provided is sufficient to cure any potential unknowing waivers. There is no way to completely eliminate the potential for coercion in the relationship between GM and its dealers. Courts cannot simply interpose themselves in the business relationship between a franchisor and its franchisees each time a franchisee files a putative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1035132 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

Page 5

class action against the franchisor. Notifying the dealers in this action, and their ability to communicate with counsel and participate in the action, should, however, provide a reasonable measure of protection. Second, prohibiting GM from entering into further agreements would infringe upon GM's freedom of speech and upon GM's ability to conduct its business. The cases upon which plaintiff largely relies for its proposed remedy, *Hawkins v. Holiday Inns, Inc.,* No. C-72-217, 1978 U.S. Dist. LEXIS 20083 (W.D.Tenn. Jan. 18, 1978), and *In re Int'l House of Pancakes Litig.,* No. 77, 1972 U.S. Dist. LEXIS 14958, (W.D.Mo. Feb. 24, 1972), are inapposite. Both cases predate *Gulf Oil* and may not comply with its requirements. Furthermore, *Hawkins* relies upon findings that the defendant intentionally coerced potential class members by requiring them to sign releases if they wished to have their franchise agreements renewed, continued, or modified or if they desired extra time to cure any default under the franchise agreements. 1978 U.S. Dist. LEXIS 20083, at *1- *2. Plaintiff provides no comparable evidence here. Instead, GM requires the execution of releases only for potential class members who desire payments above and beyond what they are entitled to under their dealer contracts with GM. In addition, the *Hawkins* court upheld the execution of releases if they were negotiated with proper counsel, meaning either class counsel for class members or other lawyers for potential class members who opted out. Here, since plaintiff has not, to date, moved for class certification, no dealer has been afforded the opportunity to opt out. It would be unfair to require every dealer to use plaintiff's counsel to negotiate a release simply because plaintiff has not yet sought to have the class certified. At most, *Hawkins* would counsel the Court to require that GM only obtain releases from dealers who have consulted with *some* attorney. *International House of Pancakes* barred the defendant from repurchasing franchises, with or without a release, because the issues in the case were simple, trial would end within the calendar year, reviewing the many releases would be burdensome on the court, and the court did not believe that the defendant should be able to negotiate individual settlements with class members. Here, the issues are complex, this case will not be tried this year (or probably even next), only fifteen releases have been executed to date, no class has been certified, and the Second Circuit has held that defendants may negotiate individual settlements prior to certification of a class. *Christensen v. Kiewit-Murdock Inv. Corp.,* 815 F.2d 206, 213 (2d Cir.1987); *Weight Watchers v.*

*Weight Watchers Int'l, Inc.,* 455 F.2d 770, 773 (2d Cir.1972). For all of these reasons, barring GM from obtaining releases is unwarranted.

*7 The Court declines at this time to void the releases that have already been executed. First, GM calls into question the Court's authority to do this (Def.'s Mem. at 15); Ralph Olds does not confront this issue in its reply. Second, even if the Court has the authority to void the releases, no dealer that has signed a release has asked the Court to void its release. Third, there is nothing in the record indicating, one way or the other, what most of the dealers who signed the releases did or did not know about this action. The only dealer as to whom the Court has specific information is former plaintiff John Martin Motors, and it would be difficult to find that a former named plaintiff entered into an unknowing waiver. Fourth, even if a dealer knew nothing about this action when it signed the release, that dealer might wish to ratify the release even after it learns of this action. The appropriate solution is to include in the notice to potential class members a statement to the effect that the Court will consider an application to void a release made by any dealer who signed such a release prior to receiving the notice. That way, dealers will have been advised of their rights; any dealer who wishes to seek to void its release can submit papers; the Court can consider this issue with knowledge of the applicable facts and law; and any dealer who wishes to settle will be able to maintain its release.

### III. Conclusion

For the reasons set forth above, the motion is granted in part and denied in part. Specifically, the Court finds that: GM's communications with potential members of the putative class warrant remedial action under Fed.R.Civ.P. 23; the specific relief requested by Ralph Olds is not warranted; to prevent potential abuse, notice must be sent, at GM's expense, to potential members of the putative class, providing them with the information indicated above; and any potential member of the putative class who has already signed a release must be afforded an opportunity to apply to the Court to have that release voided. The parties shall attempt to agree upon a notice, which shall be subject to the Court's approval and which may be provided to dealers. In the event that the parties are unable to agree within 30 days of this order, the Court shall issue an order including the language of the appropriate notice.
SO ORDERED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1035132 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**


S.D.N.Y.,2001.
Ralph Oldsmobile, Inc. v. General Motors Corp.
Not Reported in F.Supp.2d, 2001 WL 1035132
(S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2006 WL 1084556 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

**c**
Sipas v. Sammy's Fishbox, Inc.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Ginutis SIPAS, et al., Plaintiffs,
v.
SAMMY'S FISHBOX, INC, et al., Defendants.
No. 05 Civ. 10319(PAC).

April 24, 2006.

*MEMORANDUM OPINION & ORDER*
CROTTY, J.
*1 Plaintiffs, current and former parking lot attendants at lots servicing Defendants' restaurants on City Island, Bronx, New York (" City Island " ), filed this " wage-and-hour" claim under the Fair Labor Standards Act of 1938 (" FLSA " ), 29 U.S.C. § 201 *et seq* ., and New York Labor Law on December 8, 2005. Plaintiffs seek unpaid minimum wages and " spread of hour" wages for days worked in excess of ten hours pursuant to the FLSA, and return of gratuities confiscated by Defendants in violation of New York Labor Law § 196-d. (First Am. Compl. ¶¶ 1-2.) Plaintiffs Ginutis Sipas and Thomas Otero also seek back pay and liquidated damages because Defendants allegedly terminated their employment in retaliation for their retaining counsel in this action.

Defendants, five corporate entities and one individual, own and operate five seafood restaurants on City Island, for whose benefit the parking lots at which Plaintiffs work are operated. (*Id.* ¶ 18-22.) Defendant Samuel Chernin (" Chernin " ) is the President and majority shareholder of all of the Defendant corporate entities. (*Id.* ¶ 13.) Claiming not to own the lots at which restaurant patrons parked, Defendants filed a Third-Party Complaint on February 8, 2006 against certain named individuals that Defendants allege own the lots and employ the Plaintiffs.

After multiple amendments to the parties' pleadings, Plaintiffs now move to proceed as a collective action pursuant to Section 216(b) of the FLSA. The only question raised by Plaintiffs' motion is whether Plaintiffs have set forth sufficient facts establishing that the named Plaintiffs and potential collective

action Plaintiffs are " similarly situated." The Court finds that they have made this showing, and accordingly allows this case to proceed as a collective action.

DISCUSSION

Section 216(b) of the FLSA authorizes an employee to sue his employer for unpaid overtime compensation and liquidated damages on behalf of himself and other " similarly situated" employees. 29 U.S .C. § 216(b). Unlike a Rule 23 class action, in which potential plaintiffs must opt out of the action in order not to be bound by the final settlement or judgment, employees must opt in to an FLSA collective action by filing a written consent. *Id.* To facilitate the opt-in process, a court has the discretion to authorize notification to " similarly situated" potential plaintiffs and to direct an employer defendant to disclose the names and addresses of those potential plaintiffs. *See Patton v. Thompson Corp.,* 364 F.Supp.2d 263, 266 (E.D.N.Y.2005) (quoting *Hoffman-La Roche, Inc. v. Sperling,* 493 U.S. 165, 169 (1989) and *Braunstein v. Eastern Photographic Labs., Inc.,* 600 F.2d 335, 336 (2d Cir.1979)); *accord Masson v. Ecolabs, Inc.,* No. 04 Civ. 4488(MBM), 2005 WL 2000133, at *13 (S.D.N.Y. Aug. 17, 2005); *Vaicaitiene v. Partners in Care, Inc.,* No. 04 Civ. 9125, 2005 WL 1593053, at *2 (S.D.N.Y. July 6, 2005). This Circuit encourages the sending of notice to " similarly situated" individuals, as doing so " comports with the broad remedial purpose of the [FLSA], ... as well as with the interest of the courts in avoiding multiplicity of suits." *Braunstein,* 600 F.2d at 336; *see also Hoffman v. Sbarro, Inc.,* 982 F.Supp. 249, 262 (S.D.N.Y.1997) (" [C]ourts have endorsed the sending of notice early in the proceeding, as a means of facilitating the FLSA's broad remedial purpose and promoting efficient case management." ).

*2 The requirements of Rule 23 of the Federal Rules of Civil Procedure do not apply to the certification of a collective action under the FLSA. Therefore, " no showing of numerosity, typicality, commonality and representativeness need be made." *Masson,* 2005 WL 2000133, at *13 (quoting *Foster v. Food Emporium,* No. 99 Civ. 3860, 2000 WL 1737858, at *1 (S.D.N.Y. Apr. 26, 2000)). At this prediscovery stage in the litigation, the inquiry " is less stringent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 2
Not Reported in F.Supp.2d, 2006 WL 1084556 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

than the ultimate determination that the class is properly constituted." *Masson,* 2005 WL 2000133, at *13 (quoting *Jackson v. New York Tel. Co.,* 163 F.R.D. 429, 431 (S.D.N.Y.1995)). " The burden on plaintiffs is not a stringent one, and the Court need only reach a preliminary determination that potential plaintiffs are ' similarly situated." ' *Hoffman,* 982 F.Supp. at 261. Plaintiffs meet this burden by ' making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law.' ' *Id.; see also Heagney v. European Am. Bank,* 122 F.R.D. 125, 127 (E.D.N.Y.1988) (noting that the plaintiffs need show only " some identifiable factual nexus which binds the named plaintiffs and potential class members together as victims of a particular alleged discrimination" ). Thus, " the merits of plaintiffs' claims need not be evaluated nor discovery be completed in order for such a notice to be approved and disseminated." FN1 *Masson,* 2005 WL 2000133, at *13.

> FN1. If the Court finds this minimal burden satisfied, the court may conditionally certify the class. Later in the litigation, after the bulk of discovery is complete, the defendant may move to " decertify" the collective action. *See Masson,* 2005 WL 2000133, at *14. The " similarly situated" question is then revisited, but this time based on the more complete record produced through discovery. *See id.* If the Court finds that the plaintiffs are not similarly situated, the Court will decertify the collective action and the claims of the opt-in plaintiffs will be dismissed before trial. *Id.* If the Court finds that the plaintiffs are similarly situated, the collective action will proceed to trial. *Id.* Because Plaintiffs move for certification before discovery, only the first phase of the inquiry applies at this time.

Plaintiffs have met their minimal burden. The Plaintiffs Complaint and supporting Affidavits tell the following story: FN2 The eight named Plaintiffs all work (or previously worked) as parking attendants at lots located on City Island that serviced Defendants seafood restaurants. Their primary responsibility was to park and retrieve cars for patrons of Defendants' restaurants. All the Plaintiffs were required to wear the same uniforms, attend the same semi-annual meetings to discuss problems with parking operations, and answer to the same supervisors. In addition, all the Plaintiffs received no hourly wages and were compensated solely through tips, and all the Plaintiffs who remained in Defendants employ after June 2004 were required to pay Defendants $5.00 per shift, out of their tips.

> FN2. All facts are culled from Plaintiffs' First Amended Complaint, Affidavit of Plaintiff Ginutis Sipas, Affidavit of Plaintiff Vytautas Sipas, and Affidavit of Plaintiff David Marquez.

Further, Plaintiffs' Affidavits allege that " approximately seventy-five other individuals," not including the named Plaintiffs, worked in the same capacity, as parking attendants at the identified lots on City Island, since approximately August 1, 1999. At this early stage, there is no evidence of record to suggest that these seventy-five other individuals were treated differently than the named Plaintiffs. Thus, the Court finds that the named Plaintiffs have demonstrated a factual nexus between their situation and the situation of other current and former parking attendants at the subject lots sufficient to make a preliminary determination that they are all " similarly situated."

*3 Defendants argue that the Court should not certify a collective action because Defendants never employed any of the Plaintiffs or owned the parking lots at which the Plaintiffs worked. (Chemin Decl. ¶¶ 15, 17, 19.) Rather, the subject parking lots were operated as a " partnership" by the Third-Party Defendants, and neither Chernin nor the restaurant Defendants had any role in employing or supervising the Plaintiffs.

Of course, Plaintiffs vigorously dispute Defendants' lack of ownership, arguing that Defendant Chernin owned the parking lots at issue and employed the Plaintiffs to work in them as attendants. In fact, Plaintiffs allege that Chernin, in his capacity as the owner and operator of the Defendants' restaurants, required the Plaintiffs " to purchase uniforms bearing the name and logo" of his restaurants, called occasional meetings to discuss parking operations, instructed the Plaintiffs on how to carry out their duties, and provided food to Plaintiffs free of charge during shifts. (Pls.' Affs. ¶ 9-15.) Further, Plaintiffs produce New York City Department of Finance records listing Chernin as the record owner of the lots. (Menken Reply Decl., Exs. B & C.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 1084556 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Based on this record, there is substance to Plaintiffs' allegations of employment and ownership of the parking lots. Defendants are free to, and certainly will, contest these allegations, but at this early stage these factual disputes cannot serve as the basis for denying conditional certification of Plaintiffs' collective action.

CONCLUSION

Plaintiffs' request to proceed as a collective action for purposes of their claims under the FLSA is hereby GRANTED.[FN3]

> FN3. As Defendants correctly state in their opposition papers, the New York Labor Law and New York Minimum Wage Act do not contain a mechanism similar to the collective action. In order to proceed on behalf of similarly situated employees on a claim under New York law, Plaintiffs must first seek class action certification under Rule 23. *See, e.g., Scholtisek v. Eldre Corp.,* 229 F.R.D. 381, 391-95 (W.D.N.Y.2995); *Brzychnalski v. Unesco, Inc.,* 35 F.Supp.2d 351, 353-354 (S.D.N.Y.1999). The motion before the Court sought only collective action status, and not certification as a class. Therefore, to the extent that Plaintiffs wish to proceed as a class action for purposes of their claims under New York law, Plaintiffs must bring a new motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(3).

To facilitate notice to potential members who may wish to opt in, the Defendants are ORDERED to immediately disclose to Plaintiffs the names, last-known addresses and telephone numbers of each individual who has worked as a parking attendant at the lots on City Island, Bronx, New York, from August 1, 1999 through the present.[FN4] If Defendants do not have such information, they are ORDERED to affirmatively identify the individual(s) in possession of this information and provide their names and addresses to Plaintiffs.

> FN4. While the Court recognizes that the statute of limitations for FLSA actions is ordinarily two or three years, *see* 29 U.S.C. § 255, the Court does not currently have enough facts to rule out equitable tolling.

*See Jacobsen v. Stop & Shop Supermarket Co.,* No. 02 Civ. 5915, 2004 WL 1918795, at *2 (S.D.N.Y. Aug. 27, 2004).

Plaintiffs proposed collective action notice is APPROVED. Plaintiffs are permitted to mail said notice to the individuals required to be disclosed by Defendants and to publish said notice in such local newspapers as determined by Plaintiffs.

S.D.N.Y.,2006.
Sipas v. Sammy's Fishbox, Inc.
Not Reported in F.Supp.2d, 2006 WL 1084556 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2001 WL 845000 (S.D.N.Y.), 6 Wage & Hour Cas.2d (BNA) 1881

(Cite as: Not Reported in F.Supp.2d)

C

Zhao v. Benihana, Inc.
S.D.N.Y.,2001.

United States District Court, S.D. New York.
Lixin ZHAO, n behalf of herself and all others
similarly situated, Plaintiffs,
v.
BENIHANA, INC., Defendant.
No. 01 Civ. 1297(KMW).

May 7, 2001.

Karl J. Stoecker, for Plaintiffs.
Dornbush Mensch Mandelstam & Schaeffer, LLP, J.
Cody Fitzsimmons, Richard Schaeffer, for
Defendant.

Before: Hon. KIMBA M. WOOD, District Judge.

Decision

WOOD, J.
*1 THE COURT: All right, I am going to go ahead
and rule.

In ruling, I rely on the parties' briefing, the affidavits
of Ms. Zhao and Mr. Yuhara, and the copy of the
disciplinary warning given to Ms. Zhao by Mr.
Yuhara on July 13, 1997. I have determined that
expedited notice is appropriate to the other servers at
the West 56th Street location for the reasons I am
about to explain.

It is well settled that the Court has discretion to
authorize the sending of notice to potential class
members in a collective action brought pursuant to
Section 216(b) of the Fair Labor Standards Act. See
Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165
(1989); Braunstein v. Eastern Photographic
Laboratories, Inc., 600 F.2d 335, 336 (1978).

The FLSA provides that employers may take a tip
credit against the wages of a " tipped employee" by
paying them a slightly lower hourly wage, provided
that:

" such employee has been informed by the employer
of the provisions of [the law] and ... all tips received
by such employee have been retained by the

employee, except that this subsection shall not be
construed to prohibit the pooling of tips among
employees who customarily and regularly receive
tips." 29 U.S.C. Section 203(m).

It is undisputed that Benihana took a tip credit against
its servers at the West 56th Street location. Plaintiff, a
former server, claims that the tip credit was unlawful
because (1) servers were not informed of the
applicable provisions of law; and (2) tip sharing was
overseen and enforced by management and tips were
shared with employees who do not " customarily and
regularly" receive tips (kitchen helpers). At this
stage of the proceedings, plaintiff seeks to send class
notice to the other servers at the West 56th Street
location.

The threshold issue in deciding whether to authorize
class notice in an FLSA action is whether plaintiff
has demonstrated that potential class members are "
similarly situated." See 29 U.S.C. Section 216(b). To
meet this threshold, plaintiff must make a " modest
factual showing sufficient to demonstrate that she and
potential plaintiffs together were victims of a
common policy or plan that violated the law." See
Jackson v. New York Telephone Company, 163
F.R.D. 429, 431 (S.D.N.Y.1995); see also Realite v.
Ark Restaurants Corp., 7 F.Supp.2d 303, 307
(S.D.N.Y.1998) (collecting cases). The Court need
only reach a preliminary determination that potential
plaintiffs are similarly situated; the inquiry is " less
stringent than the ultimate determination that the
class is properly constituted." See Jackson, 163
F.R.D. at 431. I find that plaintiff meets this light
standard.

I first examine whether plaintiff and the potential
plaintiffs were alleged victims of a " common policy
or plan," and I find that they were. Plaintiff has
offered a copy of a warning notice for " disorderly
conduct," signed by Mr. Yuhara, the manager of the
restaurant, admonishing plaintiff for taking to the
restroom before going to the cashier's booth, and
telling her she must take tips straight to the cashier's
booth, stating that tips " belong not only to her but to
other employees as well."

*2 Have I correctly read the word " her" ? I was
assuming that very faint word is H-E-R.
MR. FITZSIMMONS: I believe you have, your

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2

Not Reported in F.Supp.2d, 2001 WL 845000 (S.D.N.Y.), 6 Wage & Hour Cas.2d (BNA) 1881

(Cite as: Not Reported in F.Supp.2d)

Honor.

THE COURT: This statement suggests that management oversaw and helped enforce the tip policy in place at the West 56th Street location. The Court finds further evidence of a restaurant-wide tip policy in the affidavit of Mr. Yuhara, who described " tip handling practices engaged in by the employees of the Restaurant" in terms that make it clear that the employees at the West 56th Street location followed a standard and rigid tipping policy. (Yuhara Affidavit Paragraphs 6 to 11.) This evidence meets the threshold for a " modest factual showing" that the servers at West 56th Street were similarly situated in terms of the tip policy. I reiterate here that I have not determined that class certification is appropriate, only that class notice should proceed. *See Realite, 7 F.Supp.2d at 309.*

I next consider whether plaintiff has alleged that this common policy or plan violates the law. I need not evaluate the merits of plaintiff's claims; like the defendants in *Kreuger v. New York Telephone Co., 1993 WL 276058 (S.D.N.Y. July 21, 1993),* defendant here " seeks to contest the merits of plaintiff's claims more vigorously than is necessary at this stage." As in *Kreuger,* plaintiff's allegations and supporting affidavits " successfully engage defendant's affidavits to the contrary" for purposes of the present motion." *Id.* (citing *Sperling v. Hoffmann-La Roche, Inc., 118 F.R.D. 392, 407 (D.N.J.1988).*

Plaintiff alleges that a portion of her tips were given to ineligible employees in violation of the tip credit provisions of the FLSA. According to plaintiff, she was required to place the tips she received in a locked box that was opened only in the presence of a chef and that the chef took about 50 percent of these tips and proceeded to share a portion of these tips with the kitchen helpers, that is, a portion of the chef's portion of the tips.

I find that plaintiff has provided sufficient evidence of a mandatory tip pool that included ineligible employees. Mr. Yuhara concedes that he disciplined plaintiff-at the behest of a chef-for what he characterized as violating the tip agreement between the servers and the chefs (Yuhara Affidavit Paragraph 25; and Disciplinary Warning); Mr. Yuhara's active involvement in policing the tip policy suggests that management either instituted or adopted the tip sharing agreement as a matter of restaurant policy and that the tip pool was therefore not voluntary. This

is sufficient evidence to " engage" defendant's alternative explanations and supporting affidavits-which argue, indeed, that the chefs voluntarily gave some of their tips to the kitchen helpers-and to warrant class notice.

I agree with defendant that plaintiff has provided scant evidence that the servers as a group were not informed of the necessary FLSA law; plaintiff relies solely on her " best knowledge" to allege that members of the potential class failed to receive proper notice of the tip credit. Nevertheless, I note that one of the policy reasons underlying early class notice is that " the experiences of other employees may well be probative of the existence vel non" of an unlawful practice, " thereby affecting the merits of the plaintiff's own claims." *Frank v. Capital Cities Communications, Inc., 88 F.R.D. 674, 676 (S.D.N.Y.1981).* Because class notice is appropriate on the unlawful tipping pool portion of plaintiff's claims, and because it will be relatively easy to determine whether any servers who opt into the class were informed of the tip credit, it seems most expeditious to allow notice of this claim to proceed at this stage.

*3 For these reasons, I conclude that notice to other potential class members is appropriate.

I am now ready to discuss the form of the class notice. Have you conferred on this and reached a consensus?

MR. FITZSIMMONS: We have not, your Honor.

THE COURT: All right. Let me urge you to do that and I will come back down as soon as you are ready.

MR. FITZSIMMONS: Thank you, your Honor.

MR. STOECKER: Thank you, your Honor.

(Recess)

THE COURT: Please have a seat, counsel. Have you had a chance to confer?

MR. STOECKER: Yes, we have, your Honor.

THE COURT: All right, who would like to report?

MR. STOECKER: I would be pleased to report.

There are two issues that we haven't been able to reach agreement on. One is a sort of mundane issue as to whether we should have a return envelope with the address of the court for people to place the consent form into.

Initially, we had them mailing the consents back to my office. We changed that to the " Clerk of the

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 845000 (S.D.N.Y.), 6 Wage & Hour Cas.2d (BNA) 1881

(Cite as: Not Reported in F.Supp.2d)

Court" to remove any ambiguity as to when notices were mailed back to me and to-

THE COURT: Why would there be ambiguity if they are postmarked?

MR. STOECKER: Well, I don't think there would be, but technically the statute of limitations is cut off when the notice is filed with the court. So, as the defendant's counsel correctly pointed out, that places my office in the middle, exposes me to getting them back and down to the court immediately. So it probably is better. And in *Schwed* they went to the court, as well.

THE COURT: OK.

MR. STOECKER: I guess our only question is how do we address the envelopes such that they get properly processed by the Clerk's office.

THE COURT: We are talking about how many envelopes?

MR. STOECKER: I don't know how many people we are talking about exactly.

MR. FITZSIMMONS: Your Honor, I think we are talking about 10 to 12 to serve, or something along those lines.

THE COURT: So you are wondering how to address them?

MR. STOECKER: Yes.

THE COURT: The Clerk of the Court, then in re this case, I suppose.

MR. STOECKER: OK.

THE COURT: With the docket number.

MR. STOECKER: OK. Right on the envelope itself?

THE COURT: On the envelope, that should have the docket number and then on the sheet of paper, I suppose.

MR. STOECKER: OK. And there is a dispute as to whether we even include envelopes with the mailing. I believe they should be included.

THE COURT: Any precedent?

MR. STOECKER: I don't know of any one way or the other, your Honor.

MR. FITZSIMMONS: Your Honor, my only response to that is that in the *Schwed* case, there is no indication that there was a self-addressed or, excuse me, an addressed envelope included in the packet, it was just the consent form and the notice of pendency of action form.

THE COURT: If I have no precedent to guide me and we are talking about 10 to 12 people, I would include return envelopes.

*4 MR. STOECKER: Yes, your Honor.

The only other issue, your Honor, is with respect to the language in the notice regarding retaliation-

THE COURT: All right, what page is this?

MR. STOECKER: On page 4 and 5 of the proposed notice.

THE COURT: OK.

MR. STOECKER: We have agreed, I think, that we should leave in the first two sentences of the first paragraph, and then after the words " You should know that employers are not permitted to retaliate against you," we have inserted the additional words " in any fashion if you decide to join this action," and then strike out the remainder of that paragraph.

THE COURT: This is what plaintiff proposes?

MR. STOECKER: No, this is what we have agreed upon.

THE COURT: Agreed. OK. So you have agreed in the second sentence of that paragraph, you are going to add the words " in any fashion" after the word " you" in line 4.

MR. STOECKER: That is correct.

THE COURT: The first word " you," and then you are going to strike the remainder of that paragraph?

MR. STOECKER: Right, after the conclusion of that sentence.

THE COURT: All right. And what about the next paragraph?

MR. STOECKER: That's where the dispute centers, your Honor. Based upon my conversations with the plaintiff, I think there is a generalized fear among the employees that there will be retaliation if they join the suit. The plaintiff I believe is in her 30s and she was one of the youngest employees there. So her feeling is that many of them think that they will not be able to get another job if they lose this job; so they are very concerned about any kind of retaliation.

I don't want them to know that they have a right without a means of effectuating it. So I simply say if you think there is a problem, contact my office, rather than having them worry about, you know, well, who do I see, where do I go if I'm retaliated against, do I have to pay an attorney. If they have a problem, they can call my office. That's why I wanted to have the language in the last paragraph in there. That's what the defendant's counsel objects to.

THE COURT: May I hear defense counsel?

MR. FITZSIMMONS: Thank you, your Honor.

I don't exactly know what the basis is for the plaintiff's counsel's claim that they have a fear of retaliation. But I do know that even given that, the very first two sentences address that head on. They say those of you currently employed by Benihana may naturally be concerned whether you will be able

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 845000 (S.D.N.Y.), 6 Wage & Hour Cas.2d (BNA) 1881

(Cite as: Not Reported in F.Supp.2d)

to, you know, continue in your jobs, and it says that you should know that employers are not permitted to retaliate against you in any fashion.

I don't know how it could be any clearer than that, your Honor, and to say anything further would really be along the lines of soliciting retaliation claims against the company if you go on to say if you feel you have been retaliated against, you should contact and then have a lawyer's name and office there. That is too suggestive and does amount to solicitation of retaliation claims.

*5 THE COURT: There is another possible approach, which is if you believe that Benihana has discriminated against you for purposes of participating in this lawsuit, you should promptly contact the court. You could leave it there if you are worried about solicitation.

MR. FITZSIMMONS: If your Honor is inclined to do that, that would be fine. I would just note that in the *Schwed* case it simply points out that an employer is not permitted to retaliate and it doesn't say anything further.

THE COURT: All right. I take Mr. Stoecker's point on this issue, and so I will substitute the word " court" for " The Law Offices of Karl J. Stoecker," and I'm going to give them a number to call at court here, Mr. Paul Robilotti. Court: Courtroom Deputy Paul Robilotti, and then at 212-805-0125.

All right, any other issues on the notice?

(Pause)

MR. FITZSIMMONS: Nothing that I don't think we can resolve amongst ourselves, your Honor.

THE COURT: OK. Just so it is clear, since you are putting it in final form, what I have done is strike " The Law Offices of Karl J. Stoecker," and I have replaced that with Court: Courtroom Deputy Paul Robilotti at 212-805-0125.

Now, I will need to see a final copy of this before it is disseminated, but I will approve it as soon as you send it to me.

MR. STOECKER: OK.

THE COURT: OK. Thank you very much.

MR. STOECKER: Thank you.

MR. FITZSIMMONS: Thank you, your Honor.

MR. SCHAEFFER: Thank you, your Honor.

S.D.N.Y.,2001.

Zhao v. Benihana, Inc.

Not Reported in F.Supp.2d, 2001 WL 845000

(S.D.N.Y.), 6 Wage & Hour Cas.2d (BNA) 1881

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.